FILED

STATE OF NORTH CAROLINA    APR 23   IN THE GENERAL COURT OF JUSTICE
                           SUPERIOR COURT DIVISION
COUNTY OF NEW HANOVER   NEW HANOVER CTY. C.S.C.   FILE NO. 19-CVS-_____

BY _____

| | |
|---|---|
| NEIGHBORHOOD NETWORKS PUBLISHING, INC. and N2 FRANCHISING, LLC, <br>          Plaintiffs <br><br>          v. <br><br> JACQUELINE MARIE LYLES and LIFESTYLE PUBLICATIONS, LLC, <br>          Defendants | VERIFIED COMPLAINT AND MOTIONS FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION |

Neighborhood Networks Publishing, Inc. and N2 Franchising, LLC (collectively, "N2"), by and through their attorneys, complain against Jacqueline Marie Lyles ("Lyles") and Lifestyle Publications, LLC ("Lifestyle") as follows:

## NATURE OF THE CASE

1.      Neighborhood Networks Publishing, Inc. ("N2 Publishing") owns and publishes magazines, *inter alia*, designed to focus on communities and neighborhoods. N2 Franchising, LLC ("N2 Franchising") franchises the opportunity to publish these publications. Lyles was an N2 franchisee, commonly called an "Area Director," operating in the Atlanta, Georgia, area. She and N2 were parties to a Franchise Agreement. The Franchise Agreement gave Lyles access to certain confidential and proprietary information provided by N2 to its Area Directors. In exchange for this information, Lyles agreed to not compete with N2 and to not solicit N2's customers for 24 months after the expiration, termination, or transfer of her Franchise Agreement. Notwithstanding this prohibition, Lyles transferred her franchise and then began working for Lifestyle in an identical role and in the same community. She began using knowledge gained in her role with N2 to compete with N2 and solicit its customers in the area where she previously had worked.

**A TRUE COPY**
CLERK OF SUPERIOR COURT
NEW HANOVER COUNTY
BY: *Charlotte A. Ramey*
Deputy Clerk of Superior Court

2.    In her role as Area Director, Lyles had access to two of N2's confidential and proprietary software systems: N2 Portal and PubManager. N2 Portal is the cloud-based software system N2's Area Directors use to, among other things, manage advertiser contact information, advertising contracts and orders, and advertiser payment information. N2's PubManager is the cloud-based software system that Area Directors use, among other reasons, to upload and manage files containing articles and customer advertisements for publication in N2's magazines. PubManager is hosted on N2's servers located in Raleigh, North Carolina. Access to both N2 Portal and PubManager require a unique username and password, which Lyles had as an Area Director. Once Lyles transferred her franchise, the Franchise Agreement obligated her to halt use of N2 Portal and PubManager. Even so, Lyles repeatedly used her unique username and her password to access both N2 Portal and PubManager to, *inter alia*, review client contact records, client payment records, and N2 content. Upon information and belief, Lyles did so to steal clients and content from N2 for Lifestyle's benefit.

3.    In this Complaint, N2 alleges claims for breach of contract, misappropriation of trade secrets, unfair and deceptive trade practices, constructive trust, computer trespass, fraudulent misrepresentation and concealment, and injunctive relief.

## PARTIES AND JURISDICTION

4.    N2 Publishing and N2 Franchising are affiliated Delaware entities authorized to do business in North Carolina, with their corporate headquarters and principal places of business located in Wilmington, North Carolina.

5.    N2 Publishing owns and publishes, as relevant here, community and neighborhood magazines circulated across the country ("N2 Publications"). One of the N2 Publications is a community magazine circulated in Atlanta, Georgia's Peachtree Battle neighborhood entitled *Peachtree Battle Living*.

2

6.    Upon information and belief, Lyles is a citizen and resident of Atlanta, Georgia. Between on or about February 1, 2016, and August 31, 2018, Lyles was an Area Director.

7.    Lyles' relationship with N2 was governed by a Franchise Agreement. The Franchise Agreement set out Lyles' rights and obligations related to Atlanta's Peachtree Battle community. A true and accurate copy of the Franchise Agreement is attached to this Complaint as **Exhibit A** and incorporated herein by reference.

8.    Upon information and belief, Lifestyle is a Missouri limited liability company that conducts business in the State of North Carolina.

9.    Lifestyle is engaged in the community publication business and competes directly with N2.

10.    Lifestyle's website indicates that Lifestyle publishes magazines in the North Carolina communities of Asheville, Charlotte, Cary, and Greensboro.

11.    This Court has both jurisdiction over the subject matter of and parties to this action.

12.    Venue is proper in New Hanover County.

## FACTUAL ALLEGATIONS

### *N2 Operates in a National, Competitive Market*

13.    The residential community publication business is competitive and operates on both the local and national level for companies like N2.

14.    N2 currently owns and publishes around 900 different community publications, which are published in 47 states.

15.    N2 currently has about 800 Area Directors who facilitate publication of N2 Publications and sell advertising for those publications.

16.    Businesses advertise in N2 Publications because they effectively target residents of affluent neighborhoods and communities.

3

17.     N2 strategically recruits Area Directors throughout the United States. It has successfully attracted and retained these Area Directors based on the Company's success, support, and strong compensation.

18.     N2 invests considerable time and resources developing its Area Directors. N2 provides these Area Directors with extensive and commercially valuable training, which is key to its operations and continued growth.

19.     N2 requires Area Directors to enter into, among other things, confidentiality and non-competition covenants before N2 will provide training or share information about its unique business model. These covenants are necessary to ensure and maintain the safety of N2's confidential, proprietary, and commercially valuable business information.

20.     N2's confidential, proprietary, and commercially valuable business information includes, among other things:  publication rates, costs, and pricing methodology; advertising targets, rates, and pricing methodology; sales and marketing strategies; publication management strategies, including editing, layout, and supply-chain management; strategic plans for growth into new territories; and compilation of business information (collectively, "Confidential Information and Trade Secrets").

21.     N2 also requires Area Directors to enter into non-solicitation covenants.

22.     Area Directors receive extensive training on establishing and fostering social communities, and communicating with local businesses to sell advertising. N2 provides Area Directors with "scripts" for marketing N2 Publications advertising options to local businesses. N2 also provides information on neighborhoods that it has already identified as targets.

23.     N2 gives its Area Directors access to multiple electronic systems, which N2 uses to conduct business.

24.     Two such systems are "N2 Portal" and "PubManager."

4

25.    N2 Portal is a cloud-based software system that Area Directors use to manage and process customer advertising contracts and orders, as well as to store and process payment information (such as e-checks and credit cards) for N2's advertising customers.

26.    PubManager is the cloud-based software system that Area Directors use, among other reasons, to upload and manage files containing articles and customer advertisements for publication in N2's magazines. PubManager is hosted on N2's servers located in Raleigh, North Carolina. Any access or use of PubManager from any electronic device, regardless of the user's physical location, necessarily takes place within the server located in Raleigh, North Carolina.

27.    Both N2 Portal and PubManager require Area Directors to use a unique login and secure password to access and use the system, and both systems also contain information, data, and records that constitute Confidential Information and Trade Secrets. As an Area Director, Lyles had access to the N2 Portal and PubManager.

### Lyles as an Area Director

28.    Beginning on or about February 1, 2016, Lyles was an N2 Area Director in Atlanta's Peachtree Battle community. Using N2's training, know-how, and software systems, Lyles was responsible for facilitating the publication of, and selling advertising for, *Peachtree Battle Living*. Lyles' assigned territory is described more particularity in Attachment B to the Franchise Agreement (the "Territory"). (*See* Exhibit A p 28.)

29.    As an Area Director, Lyles entered into a confidentiality and non-competition covenant. (*See* Exhibit A, § 7 A and B.) For a period of 24 months after the Franchise Agreement's expiration, termination, or transfer (the "Non-Compete Period"), Lyles agreed to not compete—directly or indirectly—with N2 or to engage in any capacity in a "Competitive Business," as defined under the Franchise Agreement, within the Territory, within a 15 mile radius around the

5

perimeter of the Territory; or within a 15-mile radius around the perimeter of the territory of any other Area Director.

30. Lyles also agreed to a non-solicitation agreement. (*See* Exhibit A, § 7 C.) The non-solicitation agreement was effective for 24 months following the expiration, termination, or transfer of the Franchise Agreement. It prohibited Lyles from soliciting business, directly or indirectly, from N2's customers or clients (including residential communities and advertisers).

31. Under the Franchise Agreements, N2 paid Lyles a monthly commission, which was calculated, in part, based on the amount of revenue actually received by N2 from businesses that had purchased advertising in *Peachtree Battle Living*.

32. In her role as an Area Director, Lyles was responsible for using the N2 Portal to enter billing and payment information for N2 advertisers that had purchased advertising in *Peachtree Battle Living*. She also used PubManager to upload content for publication in *Peachtree Battle Living*.

*Lyles Ends Her Relationship with N2*

33. On or about August 31, 2018, Lyles sold her franchise to William Craig O'Neal ("O'Neal"). A true and correct copy of the Transfer Agreement and Consent ("Transfer Agreement") is attached to this Complaint as **Exhibit B**, and N2 incorporates it by reference.

34. N2, as the franchisor, consented to the Transfer Agreement.

35. As a result of the Transfer Agreement, O'Neal became the Area Director for the Territory.

36. Despite no longer being an Area Director, Lyles worked with O'Neal from approximately September 2018 to November 2018 to assist in the publication of *Peachtree Battle Living*.

37. Since November 2018, Lyles has not worked with O'Neal or *Peachtree Battle Living* in any capacity.

6

*Lyles Joins Lifestyle to Compete with N2*

38. Despite transferring her Franchise Agreement, Lyles remained bound by the confidentiality and non-competition covenants, as well as the non-solicitation agreement.

39. Notwithstanding these restrictions, after ending her affiliation with N2, Lyles began employment with Lifestyle. Lifestyle actively competes with N2 throughout the United States generally, North Carolina, and in the Territory more specifically.

40. Lyles now solicits advertisements for several Lifestyle magazines, including *BuckHaven Lifestyle, Perimeter North Lifestyle, Johns Creek Lifestyle*, and *Alpharetta Lifestyle* (collectively, "Lifestyle Publications"). Upon information and belief, each Lifestyle Publication targets affluent neighborhoods in the Atlanta metropolitan area.

41. Upon information and belief, one or more Lifestyle Publications services the Territory. As a result, Lyles competes with and solicits customers of N2 within the Territory.

42. In addition, since November 2018, up to and including March 27, 2019, Lyles made unauthorized access to and use of N2 Portal and PubManager on multiple occasions.

43. Lyles used N2 Portal to view, among other things, the identity of certain of N2's clients, the nature of the ads that those clients were running, the contact information for certain of N2's clients, and the identity of certain N2 clients who had not yet paid N2 for the period of January to April 2019.

44. For example, during the period from on or about February 23, 2019, up to and including March 27, 2019, Lyles used N2 Portal to view the identity of 11 of N2's clients and the ads that those clients were running.

7

45.     Lyles accessed N2 Portal to gather information about N2's current clients. Upon information and belief, it was her goal to target those clients and to solicit their business away from N2 for the benefit of Lifestyle.

46.     Lyles used PubManager to, *inter alia*, search for and view content and proofs related to multiple N2 publications circulated in Buckhead and Peachtree Battle areas of Atlanta.

47.     Lyles accessed PubManager to gather information about N2's current clients and publications. Upon information and belief, it was her goal to target those clients and to solicit their business away from N2 for the benefit of Lifestyle.

48.     Upon learning of Lyles' repeated, unauthorized use of N2 Portal and PubManager, N2 terminated Lyles' access.

49.     After March 27, 2019, Lyles has tried multiple times to log in to N2 Portal.

50.     On or about March 28, 2019, Lyles used her personal email address (not her Lifestyle email address) to contact N2's Field Support team, which is responsible for providing support services to N2 Area Directors, requesting a copy of an advertisement that N2 had designed and created for one of its advertisers, Cunningham Associates. As part of that request, Lyles stated "I used to work for n2 and 'retired' recently." She did not notify or otherwise inform N2 that she was in fact working with Lifestyle at the time of her request. Attached and incorporated herein by reference as **Exhibit C** is the Affidavit of Kate Silberfeld, a lead person for N2's Field Support team, which Affidavit includes the communication from Lyles requesting the advertising copy for Cunningham Associates.

51.     Lyles was acting as an employee and/or authorized agent of Lifestyle when she made unauthorized use of N2's Portal and PubManager as alleged above.

8

## FIRST CLAIM FOR RELIEF
### *(Breach of Contract as to Defendant Lyles)*

52.    N2 incorporates the preceding paragraphs by reference.

53.    At all relevant times, Lyles was subject to the terms of the Franchise Agreement. (*See* Exhibit A.)

54.    In the Franchise Agreement, Lyles agreed and acknowledged that:

a.    N2's Confidential Information, as defined in the Franchise Agreement, is proprietary to and a valuable trade secret of N2 and that N2 would suffer irreparable loss and harm as a result of any disclosure or unauthorized use;

b.    The unauthorized use of N2's Confidential Information would constitute an unfair method of competition and cause N2 irreparable harm;

c.    She would receive valuable Confidential Information beyond her then-present skills and experience and that such information provided a competitive advantage;

d.    She would not use or disclose N2's Confidential Information for any purpose other than those permitted by the Franchise Agreement;

e.    For the 24-month Non-Compete Period she would not compete with N2 (1) within the Territory, (2) within a 15 mile radius around the perimeter of the Territory; or (3) within a 15-mile radius around the perimeter of the territory of any other Area Director;

f.    She would not, directly or indirectly, solicit business from N2's customers or clients (including residential communities and advertisers), nor engage in any business activities that are the same or similar to those of the Company which is or intended to be located within the Territory;

g.    She would comply with the Franchise Agreement's confidentiality and non-compete covenants, as well as the Franchise Agreement's

9

non-solicitation provision, after the Franchise Agreement's expiration, termination, or transfer; and

        h.      Pay N2 all damages, costs, and expenses, including reasonable attorney's fees, incurred by N2 after to the Franchise Agreement's expiration, termination, or transfer in obtaining injunctive or other relief for the enforcement of the above-identified provisions.

        55.     After executing the Franchise Agreement, Lyles received and benefited from N2's standard training and Confidential Information and Trade Secrets.

        56.     N2 would not have provided such training or information without Lyles having first signed the Franchise Agreement.

        57.     The Franchise Agreement is a valid, binding and enforceable contract between N2 and Lyles.

        58.     The non-competition covenant with Lyles was entered into as part of a contract for her to act as franchisee, and N2 provided consideration to Lyles for such covenant.

        59.     N2 provides publication services to customers and advertisers in the "Territory" identified in Attachment B to the Franchise Agreement, which is generally the community of Peachtree Battle.

        60.     Lyles' above-identified non-competition covenant with N2 protects N2's legitimate and important business interests, including N2's customer relationships, Confidential Information and Trade Secrets, and its business and competitive interests in the marketplace.

        61.     Lyles breached the Franchise Agreement by:

        a.      Taking and using, without N2's authorization, N2's Confidential Information and Trade Secrets for her own use and benefit in furtherance of publishing community magazines that compete directly with N2 Publications;

b. Promoting and publishing, and/or working to promote and publish, competing community magazines in violation of the Franchise Agreement's non-competition covenant;

c. Communicating with an existing N2 advertising customer for the purpose of soliciting advertising business from that N2 customer.

62. As a direct and proximate result of Lyles' breach of the Franchise Agreement, N2 is entitled to monetary damages in excess of $25,000.00 and the injunctive relief prayed for below.

63. Beginning August 31, 2018, Lyles also was subject to the terms of the Transfer Agreement. (*See* Exhibit B.)

64. As part of the Transfer Agreement, Lyles agreed that, following the transfer of her franchise, she would honor "the post-termination obligations set forth in Section 11" of the Franchise Agreement. (*See* Exhibit B p 1.)

65. Under Section 11 of the Franchise Agreement, Lyles was required to "[p]romptly discontinue all use of [N2's] Marks, Copyrighted Materials, and Confidential Information[.]" (Exhibit A p 19.) N2's "Confidential Information" included "software." (Exhibit A p 26.)

66. Lyles breached the Termination Agreement by failing to discontinue her use of N2's confidential and proprietary software system, N2 Portal. On at least two separate occasions between November 2018 and March 2019, Lyles accessed N2 Portal.

67. As a direct and proximate result of Lyles' breach of the Transfer Agreement, N2 is entitled to monetary damages in excess of $25,000.00 and the injunctive relief prayed for below.

## SECOND CLAIM FOR RELIEF
### (*Misappropriation of Trade Secrets*)

68. N2 incorporates the preceding paragraphs by reference.

69. In the course of her work with N2, Lyles was provided access to N2's Confidential Information and Trade Secrets. N2 owns this information; it is of

11

commercial and competitive value to N2; and it is critical in conducting N2's business.

70.     N2 took reasonable precautions under the circumstances to maintain the secrecy of its Confidential Information and Trade Secrets. Those reasonable efforts include, among other things, requiring Lyles to enter into a confidentiality covenant and sharing the information only on a need-to-know basis.

71.     The Confidential Information and Trade Secrets derives independent economic value from being generally unknown to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from the disclosure of N2's Confidential Information and Trade Secrets.

72.     The information described above constitutes trade secrets of N2. Lyles knew or should have known that the information described above, including N2's Confidential Information and Trade Secrets, constitute trade secrets due to Lyles' execution of the Franchise Agreement.

73.     N2 allowed Lyles access to and use of the Confidential Information and Trade Secrets while promoting N2's interests as franchisee subject to the Franchise Agreement, and under such circumstances as to make it inequitable and unjust to disclose it to others or to make use of it herself, all to N2's prejudice and competitive disadvantage.

74.     Lyles has used, and upon information and belief is currently using, N2's Confidential Information and Trade Secrets without N2's express or implied authority or consent.

75.     Upon information and belief, Lyles has disclosed N2's Confidential Information and Trade Secrets to Lifestyle and/or has used N2's Confidential Information and Trade Secrets for Lifestyle's benefit in publication of her new magazine with Lifestyle.

76.     Upon information and belief, Lifestyle has used N2's Confidential Information and Trade Secrets either independently or by and through

12

Lyles, which use has benefited Lifestyle and which use was without any consent or authority given from N2.

77.     The conduct described herein with regard to N2's Confidential Information and Trade Secrets constitutes the misappropriation and threatened misappropriation of N2's Confidential Information and Trade Secrets, and has and will proximately cause damage to N2 for which it is entitled to recover under the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. § 66-152 *et seq.*, and common law. Such damages are to be measured by the economic loss suffered by N2 or the unjust enrichment to Lyles and/or Lifestyle resulting from their misappropriation of N2's Trade Secrets, whichever is greater.

78.     The conduct described herein with regard to N2's Confidential Information and Trade Secrets is wrongful, willful and malicious. Accordingly, N2 is entitled to recover punitive damages, in addition to actual damages and attorney's fees, pursuant to applicable statutes, which is appropriate to vindicate the public interest in making an example of Lyles and/or Lifestyle and in deterring similar wrongful acts.

79.     As a direct and proximate result of these actions, N2 is entitled to monetary damages in excess of Twenty-Five Thousand and No/100 Dollars ($25,000.00) and the injunctive relief prayed for below.

### THIRD CLAIM FOR RELIEF
*(Computer Trespass, N.C. Gen. Stat. § 14-458, as to both Defendants)*

80.     N2 incorporates the preceding paragraphs by reference.

81.     Lyles was authorized to access and use N2's software systems and records in her roles as Area Director.

82.     Between November 2018 and March 2019, Lyles, both individually and in her capacity as an agent of Lifestyle, improperly used her N2 passwords, account login information, and access codes to access N2's computer networks, servers, systems, and data to view, among other things, the identity of certain of N2's clients, the nature of the ads that those clients were running, the

13

contact information for certain of N2's clients, and the identity of certain of N2's clients who had not yet paid N2 for the period of January to April 2019. Such conduct was unauthorized and was for an improper purpose.

83. Lyles had no authority to access N2's computer networks, servers, systems, and data. Her access thus was for an improper purpose and exceeded Lyles' rights.

84. Lyles actions, as fully described above, constitute computer trespass in violation of N.C. Gen. Stat. § 14-453, *et seq.*, in that she accessed a computer or computer network without authority (without right or permission of N2) and for the purpose of: (1) devising or executing a scheme or artifice to defraud; and/or (2) obtaining property.

85. Lyles' actions in violation of N.C. Gen. Stat. § 14-453, *et seq.*, have caused N2 damages, including but not limited to, lost profits.

86. Pursuant to N.C. Gen. Stat. §§ 14-458 and 1-539.2A, N2 is entitled to all damages that are a direct and proximate result of the actions of Lyles and Lifestyle in an amount to be proven at trial, as well as the costs of this action.

## FOURTH CLAIM FOR RELIEF
*(Tortious Interference with Contract as to Lifestyle)*

87. N2 incorporates the preceding paragraphs by reference.

88. The Franchise Agreement was a valid contract between N2, on the one hand, and Lyles, on the other. The Franchise Agreement contained, among other things, a valid non-solicitation agreement and a valid non-competition agreement.

89. Lifestyles was aware of the non-solicitation agreement between N2 and Lyles when Lyles began working for Lifestyle in or around November 2018.

90. Notwithstanding its knowledge, Lifestyle induced Lyles to breach the non-solicitation agreement by assigning her to the Territory and requiring her to solicit N2's advertising customers.

14

91.     Lifestyle's interference with the non-solicitation agreement between N2 and Lyles was not justified.

92.     Lifestyle was aware of the non-competition agreement between N2 and Lyles when Lyles began working for Lifestyle in or around November 2018.

93.     Notwithstanding its knowledge, Lifestyle induced Lyles to breach the non-competition agreement by assigning her to the Territory and engaging her to publish a community magazine.

94.     Lifestyle's interference with the Franchise Agreement between N2 and Lyles was not justified.

95.     As a result of Lifestyle's interference, N2 is entitled to monetary relief in an amount in excess of Twenty-Five Thousand Dollars and 00/100 ($25,000.00) and the injunctive relief prayed for below.

### FIFTH CLAIM FOR RELIEF
*(Unfair and Deceptive Practices, N.C. Gen. Stat. § 75-1.1, as to both Defendants)*

96.     N2 incorporates the preceding paragraphs by reference.

97.     Under N.C. Gen. Stat. § 75-1.1, Defendants' conduct, as described in this Complaint, constitutes unfair methods of competition and unfair or deceptive acts or practices in and affecting commerce, which have and will injure N2.

98.     Defendants' conduct possessed the tendency or capacity to mislead and created the likelihood of deception.

99.     Defendants' conduct was (and is) "in or affecting commerce," as that phrase is defined by N.C. Gen. Stat. § 75-1.1.

100.    As a proximate result of Defendants' unfair or deceptive competitive conduct in and affecting commerce, N2 has suffered actual injury and is entitled to recover compensatory damages against Defendants, jointly and severally, in an amount in excess Twenty-Five Thousand and No/100 Dollars ($25,000.00).

15

101. N2 is entitled to recover against Defendants, jointly and severally, treble its compensatory damages pursuant to N.C. Gen. Stat. §75-16.

102. N2 is entitled to recover its costs and attorney fees pursuant to N.C. Gen. Stat. §75-16.1, in that Defendants conduct was willful and due to their unwarranted refusal to fully resolve the matter prior to litigation.

## SIXTH CLAIM FOR RELIEF
### *(Constructive Trust as to both Defendants)*

103. N2 incorporates the preceding paragraphs by reference.

104. Defendants improperly and unjustly came into possession or control of the property, assets, funds and business opportunities of N2 by using Lyles' position as a former N2 franchisee.

105. Defendants would be unjustly enriched if permitted to retain possession or control of the assets, funds, property and business opportunities appropriated by them.

106. Defendants' wrongful possession and control of N2's assets, funds, property, and business opportunities have deprived N2 of a beneficial interest in those assets, funds, property, and business opportunities to which it is entitled.

107. Equity requires the imposition of a constructive trust on the assets of Defendants that were acquired through the wrongful conduct alleged above, including, not limited to, the use of N2's Confidential Information and Trade Secrets. The constructive trust is required to prevent Defendants from being unjustly enriched by their unfair, anti-competitive and deceptive conduct.

108. N2 is entitled to a constructive trust or equitable lien on all assets of Defendants generated by their diversion and misappropriation of N2's assets, funds, property, and business opportunities.

## SEVENTH CLAIM FOR RELIEF
### *(Fraudulent Misrepresentation/Fraudulent Concealment)*

109. N2 incorporates the preceding paragraphs by reference.

16

110. As set forth fully above, Lyles accessed the N2 Portal and PubManager without disclosing her involvement with Lifestyle.

111. Lyles never informed N2 that her work with O'Neal concluded in November 2018 or that she had started working with Lifestyle.

112. As set forth fully above, Lyles informed N2 that she was "retired" from N2 when she requested advertisement copy for an N2 client, and Lyles intentionally omitted her involvement with Lifestyle in her request to N2 for a copy of the Cunningham Associates advertisement.

113. In her March 2019 communication to N2, Lyles stated that Cunningham Associates had requested a copy of its advertisement with N2. Upon information and belief, Lyles knew at the time of this representation to N2 that the representation was false. In the alternative, to the extent a court of competent jurisdiction determines that Cunningham Associates had requested such advertisement, which is denied, N2 is informed and believes that the representation was fraudulent in its concealment in that Cunningham Associates only wanted the advertisement for use in Defendants' publications through Lifestyle, a fact which Defendants intentionally omitted in Lyles' representation to N2.

114. Upon information and belief, Lyles took the actions described above, including, but not limited to, Lyles request for the Cunningham Associates advertisement, to assist in the publication of a Lifestyle magazine or to bring one or more advertising customers to Lifestyle, such that Lyles was acting for and on behalf of Lifestyle when Lyles took the actions described herein.

115. Despite knowing that Lyles was engaged by Lifestyle in a competing business, Defendants concealed this information to N2 and, upon information and belief, intentionally misled N2 by suggesting Lyles lacked involvement in the publishing business by virtue of being "retired" and by omitting her involvement with Lifestyle.

17

116. The misrepresentations described herein that Defendants made to N2 were false and were provided with the intention of deceiving N2, and did deceive N2.

117. The representations and concealments of Defendants were made for the purpose of inducing, and did induce, N2 to rely on them.

118. N2 reasonably relied upon the misrepresentations and concealments and was induced to provide the Cunningham Associates advertisement to Lyles after Lyles was locked out of the N2 Portal and PubManager.

119. N2 was unable to determine the truth of Lyles' representations because Lyles withheld and did not provide the information to make N2 aware that Lyles was engaged with a competitor.

120. As a direct and proximate result of Lyles' fraudulent misrepresentations, deceit, and concealment, N2 has suffered financial loss and damage, including, but not limited to, the loss of expected and anticipated revenue from advertisers that have been diverted to Lifestyle's publications.

121. On account of the fraudulent misrepresentation, deceit, and concealment, N2 is entitled to recover damages from Defendants, jointly and severally, in an amount to be proved at the trial of this action.

## EIGHTH CLAIM FOR RELIEF
### *(Punitive Damages)*

122. N2 incorporates the preceding paragraphs by reference.

123. As set forth fully above, Defendants acted intentionally, willfully, wantonly, and in reckless disregard of their duties to N2, including defrauding N2 for the purpose of personal gain.

124. These actions warrant the imposition of punitive damages against Defendants, and N2 is entitled to have and recover an award of punitive damages in any amount this Court deems just and proper.

18

## TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF

125. N2 incorporates the preceding paragraphs by reference.

126. Under North Carolina Rule of Civil Procedure 65(b) and Section 1-485 of the General Statutes, N2 is entitled to a temporary restraining order ("TRO"), preliminary injunction, and permanent injunction.

127. N2 moves the Court for a TRO and injunction prohibiting Lyles from: (1) violating her confidentiality and non-competition covenants, including from conducting, operating, or otherwise participating in the business of publishing community magazines or selling advertisements for such publications within the Territory and (2) violating her non-solicitation agreement.

128. N2 further moves the Court for a TRO and injunction prohibiting Defendants from: (1) disclosing or copying N2's Confidential Information and Trade Secrets; (2) destroying, removing, transferring or altering any documents or tangible things, including computer files and other electronic data, relevant to the subject matter of this Complaint; and (3) transferring or disposing of any funds, assets or property, whether tangible or intangible, belonging to N2 under law or equity which Defendants unlawfully diverted from N2.

129. By virtue of the foregoing, N2 has demonstrated a likelihood of success on the merits, and that a balancing of the equities favors the issuance of an injunction against all Defendants.

130. N2 will be irreparably harmed if Defendants are not preliminarily and permanently enjoined from violating the covenants not to compete set forth in the Franchise Agreements, from using N2's Confidential Information and Trade secrets, from destroying documents or tangible things relevant to the subject matter of this Complaint, and from using, transferring or destroying funds to which N2 was entitled.

19

131.   N2 has no adequate remedy at law, and a temporary restraining order and a preliminary injunction are necessary to preserve its rights and the status quo during the pendency of this action.

## DEMAND FOR JURY TRIAL

N2 hereby demands a trial by jury on all issues so triable.

WHEREFORE, N2 prays unto the Court:

1.   That the Court enter a TRO, preliminary injunction, and permanent injunction on the terms outlined above.

2.   That N2 have and recover compensatory damages in an amount in excess of Twenty-Five Thousand and No/100 Dollars ($25,000.00).

3.   That the Court treble N2's damages, where allowed by law. *See* N.C. Gen. Stat. § 75-16.

4.   That the Court award punitive damages in an amount in excess of Twenty-Five Thousand and No/100 Dollars ($25,000.00) to vindicate the public interest in making an example of Lyles and/or Lifestyle and in deterring similar wrongful acts. N.C. Gen. Stat. §§66-154, *et seq.*

5.   That the Court impose a constructive trust for the benefit of N2 on those assets or funds owned, controlled by, or in the custody of Defendants that were procured from N2 or for N2's benefit.

6.   That the Court permanently enjoin misappropriation of N2's Confidential Information and Trade Secrets on the terms outlined above.

7.   That the Court tax the cost of this action, including N2's reasonable attorney's fees and expenses, to Defendants as allowed by law; and

8.   That the Court award N2 such other and further relief as it may deem just and proper.

20

Respectfully submitted, this the 23rd day of April, 2019.

Alexander C. Dale
N.C. State Bar I.D. No.: 028191
email: acd@wardandsmith.com
Christopher S. Edwards
N.C. State Bar I.D. No.: 48385
email: csedwards@wardandsmith.com
Ward and Smith, P.A.
For the firm of
Ward and Smith, P.A.
Post Office Box 7068
Wilmington, NC 28406-7068
Telephone: 910.794.4800
Facsimile: 910.794.4877
Attorneys for Plaintiffs

Case 7:19-cv-00089-BO   Document 1-4   Filed 05/03/19   Page 21 of 82

## VERIFICATION

STATE OF MICHIGAN
COUNTY OF KENT

        MICHAEL MASON, being duly sworn, deposes and says that he is an Agent of NEIGHBORHOOD NETWORKS PUBLISHING, INC., and as such is authorized to make this verification; that he has read the foregoing VERIFIED COMPLAINT, and the same is true of his own knowledge, except as to those matters and things stated on information and belief, and, as to those, he believes them to be true.

        This the 16th day of April, 2019.

_____
Michael Mason

KENT _____ COUNTY, \_\_\_Michigan\_\_\_

Sworn to (or affirmed) and subscribed before me this day by

\_\_\_Michael Mason\_\_\_
*(type/print name of signer)*

Date \_\_\_4-16-19\_\_\_

_____
*Signature of Notary Public*
My commission expires: \_10-29-2024\_

AMYAH JANAE CLARK
NOTARY PUBLIC
Living in Kent County, MI
Acting in \_\_KENT\_\_ County,
My Comm. Expires: 10/29/2024

AMYAH JANAE CLARK
NOTARY PUBLIC
Living in Kent County, MI
Acting in \_\_KENT\_\_ County, MI
My Comm. Expires: 10/29/2024

### N2 FRANCHISING, LLC
### FRANCHISE AGREEMENT

Jacqueline Marie Lyles
_____
**Name of Franchisee**

829 Wesley Drive NW
_____
**Street Address**

Atlanta, GA 30305
_____
**City**      **State**      **Zip Code**

(404) 936-0499
_____
**Telephone**

_____
**Franchisee ID Number**

Form dated: April 5, 2017
FDD dated: April 5, 2017



**N2 FRANCHISING, LLC**
**FRANCHISE AGREEMENT**
**TABLE OF CONTENTS**

1.  GRANT ........................................................................................................................ 1
2.  TERM AND RENEWAL .............................................................................................. 2
3.  FEES ............................................................................................................................ 2
4.  COMMISSIONS .......................................................................................................... 3
5.  FRANCHISEE'S OBLIGATIONS, REPRESENTATIONS, AND WARRANTIES ..... 4
6.  FRANCHISOR'S OBLIGATIONS ............................................................................... 9
7.  CONFIDENTIALITY; NON-COMPETITION; NON-SOLICITATION ..................... 9
8.  USE OF MARKS AND COPYRIGHTED MATERIALS .......................................... 12
9.  TRANSFER AND ASSIGNMENT ............................................................................ 13
10. DEFAULT AND TERMINATION ............................................................................. 14
11. OBLIGATIONS OF FRANCHISEE UPON TERMINATION ................................... 17
12. INSURANCE; INDEMNIFICATION; INDEPENDENT CONTRACTOR ............... 17
13. NOTICES ................................................................................................................... 19
14. APPLICABLE LAW; DISPUTE RESOLUTION ...................................................... 19
15. CONSTRUCTION OF AGREEMENT ...................................................................... 21

STATE SPECIFIC AMENDMENTS

ATTACHMENTS

| | |
|---|---|
| Attachment A | Definitions |
| Attachment B | Territory and Publication Deadline |
| Attachment C | Principals' Undertaking |
| Attachment D | Confidentiality Agreement and Ancillary Covenants Not to Compete |
| Attachment E | Statement of Ownership Interests and Management Information |
| Attachment F | Electronic Funds Transfer Authorization |

-i-

## N2 FRANCHISING, LLC
## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("**Agreement**"), is entered into by and between N2 Franchising, LLC, a Delaware limited liability company ("**Franchisor**"), and Jacqueline Marie Lyles , an Individual ("**Franchisee**"), on October 18, 2017 and will be effective when signed by Franchisor ("**Effective Date**"). Capitalized terms used in this Agreement are defined in Attachment A, hereto, unless otherwise defined herein.

### RECITALS

Franchisor's affiliate operates a business that publishes magazines, newsletters, and/or directories ("**N2 Publications**") for residential communities, cities, towns, and villages (recipients of N2 Publications, "**Community(ies)**").

Franchisor has the right to use and license the use of a system ("**System**") for the establishment and operation of franchised businesses that sell advertising for, and facilitate the publishing of, N2 Publications and that develop Community relationships, all under the Marks ("**Franchised Business**"). The System is identified by certain trade names, service marks, trademarks, logos, emblems and indicia of origin, including, but not limited to, the mark "N2 Publishing" and such other trade names, service marks, trademarks, logos, emblems, and indicia of origin as are now designated, and may hereafter be designated by Franchisor in writing, for use in connection with the System ("**Marks**").

The distinguishing characteristics of the System include, without limitation, specifications, policies and procedures for operations; quality of the products and services offered; procedures for sales, management, and financial control; customer service; training and assistance; and advertising and promotional programs, all of which may be changed, improved, and further developed by Franchisor from time to time.

Franchisee wishes to obtain the right to establish and operate a Franchised Business in the non-exclusive geographic area ("**Territory**") identified in Attachment B to this Agreement, using the Marks and the System.

Franchisor is willing to grant Franchisee a franchise to operate a Franchised Business in accordance with the terms and conditions of this Agreement in reliance on Franchisee's application and Franchisee's representations made in this Agreement.

NOW, THEREFORE, in consideration of the mutual undertakings and commitments set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### AGREEMENT

1.  **GRANT**

    A.    Grant of Rights. Franchisor hereby grants Franchisee the non-exclusive right and license, and Franchisee hereby accepts the right and obligation, to establish and operate the Franchised Business. Franchisee acknowledges and agrees that this Agreement grants Franchisee the right to operate only the Franchised Business and to solicit only Communities located within the Territory set forth in Attachment B. Franchisee must not solicit any Community that is not within Franchisee's Territory without Franchisor's prior written consent. Additionally, Franchisee must not solicit any advertiser (regardless of its location) that is already under an Advertising Contract (defined in Section 5.D.(1)) with Franchisor or any of its affiliates. Franchisee may, however, sell advertising to any advertiser for any N2 Publication as long as such advertiser is not already under an Advertising Contract, regardless of where the advertiser is located.

    B.    Reserved Rights. The rights granted to Franchisee under this Agreement are nonexclusive, and Franchisee is not granted any territorial rights or other protection. Accordingly, Franchisor, its affiliates,

Case 7:19-cv-00089-BO   Document 1-4   Filed 05/03/19   Page 25 of 82

and any other authorized person or entity will, without limitation, have the right (i) to develop and establish other business systems (including systems that distribute products or services similar to those offered by the Franchised Business) using the Marks, or other names or marks, and to grant licenses to use those systems at any location without providing any rights to Franchisee, (ii) to advertise and promote the N2 Publishing business anywhere, (iii) to operate, and license others to operate, any N2 Publishing business or any publishing business of any of Franchisor's affiliates anywhere, including locations that are inside, adjacent to, or surrounded by Franchisee's Territory, and (iv) to engage, directly or indirectly, at wholesale, retail, or otherwise, in the production, distribution, license, and sale of all forms (including electronic forms) of magazines, newsletters, advertising, or other services and products, under the Marks, or under other names or marks, at any location, including in the Territory, through any method of distribution, including, but not limited to, mail order catalogs and the Internet, regardless of the proximity to, or the competitive impact on, the Franchised Business.

  C.  <u>Cross-publication Advertising</u>. Notwithstanding anything to the contrary herein, Franchisee acknowledges and agrees that other persons or entities may sell advertising for Franchisee's N2 Publication(s), provided that such sales comply with the restrictions relating to existing Advertising Contracts set forth in <u>Section 1.A</u>. Persons or entities that make such sales will be paid a commission in the amount of the Cross-selling Fee, and Franchisee's aggregate Commission payment will be reduced by the amount of the Cross-selling Fee. Further, if Franchisee sells advertising for an N2 Publication that is the responsibility of another N2 Publishing franchisee, then Franchisee will be eligible to receive a commission payment for such sale(s), as set forth in the Administration Manual.

## 2.  TERM AND RENEWAL

  A.  <u>Term; Opening Date</u>. The term of this Agreement will begin on the Effective Date and will continue until two years from the Effective Date ("**Term**"), unless terminated earlier in accordance with this Agreement. Franchisee must commence business with the public no later than 60 days after the Effective Date, unless Franchisee obtains a written extension of such time period from N2.

  B.  <u>Renewal</u>. This Agreement and the rights granted by this Agreement are not renewable, and Franchisee has no expectation of any right to extend or renew the Term.

## 3.  FEES

  A.  <u>Initial Franchise Fee</u>. Franchisor hereby waives the initial franchise fee of $570. If this is the second or additional franchise agreement Franchisee is entering into, Franchisee is not required to pay Franchisor an initial franchise fee.

  B.  <u>Additional Samples Fee</u>. Franchisor will provide Franchisee a defined number of Franchisee's N2 Publications each month to be used as samples. If Franchisee requests additional samples, the cost Franchisor or its affiliate incurs to produce such additional samples will be deducted from Franchisee's next Commission payment.

  C.  <u>Adjustment Fee</u>. After Franchisor receives from Franchisee the content to be included in each of Franchisee's N2 Publications, Franchisor or its affiliate will provide Franchisee a proof copy of the N2 Publication(s). If Franchisee requests that Franchisor make any changes to the layout or content of the proof copy, then Franchisee must pay Franchisor or its affiliate the then-current adjustment fee assessed to make such changes, in accordance with Franchisor's then-current adjustment policy, as set forth in the Administration Manual, which Franchisor may change from time to time in its sole discretion.

  D.  <u>Missed Deadline Fee</u>. If Franchisee fails to submit to Franchisor or its affiliate the content required to publish any of Franchisee's N2 Publications by the applicable deadline communicated to Franchisee by Franchisor or its affiliate, then Franchisor reserves the right to require Franchisee pay Franchisor or its affiliate the then-current missed deadline fee, as set forth in the Administration Manual, which Franchisor may change from time to time in its sole discretion.

Case 7:19-cv-00089-BO  Document 1-4  Filed 05/03/19  Page 26 of 82

## 4.   COMMISSIONS

A.      Commission Payments. Franchisor will calculate Commissions on an N2 Publication-by-N2 Publication basis and will pay Franchisee a monthly Commission based on the aggregate of all monthly Commissions earned for each of Franchisee's N2 Publications (if Franchisee manages more than one N2 Publication), unless the calculation of the Commission equals a Negative Commission, in which case, Franchisee will not receive a Commission in such month, and the amount of the Negative Commission will continue to be due and will be deducted from Cash Received in subsequent month(s) as part of the Commission(s) calculation for such subsequent month(s). Franchisor reserves the right to make Commission payments based upon estimates of payments it or its affiliate will receive in connection with Publication and Advertising Contracts (defined below), and it and its affiliate reserve the right to refund, for any reason, payments made by advertisers. Commission payments will be accompanied by a Commissions accounting and reconciliation report. If the Commissions report reflects that Franchisee has been paid a Commission in an amount that is more than Franchisee is due, then Franchisee must return to Franchisor the amount of overpayment ("**Returnable Commissions**").

B.      Returnable Commissions. Franchisee and Principals are jointly and severally liable for, and will return all Returnable Commissions to, Franchisor. Franchisor may deduct the amount of any Returnable Commissions from future Commissions payable to Franchisee hereunder. After the termination or expiration of this Agreement, Franchisor will notify Franchisee and Principals of any Returnable Commissions, and Franchisee and Principals will have 15 days to return such Returnable Commissions to Franchisor. Franchisee and Principals acknowledge that any failure by Franchisee or Principals to return any Returnable Commissions to Franchisor within 15 days after any such notice is a breach of this Agreement for which Franchisor may pursue all legal and equitable remedies that may be available to it, including termination of this Agreement. If Franchisee fails to pay Returnable Commissions as required herein, and Franchisor elects, in its sole discretion, to pursue payment of any Returnable Commissions in collection, then Franchisee and Principals agree to pay such collection costs in addition to the Returnable Commissions owed. This Section 4.B. will survive the expiration or termination of this Agreement.

C.      Content Submission Deadlines and Commission Payment Dates. Upon execution of this Agreement, Franchisor will, in its sole discretion, assign Franchisee a monthly deadline for advertising and content submission. The deadline will be set forth in Attachment B, and Commissions, if any, will be paid to Franchisee within 30 days following Franchisee's assigned deadline.

D.      Electronic Funds Transfer. At Franchisor's request, Franchisee will execute Attachment F to this Agreement and all other documents necessary to permit Franchisor to credit or debit funds into Franchisee's designated bank account by electronic funds transfer ("EFT") in the amount of the Commission payments described in Section 4.A. and any other amounts due under this Agreement at the time such amounts become due and payable under the terms of this Agreement. Upon written notice to Franchisee, Franchisor may designate another method of payment.

E.      Taxes. Franchisee and Franchisor agree that Franchisor will not withhold, deduct, or pay income tax, social security, or any other payroll or other taxes or amounts for Franchisee's benefit or for the benefit of any and all personnel hired by Franchisee, including but not limited to, employees, contractors, subcontractors, or agents ("**Independent Staff**"). Franchisee is solely responsible for filing all tax returns, tax declarations, and tax schedules, and for the payment of all taxes as required by law, including without limitation, local, state, and federal income taxes, Social Security taxes, Medicare taxes, unemployment compensation taxes, and any other federal, state, or local taxes, fees, or withholdings due for Franchisee. Franchisee is responsible for withholding, accruing, and paying all income, Social Security, Medicare, unemployment compensation taxes, and any other federal, state, or local taxes, fees, or withholdings relating to all Independent Staff, if any, as well as all statutory insurance and other benefits required by law for Franchisee and Independent Staff and all other benefits promised to the Independent Staff by Franchisee, if any.

3

F. National Ads. Franchisor has the right, but not the obligation, to place national or regional advertisements or advertising inserts that have been solicited and obtained by Franchisor or a third party, without Franchisee's involvement, in each N2 Publication in the size and format as determined by Franchisor in its sole discretion and at Franchisor's sole expense ("**National Ads**"). Franchisee has no right to review and/or approve the form or content of such National Ads. Franchisor may, but is not required to, pay Franchisee a commission with respect to any National Ad. If Franchisor elects to pay Franchisee a commission for any particular National Ad, such commission will be paid in accordance with Franchisor's then-current National Ad commission policy, as set forth in the Administration Manual, and the amount of such commission may be calculated in a different manner than the calculation of Commissions under Section 4.A., in Franchisor's sole discretion. If any additional incremental expenses are incurred by Franchisor due to the placement of National Ads, and Franchisor does not pay Franchisee a commission for such placements, the additional incremental expenses resulting from the National Ad(s) in such N2 Publication will not be included in Publication Expenses for purposes of calculating Franchisee's commission.

5. **FRANCHISEE'S OBLIGATIONS, REPRESENTATIONS, AND WARRANTIES**

A. Standards Compliance. To protect the reputation and goodwill of Franchisor and to maintain the high standards of operation under the Marks, Franchisee must conduct its business in accordance with the Administration Manual, other written directives which Franchisor may issue to Franchisee from time to time, and any other manuals and materials created or approved for use in the operation of the Franchised Business. Franchisee acknowledges and agrees that following System standards and maintaining uniformity among all N2 Publishing businesses is important. Franchisee further acknowledges and agrees that local conditions or other special circumstances may warrant a deviation from System standards, and Franchisor may, in its reasonable judgment, allow such deviation.

B. Approved Products and Services. Franchisee must offer only the products and services that have been expressly approved for sale in writing by Franchisor; Franchisee must discontinue offering any products or services which Franchisor may, in its sole discretion, disapprove in writing at any time; and Franchisee must refrain from deviating from Franchisor's standards and specifications without Franchisor's prior written consent.

C. Approved Suppliers. Franchisee must comply with all of Franchisor's requirements relating to the purchase of products, supplies, and/or services used or offered by Franchisee's N2 Publishing business and if required, must purchase such items and/or services from suppliers approved by Franchisor, including without limitation payroll processing and insurers. Franchisee acknowledges and agrees that Franchisor may change the number of approved suppliers or distributors at any time and may designate itself, an affiliate, or a third party as the exclusive source for any or all items or services. If Franchisee desires to purchase, lease, or use any products, services, or other items from an unapproved supplier, Franchisee must submit to Franchisor a written request for such approval, or must request the supplier itself to make such request. Franchisee must not purchase or lease from any supplier until and unless such supplier has been approved in writing by Franchisor. Franchisor has the right to require that its representatives be permitted to inspect the supplier's business premises and that samples from the supplier be delivered, if applicable, either to Franchisor or to an independent laboratory designated by Franchisor, for testing. A charge, not to exceed the cost of the inspection and of the test (including Franchisor's administrative costs attributable to both), must be paid by Franchisee or the supplier. Franchisor reserves the right, at its option, to re-inspect from time to time the business premises and products of any such approved supplier and to revoke its approval upon the supplier's failure to continue to meet any of Franchisor's then-current criteria. Nothing in the foregoing will be construed to require Franchisor to approve any particular supplier. Franchisee's failure to comply with the provisions of this Section 5.C. will be deemed a material breach under this Agreement.

4

D.   Training.

(1)   Franchisee must successfully complete, as Franchisor determines, Franchisor's initial training program prior to commencing operations of the Franchised Business. Franchisee and any other personnel of Franchisee whom Franchisor may designate (for purposes of brand standards compliance and communications), must attend and complete any remedial or additional training that Franchisor may from time to time require. Initial training is provided at no additional charge to Franchisee, but Franchisee is responsible for all other costs, such as transportation, lodging, meals, wages, and other travel-related expenses.

(2)   If Franchisor requires, or if Franchisee requests additional or remedial training, attendees of additional or remedial training may be required to pay Franchisor's then-current rate for such additional or remedial training or tuition/attendance fees charged by other third-party providers of such training. Franchisee is responsible for all of its costs associated with training, including without limitation transportation, lodging, other travel-related costs, and wages. Training will be conducted at locations and using the methods designated by Franchisor.

E.   Management and Promotion of the Franchised Business. The Principal named in Attachment E, hereto, must personally supervise and devote full-time attention to the day-to-day operations and management of the Franchised Business. Franchisee must diligently promote the sale of, and stimulate interest in, advertising in the N2 Publication that Franchisee manages, however Franchisee must not agree, represent, or warrant to any advertiser that such advertiser will have any exclusive advertising rights and/or protection from competing advertisers. In promoting the N2 Publication(s), Franchisee must:

(1)   Solicit contracts for N2 Publications within Franchisee's Territory ("**Publication Contracts**") and for advertising in such N2 Publications from advertisers ("**Advertising Contracts**") (Publication Contracts and Advertising Contracts, collectively, "**Publication and Advertising Contracts**"), quoting prices and terms set by Franchisor or its affiliate (or otherwise approved by Franchisor in writing), and using the form contracts provided by Franchisor or its affiliate. To the fullest extent permitted by applicable law, Franchisor and/or its affiliate reserve the right to establish maximum, minimum, or other pricing requirements with respect to Publication and Advertising Contracts. All Publication and Advertising Contracts must be between Franchisor or its affiliate and the Community or advertiser, as applicable, and Franchisee will not be a party to, or a third-party beneficiary of, any such Publication or Advertising Contract. Additionally, all fees and amounts payable under the Publication and Advertising Contracts must be paid directly to Franchisor or its affiliate or their designee, as applicable, in accordance with the terms thereof, and Franchisee must not accept any payments from any advertiser or Community, nor will Franchisee make payments on behalf of any Community or advertiser for any reason. Franchisor may terminate this Agreement for Franchisee's failure to comply with the requirements set forth in this Section 5.E.(1).

(2)   Forward to Franchisor or its affiliate all Publication and Advertising Contracts which have been executed by the Community or advertiser, as applicable, for review, approval, and execution by Franchisor or its affiliate no later than 30 days after such Publication and Advertising Contracts have been executed by the Community or advertiser, as applicable, and enter all Publication Advertising Contracts into the accounting system (Portal) designated by Franchisor within seven days from the date of sale; and

(3)   For each Campaign, and for each N2 Publication that Franchisee manages: (a) complete at least three Qualified Sales or maintain an average Commission payment of at least $3,000; (b) for each month of each Campaign, include the number of neighborhood-specific articles required in the Administration Manual; and (c) sponsor the number of networking events required in the Administration Manual. A "**Campaign**" is a four-month period starting in January of each year, and a "**Qualified Sale**" is the sale of a new advertising contract that has a term of at least 12 months and generates Cash Received of at least $150 per month.

5

F.     Participation in Strategic Partner Arrangements. Franchisor or other N2 Publishing franchisees may, from time to time, establish one or more national or regional accounts with N2 Publishing advertisers that may be located in, or have offices, branches, or some other presence in Franchisee's Territory ("**Strategic Partners**"). Franchisor may, at its discretion, permit Franchisee to call on Strategic Partners in an effort to sell advertising to Strategic Partners in Franchisee's N2 Publishing publications. If Franchisee attempts to sell advertising to a Strategic Partner, Franchisee must strictly comply with all of Franchisor's or its affiliate's requirements relating to such relationships, including honoring any pricing arrangement agreed to between Franchisor or its affiliate and each Strategic Partner. Franchisor reserves the right to designate, at any time, any of Franchisee's advertisers as a Strategic Partner.

G.     Participation in Conferences. Franchisor may, but is not required to, offer, host, or arrange for national and/or regional conferences to be held one or more times each year. If Franchisor requires Franchisee's attendance at such conferences, then Franchisee will attend and pay all related travel and attendance costs, which may include an attendance fee.

H.     Office; Equipment. Franchisee may operate the Franchised Business from any facility it chooses, which may be Franchisee's home. Franchisee's office must be located within a radius of 50 miles from the perimeter of Franchisee's Territory. Franchisor does not provide Franchisee any assistance in locating an office. Franchisee must acquire and use any computer (including tablets) and software for the operation of the Franchised Business that Franchisor requires, including any enhancements, additions, substitutions, modifications, upgrades, and specific models or versions ("**Devices**"). Franchisor may also require Franchisee to license from Franchisor, or others Franchisor designates, any computer software Franchisor develops or acquires for use in connection with the Franchised Business and pay the associated fee. If Franchisor provides Franchisee with any Device(s), Franchisor reserves the right to maintain complete access, at all times, to such Devices without Franchisee's permission, and Franchisee must provide Franchisor all passwords and other login credentials at Franchisor's request.

I.     Disclosure and Franchisee's Investigation of this Franchise.

(1)     Franchisee acknowledges having received a complete copy of this Agreement and all related attachments and exhibits and a complete copy of Franchisor's franchise disclosure document required by the Federal Trade Commission's Franchise Trade Regulation Rule (16 C.F.R. Part 436) within the time period required by applicable law before Franchisee executed this Agreement or paid any consideration to Franchisor. Franchisee acknowledges that it did not rely on any promises, representations, or agreements about the system, business, or franchise not expressly contained in this Agreement or Franchisor's franchise disclosure document in making its decision to sign this Agreement. Franchisee acknowledges that Franchisor and its representatives have not made any promises, representations, or agreements, oral or written, except as expressly contained in this Agreement and the franchise disclosure document. Franchisee further acknowledges that Franchisee has read this Agreement and Franchisor's franchise disclosure document and that Franchisee understands the terms of this Agreement and accepts them as being reasonably necessary for Franchisor to maintain the uniformity of N2 Publishing businesses and to protect the goodwill of the Marks and the integrity of the System.

(2)     Franchisee has conducted an independent investigation of the business contemplated by this Agreement and recognizes that an investment in the Franchised Business involves business risks; that Franchisee's success is largely dependent on Franchisee's abilities and efforts; and that the nature of the Franchised Business may change over time. Franchisee has not received or relied on any guaranty or assurance, express or implied, as to the revenues, profits, or success of the business contemplated by this Agreement.

(3)     Franchisee understands and agrees that Franchisor may operate and change the System and Franchisor's business in any manner that is not expressly and specifically prohibited by this Agreement. Without limitation of the foregoing, Franchisee acknowledges that the products and services to

6

be offered by Franchisee may be supplemented, improved, or otherwise modified from time to time by Franchisor.

(4)    Whenever Franchisor has expressly reserved in this Agreement, or is deemed to have a right and/or discretion to take or withhold an action, or to grant or decline to grant Franchisee a right to take or withhold an action, then except as otherwise expressly and specifically provided in this Agreement, Franchisor may make its decision or exercise its right and/or discretion on the basis of Franchisor's judgment of what is in Franchisor's best interests, including, without limitation, Franchisor's judgment of what is in the best interests of Franchisor's franchise network at the time Franchisor's decision is made or Franchisor's right or discretion is exercised, without regard to whether: (a) other reasonable alternative decisions or actions could have been made by Franchisor; (b) Franchisor's decision or the action Franchisor takes promotes its financial or other individual interest; (c) Franchisor's decision or the action Franchisor takes applies differently to Franchisee and one or more other franchisees or Franchisor's company-owned operations; or (d) Franchisor's decision or the exercise of Franchisor's right or discretion is adverse to Franchisee's interests. In the absence of an applicable statute, Franchisor will have no liability to Franchisee for any such decision or action. Franchisor and Franchisee intend that the exercise of Franchisor's right or discretion will not be subject to limitation or review. If applicable law implies a covenant of good faith and fair dealing in this Agreement, Franchisor and Franchisee agree that such covenant will not imply or impute any rights or obligations that are inconsistent with a fair construction of the terms of this Agreement and that this Agreement grants Franchisor the right to make decisions, take actions, and/or refrain from taking actions not inconsistent with Franchisee's rights and obligations hereunder.

J.    Organization. If Franchisee is a corporation, partnership, limited liability company, or other legal entity, Franchisee represents and warrants the following:

(1)    Franchisee is duly organized and validly existing under the laws of the state of its formation;

(2)    Franchisee is duly qualified and is authorized to do business in each jurisdiction in which its business activities or the nature of the properties owned by it require such qualification;

(3)    Franchisee's corporate charter or written partnership or limited liability company agreement will at all times provide that the activities of Franchisee are confined exclusively to the operation of the Franchised Business;

(4)    The execution of this Agreement and the performance of the transactions contemplated hereby are within Franchisee's corporate power, if Franchisee is a corporation, or if Franchisee is a partnership or a limited liability company, are permitted under Franchisee's written partnership or limited liability company agreement and have been duly authorized by Franchisee; and

(5)    Franchisee has provided to Franchisor prior to the execution of this Agreement, and will from time to time during the Term of this Agreement at Franchisor's request provide to Franchisor, copies of Franchisee's articles of incorporation and bylaws or, as applicable, Franchisee's written partnership or limited liability company agreement, other governing documents, any amendments to them, resolutions authorizing Franchisee's entry into and performance of this Agreement, and any certificates, buy-sell agreements, or other documents restricting the sale or transfer of Franchisee's stock or other ownership interests and any other documents that Franchisor may reasonably request.

K.    Ownership; Principals' Undertaking.

(1)    If Franchisee is a corporation, partnership, limited liability company, or other legal entity, the ownership interests in Franchisee are accurately and completely described in Attachment E. If Franchisee is a corporation, Franchisee will maintain at all times a current list of all owners of record and all beneficial owners of any class of voting securities in Franchisee or, if Franchisee is a partnership, limited

7

liability company, or other form of legal entity, Franchisee will maintain at all times a current list of all owners of an interest in the partnership, limited liability company, or other entity. Franchisee will make its list of owners available to Franchisor upon request.

(2)     If Franchisee is a corporation, Franchisee will maintain stop-transfer instructions against the transfer on its records of any of its equity securities and each stock certificate representing stock of the corporation will have conspicuously endorsed upon it a statement in a form satisfactory to Franchisor that it is held subject to all restrictions imposed upon assignments by this Agreement. If Franchisee is a partnership or limited liability company, its written partnership or limited liability company agreement will provide that ownership of an interest in the partnership or limited liability company is held subject to all restrictions imposed upon assignments by this Agreement.

(3)     The Principals that Franchisor designates are set forth in <u>Attachment E</u> and must sign the Principal's Undertaking, <u>Attachment C</u> to this Agreement.

L.     <u>Legal Compliance</u>. In addition to complying with Franchisor's obligations under this Agreement, Franchisee will comply with all applicable federal, state, and local laws, rules, regulations, ordinances, and orders. Such laws, rules, regulations, ordinances, and orders vary from jurisdiction to jurisdiction and may be amended or implemented or interpreted in a different manner from time to time. It is Franchisee's sole responsibility to apprise itself of the existence and requirements of all such laws, rules, regulations, ordinances, and orders and to adhere to them at all times during the Term of this Agreement. Without limiting the foregoing, Franchisee certifies that neither Franchisee nor any of Franchisee's Principals, employees, or anyone associated with Franchisee is listed in connection with any Anti-Terrorism Law (including, but not limited to, the Annex to Executive Order 13224 (The Annex is available at (http://www.treasury.gov/resource-center/sanctions/Programs/Pages/Programs.aspx), and Franchisee agrees not to hire or have any dealings with a person so listed. Franchisee further certifies that Franchisee has no knowledge or information that, if generally known, would result in Franchisee, Franchisee's Principals, employees, or anyone associated with Franchisee being so listed. Franchisee agrees to comply with and/or assist Franchisor to the fullest extent possible in Franchisor's efforts to comply with the Anti-Terrorism Laws and, in connection with such compliance, Franchisee represents and warrants that none of Franchisee's property or interests are subject to being "blocked" under any of the Anti-Terrorism Laws and that Franchisee and Franchisee's Principals are not otherwise in violation of any of the Anti-Terrorism Laws. Franchisee is solely responsible for ascertaining which actions it must take to comply with all Anti-Terrorism Laws, and Franchisee specifically acknowledges and agrees that its indemnification responsibilities as provided in this Agreement pertain to its obligations under this <u>Section 5.L.</u> Any misrepresentation by Franchisee under this <u>Section 5.L.</u> or any violation of the Anti-Terrorism Laws by Franchisee, its Principals, or employees will constitute grounds for immediate termination of this Agreement and any other agreement Franchisee has entered into with Franchisor or any of its affiliates.

M.     <u>Powers of Attorney</u>. Franchisee hereby appoints Franchisor as Franchisee's true and lawful attorney-in-fact, with full power and authority to assign to Franchisor upon the termination, expiration, or transfer of this Agreement all rights to any telephone number(s) and any business listings related to or associated with the Franchised Business. Such power of attorney will survive the expiration or termination of this Agreement, and Franchisee agrees to execute such forms and documents as Franchisor deems necessary to appoint Franchisor as Franchisee's true and lawful attorney-in-fact with full power and authority for the foregoing purposes. Franchisor will not assume any obligations for costs or expenses related to such telephone number(s) that accrued prior to the date on which Franchisor acquired the telephone number(s).

N.     <u>No Competing Interests</u>. Franchisee warrants and represents that neither Franchisee nor any of its affiliates nor Principals own, operate, or have any financial or beneficial interest in any business that is the same as or similar to an N2 Publishing business; nor are bound by any confidentiality,

8

non-disclosure, non-competition, and/or non-solicitation agreement(s) such that entering into this Agreement will violate such agreement(s).

O.     Continuing Obligations. Franchisee and Franchisee's Principals make the foregoing representations, warranties, and covenants understanding that such representations, warranties, and covenants are continuing obligations. Franchisee agrees to cooperate with Franchisor to verify Franchisee's and Franchisee's Principals' continuing compliance with such representations, warranties, and covenants. Any failure to comply with these representations, warranties, and covenants will constitute a material event of default under this Agreement.

P.     Performance by Delegate. Franchisee acknowledges and agrees that any rights or duties of Franchisor may be exercised and/or performed by any of Franchisor's affiliates, designees, agents (who may be an unaffiliated third party), or employees.

Q.     Submission of Information. Franchisee must provide Franchisor information relating to the Franchised Business as Franchisor may reasonably require and in the manner Franchisor requires.

6.     **FRANCHISOR'S OBLIGATIONS**

Franchisor agrees to provide, or cause to be provided, the following to Franchisee:

A.     Administration Manual. During the initial training program and for the Term of this Agreement, access to the Administration Manual, either in paper and/or electronic form.

B.     Software Programs. For a reasonable fee, any Software Programs that Franchisor acquires or develops for use in the System; provided, that Franchisor is under no obligation to develop or acquire such Software Programs.

C.     Operational Advice. Ongoing advice and written materials, as Franchisor deems necessary in its sole discretion, concerning techniques for managing and operating the Franchised Business.

D.     Approved Products, Services, and Suppliers. From time to time, as Franchisor deems appropriate, a list of approved products, services, and suppliers.

E.     Training. An initial training program for Franchisee and additional training as determined by Franchisor.

7.     **CONFIDENTIALITY; NON-COMPETITION; NON-SOLICITATION**

A.     Non-Disclosure of Confidential Information. Franchisee and Principals agree that the Confidential Information is solely owned by Franchisor and this Agreement does not grant to Franchisee or any Principal any rights in or to the Confidential Information. Franchisee and Principals further agree that the use or duplication of any of the Confidential Information in any other business would constitute an unfair method of competition. Franchisee and Principals acknowledge that Franchisor desires to maintain the confidentiality of the Confidential Information and is making it available to Franchisee for the sole purpose of Franchisee using the Confidential Information in connection with the operation of the Franchised Business under the terms and conditions of this Agreement. Franchisee and Principals further acknowledge and agree that the Confidential Information is proprietary to and a valuable trade secret of Franchisor and that any disclosure or unauthorized use thereof will cause irreparable loss and harm to Franchisor. In consideration of the opportunity to obtain access to the Confidential Information, Franchisee and each Principal hereby agree as follows:

(1)     Not to use the Confidential Information for their own use or for any other purpose except to carry out the obligations of Franchisee pursuant to the terms this Agreement and not to disclose the Confidential Information, except (a) as may be required by law, or (b) to counsel, accountants, and other professional representatives of Franchisee or Principals. In the event Franchisee, any Principal, or any persons who were disclosed the Confidential Information become legally compelled (by deposition, interrogatory, request for documents, subpoena, civil investigative demand, or similar process) to disclose any of the

9

Confidential Information, Franchisee and Principals will provide Franchisor with prompt prior written notice of such requirement so that Franchisor may seek a protective order or other appropriate remedy and/or waive compliance with the terms hereof. In the event that such protective order or other remedy is not obtained, or that Franchisor waives compliance with the provisions hereof, Franchisee and Principals agree to furnish only that portion of the Confidential Information which Franchisee and/or Principals are advised by written opinion of counsel is legally required and exercise best efforts to obtain assurance that confidential treatment will be accorded such Confidential Information;

        (2)     To ensure that all counsel, accountants, and other representatives of Franchisee and/or Principals who are given access to the Confidential Information on behalf of Franchisee or Principals comply with the confidentiality provisions of this Agreement. Franchisee and each Principal are, jointly and severally, fully responsible for any breach of this Agreement by any person to whom access to the Confidential Information is given by Franchisee, Principals, or their representatives;

        (3)     Not to make copies of the Confidential Information; and

        (4)     Upon termination or expiration of this Agreement, promptly return to Franchisor all Confidential Information and all copies thereof.

        B.     Noncompetition. Franchisee and Principals represent that they are not currently working with or for, and that they are not currently engaged in any capacity, by any individual, organization, or company that conducts a business similar to or competitive with any N2 Publishing business that is the same as or similar to any type of N2 Publication that provides informational publications to neighborhoods, residential communities, homeowners' associations (HOAs), and other similar groups or informational publications to any specific commercial or professional industry or group (collectively, **"Consumers"**), including any business or group that provides newsletters, magazines, periodicals, Websites, or any similar media to any Consumer (**"Competitive Business"**). Franchisee and each Principal specifically acknowledge that they will receive valuable Confidential Information beyond their present skills and experience and that such Confidential Information provides a competitive advantage. In consideration for gaining access to such Confidential Information, Franchisee and Principal agree that:

        (1)     During the Term of this Agreement, neither Franchisee nor any Principal will engage in any capacity, by any individual, organization, or company, in any Competitive Business at any location within the United States, its territories or commonwealths, or any other country, province, state, or geographic area in which Franchisor or its affiliates have used, sought registration of, or registered the Marks or similar marks or operated or granted others the right to operate a business (including other N2 Publishing franchisees) under the Marks or similar marks; and

        (2)     For a period of 24 months immediately following the expiration, termination, or transfer of this Agreement (**"Non-Compete Period"**), neither Franchisee nor any Principal will compete, directly or indirectly, with Franchisor (or its successors and assigns) or engage in any capacity, by any individual, organization, or company, in any Competitive Business within the Territory; within a 15-mile radius around the perimeter of the Territory; or within a 15-mile radius around the perimeter of the territory of any other N2 Publishing franchisee, directly or indirectly, through any type of sales person or agent. Without limiting the foregoing whatsoever, during the Non-Compete Period, neither Franchisee nor any Principal will, directly or indirectly, solicit business from Consumers, Communities, clients (including advertisers) of Franchisor or of any other N2 Publishing franchisee (within the geography defined above), nor engage in any business activities that are the same as or similar to those of Franchisor or its franchisees.

        C.     Non-solicitation. During the Term of this Agreement, and for a period of 24 months immediately following the expiration, termination, or transfer of this Agreement, Franchisee and Principals will not, directly or indirectly, employ or seek to employ, any person who is employed by or under contract with Franchisor or any of its affiliates or by any N2 Publishing franchisee, or directly or indirectly induce any such person to leave his or her employment or position without first obtaining the written consent of

Case 7:19-cv-00089-BO   Document 1-4   Filed 05/03/19   Page 34 of 82

Franchisor or such other employer. Likewise, during the Term of this Agreement and for a period of 24 months immediately following expiration, termination, or transfer of this Agreement, Franchisee and Principals will not have direct or indirect communications for the purpose of soliciting advertising with any N2 Publishing customers that Franchisee has obtained as a result of Franchisor's Confidential Information.

D.   Reasonableness of Covenants. Franchisee and Principals agree that the preceding covenants contain reasonable limitations as to time, geographical area, and scope of activity to be restrained and do not impose a greater restraint than is necessary to protect the goodwill or other business interests of Franchisor. Each of the covenants herein will be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Section 7. is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which Franchisor is a party, Franchisee and Principals expressly agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Section 7. Franchisee and Principals further understand and agree that Franchisor will have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Section 7., or any portion thereof, without Franchisee's or Principals' consent, effective immediately upon notice to Franchisee or Principals, and Franchisee and Principals agree that they will promptly comply with any covenant as so modified. The time periods set forth in this Section 7. will be tolled for any period of noncompliance.

E.   Improvements. If Franchisee, Franchisee's employees, or Principals develop any new concept, process, or improvement in the operation or promotion of the Franchised Business ("Improvement"), Franchisee agrees to promptly notify Franchisor and provide Franchisor with all necessary related information, without compensation. Any such Improvement will become Franchisor's sole property, and Franchisor will be the sole owner of all related patents, patent applications, and other intellectual property rights. Franchisee and Franchisee's Principals hereby assign to Franchisor any rights Franchisee or they may have or acquire in the Improvements, including the right to modify the Improvement, and waive and/or release all rights of restraint and moral rights therein and thereto. Franchisee and Franchisee's Principals agree to assist Franchisor in obtaining and enforcing the intellectual property rights to any such Improvement in any and all countries and further agree to execute and provide Franchisor with all necessary documentation for obtaining and enforcing such rights. Franchisee and Franchisee's Principals hereby irrevocably designate and appoint Franchisor as Franchisee's and their agent and attorney-in-fact to execute and file any such documentation and to do all other lawful acts to further the prosecution and issuance of patents or other intellectual property right related to any such Improvement. In the event that the foregoing provisions of this Section 7.E. are found to be invalid or otherwise unenforceable, Franchisee and Franchisee's Principals hereby grant to Franchisor a worldwide, perpetual, non-exclusive, fully-paid license to use and sublicense the use of the Improvement to the extent such use or sublicense would, absent this Agreement, directly or indirectly, infringe Franchisee's or their rights therein.

F.   Remedies. Franchisee and Principals agree that the obligations in this Section 7. are necessary and reasonable in order to protect Franchisor and expressly agree that monetary damages would be inadequate to compensate Franchisor for any  breach of any covenant or agreement set forth herein. Accordingly, Franchisee and Principals agree and acknowledge  that any such violation or threatened violation will cause irreparable injury to Franchisor for which no  adequate remedy at law may be available and that, in addition to any other remedies that may be available, in law, in equity, or otherwise, Franchisor is entitled to obtain injunctive relief and  specific performance against Franchisee and/or Principals for the threatened breach of this Section 7. or the continuation of  any such breach, without proof of actual damages and without the posting of any bond. Franchisee and Principals further  agree to pay all court costs and reasonable attorneys' fees incurred by Franchisor in  connection with the enforcement of this Section 7., including payment of all costs and expenses  for obtaining  injunctive relief or any other remedy available to Franchisor for any violation of the requirements of this Section 7.

11

G.     Execution of Covenants by Franchisee's Principals and Management. Franchisee agrees to require and obtain the execution of covenants similar to those set forth in Sections 7.A., B., and C. from all of Franchisee's Principals not signing the Principals' Undertaking, and, at Franchisor's request, any other of Franchisee's personnel. These covenants must be substantially in the form set forth in Attachment D; however, Franchisor reserves the right, in Franchisor's sole discretion, to decrease the scope of the noncompetition covenant set forth in Attachment D or eliminate such noncompetition covenant altogether for any person that is required to execute such agreement.

## 8.     USE OF MARKS AND COPYRIGHTED MATERIALS

Franchisor hereby grants Franchisee a limited license to use the Marks and Copyrighted Materials designated by Franchisor, solely for the purpose of operating, advertising, and promoting the Franchised Business, as contemplated by this Agreement. Due to the nature of the relationship between the parties and for their mutual benefit, the license is granted royalty-free. Franchisee further expressly agrees that:

A.     Franchisor is the lawful owner of the Marks and the Copyrighted Materials. Franchisee's interest in the Marks and the Copyrighted Materials is solely that of a licensee, and all goodwill attributable to the use of the Marks with respect to the Franchised Business will accrue to the benefit of Franchisor. Franchisee disclaims any proprietary interest in any of the Marks and the Copyrighted Materials.

B.     Franchisee will not use the name of any N2 Publication or any of Franchisor's Marks or trade names, including the Marks "N2" or "N2 Publishing", or any abbreviation, acronym, or variation of those words as part of Franchisee's name or that of any business entity in which Franchisee owns or holds an interest. Franchisee must submit to Franchisor for approval, in writing, Franchisee's proposed entity name, and Franchisee will not name its entity using any name that is not approved by Franchisor.

C.     Franchisee must use the Marks in the precise form that Franchisor prescribes and must observe Franchisor's directions regarding the presentation, display, and use of the Marks and the use, copying, and distribution of the Copyrighted Materials.

D.     Without Franchisor's prior written approval, which Franchisor may give or withhold in Franchisor's sole discretion, Franchisee may not develop, create, generate, own, or otherwise use or participate in any computer and/or electronic media (including but not limited to the Internet, bulletin boards, social networking sites (e.g., Facebook), news groups, and discounting/couponing sites) in connection with the Franchised Business. If Franchisor grants approval for Franchisee's use of an Internet Website, Franchisee acknowledges that the form, content, and appearance of any Internet Website Franchisee uses must comply with the System standards and must be approved by Franchisor in writing before being used. Accordingly, Franchisee agrees that Franchisee has no authority to, and Franchisee will not, establish any Website that creates any association with the Marks or the System, or post any advertisements or material on the Internet that depict or display the Marks or suggest an association with the System, without Franchisor's express prior written consent. Without limitation of the foregoing, if Franchisor requires, any Internet Website created by or for Franchisee must contain a hypertext link to Franchisor's Internet Website in the form Franchisor requires, and no other hypertext links to third-party Internet Websites unless previously approved in writing by Franchisor. Notwithstanding Franchisor's approval of a Website, Franchisor reserves the right to revoke Franchisor's approval at any time such Website fails to continue to meet Franchisor's standards, and Franchisee agrees that upon such revocation, Franchisee will immediately discontinue use of the Website.

E.     Franchisee acknowledges that Franchisor has established and maintains an Internet Website that provides information about the N2 Publishing business. Franchisor has sole discretion and control over the Website's maintenance, design, and contents. Franchisee acknowledges that Franchisor is the lawful, rightful, and sole owner of the Internet domain name, www.n2pub.com, and unconditionally disclaims any ownership interest in such or any colorably similar Internet domain name. Franchisee will not register any Internet domain name in any class or category that contains the name of any N2 Publication

12

or the words "N2" or "publishing" or any abbreviation, acronym, or variation of those words. Additionally, Franchisor may, in its sole discretion, provide Franchisee with a _____@n2pub.com email address. If Franchisor provides Franchisee such email address, Franchisee must use such email address in connection with the Franchised Business and as otherwise directed in the Administration Manual. If Franchisee requests additional email addresses using the n2pub.com domain, Franchisee must pay Franchisor the then-current fee for each such additional address.

       F.       Franchisee must obtain Franchisor's prior approval for all advertising and promotional plans and materials that Franchisee desires to use to promote Franchisee's N2 Publishing business and that have not been prepared or previously approved by Franchisor. Franchisee must submit such unapproved plans and materials to Franchisor (by personal delivery, by facsimile, through the mail, or by e-mail using the e-mail address required by Franchisor), and Franchisor will approve or disapprove such plans and materials within 14 days from the date of receipt by Franchisor, and Franchisor reserves the right to disapprove previously approved plans and materials at any time, in Franchisor's sole discretion. Franchisee will not use such plans or materials until approved by Franchisor. Franchisee must promptly discontinue use of any promotional or advertising plans or materials upon notice from Franchisor to do so.

       G.       Franchisee must notify Franchisor immediately of any apparent infringement of, or challenge to, Franchisee's use of any Mark and of any claim by any person of any rights in any Mark or any Copyrighted Materials. Franchisee and Principals must not communicate with any person other than Franchisor, its affiliates, their counsel, and Franchisee's counsel in connection with any such apparent infringement, challenge, or claim. Franchisor will have complete discretion to take any action it deems appropriate in connection with any infringement of, or challenge or claim to, any Mark or Copyrighted Materials and the right to control exclusively, or to delegate control of, any settlement, litigation, Patent and Trademark Office, or other proceeding arising out of any such alleged infringement, challenge, or claim or otherwise relating to any Mark or Copyrighted Materials. Franchisee agrees to execute all such instruments and documents, render such assistance, and do such acts or things as may, in the opinion of Franchisor, reasonably be necessary or advisable to protect and maintain the interests of Franchisor or any affiliate in the Marks or Copyrighted Materials.

## 9.     TRANSFER AND ASSIGNMENT

       A.      By Franchisor.

       (1)     Franchisor has the right to transfer or assign this Agreement and all or any part of its rights or obligations herein to any person or legal entity without prior notice to, or consent of, Franchisee, and upon such transfer or assignment, the transferee or assignee will be solely responsible for all of Franchisor's obligations arising hereunder subsequent to the transfer or assignment.

       (2)     If Franchisor transfers or assigns this Agreement to an unaffiliated third-party purchaser in connection with the sale of the entire N2 Publishing business, and if, as of the date of such transfer or assignment, the remaining Term of this Agreement is less than 540 days, then, prior to or contemporaneously with the closing of such transfer or assignment, Franchisor will, at Franchisee's option, enter into an amendment to this Agreement with Franchisee pursuant to which the then-existing Term of this Agreement will be extended so that it expires on the date which is 540 days from the closing date of such transfer or assignment. Nothing in this Section 9.A.(2) limits or otherwise affects Franchisor's right to transfer or assign this Agreement as provided in Section 9.A.(1).

       B.      By Franchisee. Franchisee will not transfer or assign this Agreement without Franchisor's prior written consent. Any purported assignment or transfer, by operation of law or otherwise, made in violation of this Agreement will be null and void and will constitute a material breach under this Agreement. If Franchisee wishes to transfer all or part of its interest in the Franchised Business or this Agreement, or if Franchisee or any Principal wishes to transfer any ownership interest in Franchisee, transferor and the proposed transferee must apply to Franchisor for its consent. Franchisor will not unreasonably withhold its

13

Case 7:19-cv-00089-BO   Document 1-4   Filed 05/03/19   Page 37 of 82

consent to a transfer of any interest in Franchisee, in the Franchised Business, or in this Agreement but may require any or all of the following as conditions of its consent:

        (1)    Franchisee and its affiliates are not in default of this Agreement, or any other agreement with Franchisor or its affiliates, and have substantially and timely complied with all the terms and conditions of such agreements during their respective terms, including but not limited to paid all amounts due;

        (2)    The transferor and its principals, if applicable, have executed a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its affiliates, their respective officers, directors, shareholders, partners, members, agents, representatives, independent contractors, servants, and employees, past and present, in their corporate and individual capacities, including, without limitation, claims arising under this Agreement and any other agreement with Franchisor or its affiliates, and under federal, state, or local laws, rules, and regulations or orders;

        (3)    The transferee demonstrates to Franchisor's satisfaction that it meets Franchisor's then-current qualifications, and, at the transferee's expense, transferee and any of it owners and any other personnel required by Franchisor complete any training programs then in effect for N2 Publishing franchisees upon such terms and conditions as Franchisor may require;

        (4)    The transferee must enter into a written agreement, in a form satisfactory to Franchisor, assuming full, unconditional, joint and several, liability for, and agreeing to perform from the date of the transfer, all obligations, covenants, and agreements of Franchisee under this Agreement. If the transferee is a corporation, partnership, limited liability company, or other entity, those of transferee's principals who are designated as principals, also must execute such agreement and guarantee the performance thereof;

        (5)    The transferee must execute Franchisor's then-current form of franchise agreement for a term ending on the expiration date of this Agreement (including any renewal terms provided by this Agreement). The new franchise agreement will supersede this Agreement in all respects, and its terms may differ from the terms of this Agreement, including higher fees, but the transferee will not be required to pay an initial franchise fee. If the transferee is a corporation, partnership, limited liability company, or other entity, those of transferee's principals who are designated as principals, also must execute such agreement and guarantee the performance thereof;

        (6)    The transferor will remain liable for all of its obligations to Franchisor under this Agreement incurred prior to the effective date of the transfer and must execute any and all instruments reasonably requested by Franchisor to evidence such liability;

        (7)    Upon application for consent, Franchisee must pay Franchisor a transfer fee in an amount equal to the then-current initial franchise fee that Franchisor generally charges to new N2 Publishing franchisees, plus Franchisor's reasonable attorneys' fees incurred in connection with the transfer; and

        (8)    If transferee is a corporation, partnership, limited liability company, or other entity, the transferee must make all of the representations, warranties, and covenants in Section 7. as Franchisor may request and must provide evidence satisfactory to Franchisor that such representations, warranties, and covenants are true and correct as of the date of the transfer.

## 10.    DEFAULT AND TERMINATION

        A.    Default and Termination. Franchisee acknowledges that each of Franchisee's obligations described in this Agreement is a material and essential obligation; that nonperformance of such obligations will adversely and substantially affect Franchisor and the System; and that the exercise by Franchisor of the rights and remedies set forth herein is appropriate and reasonable.

14

B.  Automatic Termination. Franchisee will be deemed to be in default of this Agreement, and all rights granted herein will automatically terminate without notice to Franchisee if:

(1)  Franchisee becomes insolvent or makes a general assignment for the benefit of creditors;

(2)  Franchisee files a voluntary petition under any section or chapter of federal bankruptcy law or under any similar law or statute of the United States or any state thereof;

(3)  an involuntary petition is filed with respect to Franchisee under any such laws and is not dismissed within 60 days after it is filed;

(4)  Franchisee admits in writing its inability to pay its debts when due;

(5)  Franchisee is adjudicated as bankrupt or insolvent in proceedings filed against Franchisee under any section or chapter of federal bankruptcy laws or under any similar law or statute of the United States or any state;

(6)  a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee;

(7)  a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction;

(8)  proceedings for a composition with creditors under any state or federal law should be instituted by or against Franchisee;

(9)  a final judgment remains unsatisfied or of record for 30 days or longer (unless supersedeas bond is filed);

(10)  Franchisee is dissolved; or

(11)  execution is levied against Franchisee's business or property.

C.  Termination on Notice; No Cure. Franchisor may terminate this Agreement immediately upon written notice to Franchisee, without an opportunity to cure, if:

(1)  Franchisee abandons or otherwise permanently ceases operations of the Franchised Business contemplated by this Agreement;

(2)  Franchisee transfers or attempts to transfer this Agreement in violation of Section 9. of this Agreement;

(3)  Franchisee uses the Copyrighted Materials or uses or discloses the Confidential Information in violation of this Agreement; or

(4)  Franchisee or any Principal is convicted of, or pleads nolo contendre to, a felony or indictable offense in any court, becomes known to Consumers as being of bad moral character, disparages, embarrasses, or tarnishes Franchisor's reputation, or fails to comport itself at all times in accordance with the highest standards of conduct and behavior, consistent with its responsibilities as an N2 Publishing franchisee.

D.  Termination on Notice; Opportunity to Cure. Except as provided in Sections 10.B. and 10.C. of this Agreement, upon any default by Franchisee which is capable of being cured, Franchisor may terminate this Agreement by giving Franchisee written notice of termination stating the nature of the default and the time period within which the default must be cured ("cure period"). Franchisee may avoid termination by immediately initiating a remedy to cure such default and curing it to Franchisor's satisfaction within the cure period (or any longer period that applicable law may require. If any such default is not cured within the cure period, this Agreement will terminate without further notice to Franchisee

Case 7:19-cv-00089-BO   Document 1-4   Filed 05/03/19   Page 39 of 82

effective immediately upon the expiration of the cure period. Defaults which are susceptible of cure hereunder may include, but are not limited to, the following:

(1)     the total Publication Expenses (defined below) and other expenses for all N2 Publications for which Franchisee is responsible exceed the total revenue actually received by Franchisor under the Advertising Contracts for all N2 Publications for which Franchisee is responsible in any consecutive two-calendar-month period during the Term hereof;

(2)     Franchisee does not meet all processing and other publication deadlines;

(3)     Franchisee does not operate its Franchised Business in accordance with all of Franchisor's standards and procedures, including without limitation, those set forth in <u>Section 5.E.(3)</u> in this Agreement and those set forth in Franchisor's Administration Manual;

(4)     Franchisee fails to maintain N2 Publication(s) for the Territory that contains substantive, current, Community-specific information in accordance with Franchisor's standards and procedures;

(5)     Franchisee fails to submit content on or before the applicable deadline;

(6)     Franchisor terminates more than one Publication Contract or otherwise ceases production of more than one N2 Publication, for which Franchisee is responsible, in any six-month period due to the fact that the Publication Expenses for such N2 Publications exceed the total revenue received by Franchisor with respect to such N2 Publication;

(7)     Franchisee otherwise discontinues more than one N2 Publication in any six-month period for any reason or is forced to discontinue more than one N2 Publication in any six-month period of time due to the fact that the Publication Expenses for such discontinued N2 Publication exceed the total revenue received by Franchisor with respect to such N2 Publication;

(8)     Franchisee or Principals fail to return any Returnable Commissions to N2 within 15 days after receiving notice from Franchisor that such Returnable Commissions are due;

(9)     Franchisee fails to pay when due any fee, expense, charge, or other amount due and owing to any supplier or creditor of Franchisee and does not cure within 10 days following notice from Franchisor;

(10)    Franchisee fails to pay its employees and/or independent contractors in accordance with applicable federal, state, and local labor and/or employment and payday laws;

(11)    Franchisee misuses or makes any unauthorized use of the Marks or otherwise materially impairs the goodwill associated therewith or Franchisor's rights therein and fails to cure such default within 24 hours following notice from Franchisor.

(12)    Franchisee or any Principal fails to comply with the restrictions against competition set forth in <u>Section 7.B.</u> of this Agreement and fails to cure such default within 10 days following notice from Franchisor.

(13)    Franchisee fails to comply with any other provision of this Agreement and fails to cure such breach within 30 days following written notice from Franchisor.

E.      <u>Mutual Termination Right</u>. Franchisor and Franchisee each have the right to terminate this Agreement for any reason or no reason by providing the other party with written notice of termination on or before the earlier to occur of (1) six months following the Effective Date or (2) the date on which the first N2 Publication for which Franchisee is responsible is issued. In the event of termination of this Agreement pursuant to this <u>Section 10.E.</u>, neither party will incur any liability or have any obligation to pay the other party any amounts due and owing hereunder, except for amounts due and owing as of the date of the mutual termination. In Franchisor's sole discretion, Franchisor may condition Franchisee's termination under this <u>Section 10.E.</u> upon the parties' execution of a mutual termination and release agreement in the form required by

Case 7:19-cv-00089-BO   Document 1-4   Filed 05/03/19   Page 40 of 82

Franchisor, and Franchisee will be required to comply with all of its post-termination obligations required in this Agreement.

## 11.   OBLIGATIONS OF FRANCHISEE UPON TERMINATION

Upon the expiration or termination of this Agreement, all rights granted to Franchisee hereunder will immediately terminate, and Franchisee must:

A.   Immediately cease to conduct operations as an N2 Publishing franchisee;

B.   Promptly discontinue all use of the Marks, Copyrighted Materials, and Confidential Information and take appropriate action to return to Franchisor all Copyrighted Materials and Confidential Information in Franchisee's possession or within its control;

C.   Pay all amounts due under this Agreement;

D.   Comply with the covenants set forth in Section 7.;

E.   At Franchisor's option, assign to Franchisor all rights to any business listings related to or associated with the Franchised Business and execute all forms and documents required by Franchisor to transfer such service and numbers to Franchisor. Franchisee agrees to use different telephone numbers at or in connection with any subsequent business conducted by Franchisee; and

F.   Pay to Franchisor all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Franchisor subsequent to the termination or expiration of this Agreement in obtaining injunctive or other relief for the enforcement of any provisions of this Section 11.

## 12.   INSURANCE; INDEMNIFICATION; INDEPENDENT CONTRACTOR

A.   Insurance. Franchisee will procure and maintain in full force and effect at all times during the Term of this Agreement, at Franchisee's expense, an insurance policy or policies protecting Franchisee against any demand or claim with respect to personal injury, death, or property damage, or any loss, liability, or expense whatsoever arising or occurring at or in connection with Franchisee's operation as an independent contractor. Such policy or policies must be written by a carrier approved or required by Franchisor and must include, but not be limited to, the following:

(1)   Comprehensive General Liability Insurance, including broad form contractual liability, broad form property damage, personal injury, advertising injury, completed operations, products liability, and fire damage coverage, in the amount of $2,000,000 combined single limit per occurrence, $4,000,000 general aggregate.

(2)   Automobile liability coverage, including coverage of owned, non-owned, and hired vehicles, with coverage in amounts not less than $300,000, combined single limit.

(3)   Such other insurance as may be required by the state or locality in which Franchisee operates.

Franchisor reserves the right, in its sole discretion, to require Franchisee to procure and maintain in full force and effect at all times during the Term of this Agreement, at Franchisee's expense, any other insurance policies or coverages that Franchisor deems necessary, as well as higher policy limits, as specified by Franchisor from time to time in writing.

Franchisee may elect to have reasonable deductibles in connection with the coverage required under above. Such policies must also include a waiver of subrogation in favor of Franchisor, its affiliates, and the officers, directors, shareholders, partners, members, agents, representatives, independent contractors, servants, and employees of each of them. Franchisee's obligation to obtain and maintain the foregoing policies in the amounts specified are not limited in any way by reason of any insurance which may be

17

Case 7:19-cv-00089-BO   Document 1-4   Filed 05/03/19   Page 41 of 82

maintained by Franchisor, nor will Franchisee's performance of such obligation relieve it of liability under the indemnity provisions set forth in Section 12.B. of this Agreement. All insurance policies required hereunder (except workers' compensation, if applicable) must name Franchisor and its affiliates, and the officers, directors, shareholders, partners, members, agents, representatives, independent contractors, servants, and employees of each of them, as additional insureds and must expressly provide that such additional insureds' interests will not be affected by Franchisee's breach of any policy provisions.

Should Franchisee, for any reason, fail to procure or maintain the insurance required by this Agreement, as such requirements may be revised from time to time by Franchisor in writing, Franchisor will have the right and authority (without, however, any obligation to do so) immediately to procure such insurance and to charge same to Franchisee, which charges, together with a reasonable fee for Franchisor's expenses in so acting, will be payable by Franchisee immediately upon notice. Franchisor may also, in its sole discretion, elect to reduce the compensation payable to Franchisee under Section 4. of this Agreement by an amount equal to the charges Franchisor incurs in procuring and maintaining such insurance coverage required by this Agreement. The foregoing remedies are in addition to any other remedies Franchisor may have at law or in equity.

B.     Indemnification. Franchisee will indemnify, defend, and hold harmless Franchisor, its affiliates, and their respective officers, directors, employees, owners, agents, representatives, and independent contractors, past or present ("**Indemnitees**"), harmless, to the fullest extent permitted by law, from any and all losses and expenses (defined below) incurred in connection with any action, suit, proceeding, claim, demand, investigation, or inquiry (formal or informal), or any settlement thereof (whether or not a formal proceeding or action has been instituted), which arises out of or is based upon any act or omission, whether actual or alleged, negligent or otherwise, of Franchisee, its employees, or agents, in connection with the performance of Franchisee, its employees, or agents in connection with the operation of the Franchised Business, Franchisee's employer/employee relationships, or the breach by Franchisee of any representation or warranty herein. "**Losses and expenses**" includes, without limitation, all losses, compensatory, exemplary, or punitive damages, fines, charges, costs, expenses, lost profits, reasonable attorneys' fees, court costs, settlement amounts, judgments, compensation for damages to Franchisor's reputation and goodwill, and other such amounts incurred in connection with the matters described. This indemnity will survive the expiration or termination of this Agreement.

C.     Collections Actions. Franchisee will reimburse Franchisor or its affiliate for the costs Franchisor or its affiliate incurs to enforce advertising contracts entered into in connection with Franchisee's N2 Publications. If advertisers breach such agreements, Franchisor and/or its affiliate reserve the right, in their sole discretion, to seek payment from advertisers either by engaging a collections agency, instituting other collections means, and/or filing a lawsuit, and Franchisee will reimburse Franchisor or its affiliate for the costs of enforcement, including without limitation collections costs, other legal and court costs, and reasonable attorneys' fees.

D.     Relationship of the Parties. Franchisee and Franchisor are independent contractors. Neither Franchisee nor Franchisor are agents, legal representatives, subsidiaries, joint venturers, partners, employees, or servants of the other for any purpose. Neither Franchisee nor Franchisor will be obligated by, or have any liability under, any agreements or representations made by the other, nor will Franchisor be liable for any damages to any person or property directly or indirectly arising out of Franchisee's operation of the Franchised Business, whether or not caused by Franchisor's negligence or willful action or failure to act. Franchisor also has no liability for any sales, use, excise, gross receipts, property, income, or other taxes that Franchisee might incur in connection with Franchisee's operation of the Franchised Business. Franchisee has control over Franchisee's own work schedule and determines the hours Franchisee works on any given day. Franchisee will use his or her own equipment and materials. Franchisor will provide from time to time suggestions and training to assist Franchisee, but Franchisee has control over the method used to obtain the desired results, provided that the actions performed are ethical, legal, and do not violate Franchisor's policies. All employees hired by or working for Franchisee will be Franchisee's or

18

Franchisee's affiliates' employees and will not, for any purpose, be deemed employees of Franchisor or subject to Franchisor's control. Franchisor does not have the authority to hire, fire, promote, or demote any of Franchisee's or Franchisee's affiliates' employees or take any disciplinary action whatsoever against any of them. Additionally, Franchisee must communicate to all employees that Franchisee, not Franchisor, is their employer; and Franchisee must ensure that no payroll checks or other employment-related documents (such as job applications and W-2s) contain or reference the Marks or Franchisor's name. During the Term of this Agreement, Franchisee must hold itself out to the public as an independent contractor conducting the Franchised Business pursuant to the rights granted by Franchisor.

13. **NOTICES**

    A.    Except as expressly provided in Section 13.B. below, any and all notices required or permitted under this Agreement must be in writing and must be delivered by electronic mail to the parties at the following e-mail addresses:

| | |
|---|---|
| Notices to N2: | legal@n2pub.com |
| Notices to Franchisee and Principals: | Jacqueline.Lyles@n2pub.com |

All notices and other written communications will be deemed delivered and received on the date the transmission is received in the e-mail box designated above, whether or not the party receiving such message opens and reads the message in a timely manner. Franchisor and Franchisee have, and each of them hereby accept, the obligation to check, open, and read the messages in the e-mail boxes designated above at least once each Business Day.

    B.    Upon the expiration or termination of this Agreement, or if, for any reason, Franchisor no longer provides an n2pub.com e-mail account to Franchisee, then all future notices must be in writing and personally delivered or mailed by expedited delivery service or certified or registered mail, return receipt requested, first-class postage prepaid to the parties at the following addresses until a different address is designated by written notice to the other party:

| | |
|---|---|
| Notices to Franchisor: | N2 Franchising, LLC<br>5051 New Centre Drive<br>Wilmington, North Carolina 28403<br>Attention: President |
| Notices to Franchisee and Principals: | Jacqueline Marie Lyles<br><br>829 Wesley Drive NW<br><br>Atlanta, GA 30305<br><br>Attention: Jacqueline Marie Lyles |

14. **APPLICABLE LAW; DISPUTE RESOLUTION**

    A.    Governing Law. Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Sections 1051 *et seq.*) or other federal law, this Agreement, the franchise, and all claims arising from the relationship between Franchisor and Franchisee will be governed by and construed in accordance with the laws of the state of North Carolina, without regard to its conflict of law rules. Franchisor and Franchisee acknowledge that the agreements regarding applicable law, forum, and venue set forth in this Section 14. provide each of the parties with the mutual benefit of uniform interpretation of this Agreement and any dispute arising out of this Agreement or the relationship created by this Agreement.

19

Franchisor and Franchisee further acknowledge the receipt and sufficiency of mutual consideration for such benefit.

      B.    Arbitration.

          (1)     Any dispute, controversy, or claim arising out of, in connection with, or relating to this Agreement, and the relationships created hereby; or the formation, interpretation, breach, termination, or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, must be resolved by arbitration. The arbitration must be administered in accordance with the Commercial Rules of the AAA. There will be one arbitrator. The arbitrator(s) must be experienced in franchising or franchise law and have no prior business or professional relationship with either party. All matters relating to arbitration will be governed by the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.) ("FAA"). The parties intend and agree that any state laws attempting to prohibit arbitration or void out-of-state forums for arbitration are preempted by the FAA and that arbitration will be held as provided in this Section 14.B. The arbitrator(s) must provide a reasoned award in writing. The award rendered by the arbitrator(s) will be final, and judgment may be entered thereon in any court having jurisdiction thereof.

          (2)     The costs and expenses of arbitration paid to the AAA and to the arbitrator will initially be paid equally by the two sides to the arbitration. All other arbitration-related expenses, including but not limited to attorneys' fees and travel expenses, will be paid initially by the party which incurred such expense. Notwithstanding the foregoing, the arbitrator(s) must award to the prevailing party the reasonable costs and fees, including attorneys' fees, incurred in the arbitration.

          (3) .    Arbitration will be conducted in the city in which Franchisor maintains its principal business office at the time of the arbitration.

          (4)     TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ARBITRATION WILL PROCEED SOLELY ON AN INDIVIDUAL BASIS WITHOUT THE RIGHT FOR ANY DISPUTES TO BE ARBITRATED ON A CLASS ACTION BASIS OR ON BASES INVOLVING CLAIMS BROUGHT IN A PURPORTED REPRESENTATIVE CAPACITY ON BEHALF OF OTHERS. DISPUTES MAY NOT BE JOINED OR CONSOLIDATED WITH ANY OTHER ARBITRATION UNLESS AGREED TO IN WRITING BY ALL PARTIES.

          (5)     The arbitrator(s) has no power or authority to award punitive damages and, with respect to any claim for damages, the arbitrator(s) is authorized to award only actual damages sustained by a party.

          (6)     If Franchisor, Franchisee, or any of Franchisee's Principals files in court any claim that should have been brought in arbitration under this Section 14.B., and the other party succeeds in a motion to compel arbitration of such claim, the party filing such claim in court must reimburse the other party its reasonable attorneys' fees and costs for defending against the lawsuit and for its motion to compel arbitration. Further, if prior to an arbitrator's final decision, either Franchisee, any of Franchisee's Principals, or Franchisor commences an action in any court for a claim that arises out of or relates to this Agreement (except for the purpose of enforcing this arbitration provision or as otherwise permitted by this Agreement), the party bringing the action in court will be responsible for the other party's expenses of enforcing this arbitration provision, including court costs, arbitration filing fees, and other costs and attorneys' fees.

          (7)     Neither Franchisee nor any of Franchisee's Principals will assert any claim or cause of action against Franchisor or its officers, directors, shareholders, employees, or affiliates after two years following the event giving rise to such claim or cause of action.

          (8)     Notwithstanding the foregoing provisions of this Section 14.B., controversies, disputes, or claims related to or based on past due monies owed pursuant to this Agreement, the Marks, the Confidential Information, or the Copyrighted Materials may be brought in court.

20

(9)     Notwithstanding the foregoing, each party retains the right to apply to any court of competent jurisdiction for provisional and/or conservatory relief, including injunctions or pre-arbitral attachments, and any such request will not be deemed in compatible with the agreement to arbitrate or a waiver of the right to arbitrate. Franchisee and its Principals hereby irrevocably consent to personal jurisdiction in the state and federal courts located in the county in which Franchisor maintains its principal place of business for this purpose.

C.     To the extent that litigation is permitted in accordance with the above provisions, or in the event that, notwithstanding the above provisions, it is ultimately determined that a particular claim is not arbitrable under applicable law, the following provisions will apply:

(1)     **VENUE AND JURISDICTION.** ANY ACTION BROUGHT BY ANY PARTY AGAINST THE OTHER IN ANY COURT, WHETHER FEDERAL OR STATE, MUST BE BROUGHT EXCLUSIVELY WITHIN THE COUNTY OR THE FEDERAL JUDICIAL DISTRICT WHERE FRANCHISOR'S PRINCIPAL BUSINESS OFFICE IS LOCATED. FRANCHISEE AND ITS PRINCIPALS HEREBY SUBMIT TO THE JURISDICTION OF THOSE COURTS FOR PURPOSES OF ANY SUCH PROCEEDING AND WAIVE ANY OBJECTIONS TO JURISDICTION AND ANY CLAIM THAT SUCH PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM OR THAT VENUE IS IMPROPER. NOTWITHSTANDING THE ABOVE, WITH RESPECT TO ANY ACTION WHICH INCLUDES INJUNCTIVE RELIEF OR OTHER PROVISIONAL RELIEF, ANY PARTY MAY BRING SUCH ACTION IN ANY COURT IN ANY STATE WHICH HAS JURISDICTION.

(2)     **WAIVER OF JURY TRIAL.** FRANCHISEE AND FRANCHISOR HEREBY IRREVOCABLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, BROUGHT BY EITHER OF THEM AGAINST THE OTHER, WHETHER OR NOT THERE ARE OTHER PARTIES IN SUCH ACTION OR PROCEEDING.

(3)     **WAIVER OF PUNITIVE DAMAGES.** THE PARTIES HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO OR CLAIM OF ANY PUNITIVE OR EXEMPLARY DAMAGES AGAINST THE OTHER AND AGREE THAT IN THE EVENT OF A DISPUTE BETWEEN THEM, CLAIMS FOR DAMAGES WILL BE LIMITED TO THE RECOVERY OF ANY ACTUAL DAMAGES SUSTAINED BY A PARTY.

(4)     Attorneys' Fees. If either party commences a legal action against the other party arising out of or in connection with this Agreement, the prevailing party will be entitled to have and recover from the other party its reasonable attorneys' fees and costs of suit.

15.     **CONSTRUCTION OF AGREEMENT**

A.     Entire Agreement. This Agreement, the documents referred to herein, and the Attachments hereto constitute the entire, full, and complete agreement between Franchisor, Franchisee, and Principals concerning the subject matter hereof and supersede all prior related agreements; provided, however, that nothing in this or any related agreement is intended to disclaim the representations Franchisor made in the franchise disclosure document that Franchisor furnished to Franchisee. Except for those permitted to be made unilaterally by Franchisor hereunder, no amendment, change, or variance from this Agreement will be binding on either party unless mutually agreed to by the parties and executed by their authorized officers or agents in writing.

B.     No Waiver. No delay, waiver, omission, or forbearance on the part of Franchisor to exercise any right, option, duty, or power arising out of any breach or default by Franchisee or the Principals under this Agreement will constitute a waiver by Franchisor to enforce any such right, option, duty, or power against Franchisee or the Principals, or as to a subsequent breach or default by Franchisee or the Principals.

21

C.      Approval or Consent. Whenever this Agreement requires the prior approval or consent of Franchisor, Franchisee must make a timely written request to Franchisor, and such approval or consent must be obtained in writing. No waiver, approval, consent, advice, or suggestion given to Franchisee, and no neglect, delay, or denial of any request therefor, will constitute a warranty or guaranty by Franchisor, nor does Franchisor assume any liability or obligation to Franchisee or any third party as a result thereof.

D.      Force Majeure. Upon the occurrence of an event of Force Majeure, the party affected thereby must give prompt notice thereof to the other party, together with a description of the event, the duration for which the party expects its ability to comply with the provisions of the Agreement to be affected, and a plan for resuming operation under the Agreement, which the party must promptly undertake and maintain with due diligence. Such affected party will be liable for failure to give timely notice only to the extent of damage actually caused. If an event of Force Majeure occurs, Franchisor will continue to be obligated to pay Franchisee any and all amounts that it is duly obligated to pay in accordance with the terms of this Agreement prior to the occurrence of such event, and the Indemnitees will continue to be indemnified and held harmless by Franchisee in accordance with Section 12. Except as provided in this Section 15.D., neither party will be held liable for a failure to comply with any terms and conditions of this Agreement when such failure is caused by an event of Force Majeure.

E.      Severability. Except as expressly provided to the contrary herein, each portion, section, part, term, and provision of this Agreement will be considered severable; and if, for any reason, any portion, section, part, term, or provision is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such determination will not impair the operation of, or have any other effect upon, the other portions, sections, parts, terms, or provisions of this Agreement that may remain otherwise intelligible, and the latter will continue to be given full force and effect and bind the parties; the invalid portions, sections, parts, terms, or provisions will be deemed not to be part of this Agreement; and such portion, section, part, term, or provision as similar as possible to that which was severed will automatically be added, which addition will be valid and not contrary to or in conflict with any law or regulation.

F.      Counterpart Execution. This Agreement may be executed in multiple counterparts, each of which when so executed will be an original, and all of which will constitute one and the same instrument.

G.      Headings. The captions used in connection with the sections and subsections of this Agreement are inserted only for purpose of reference. Such captions will not be deemed to govern, limit, modify, or in any other manner affect the scope, meaning, or intent of the provisions of this Agreement or any part thereof, nor will such captions otherwise be given any legal effect.

H.      Survival. Any obligation of Franchisee or the Principals that contemplates performance of such obligation after termination or expiration of this Agreement or the transfer of any interest of Franchisee or the Principals therein will be deemed to survive such termination, expiration, or transfer. Without limitation of the foregoing, the provisions of Section 14. are intended to benefit and bind certain third-party non-signatories and will continue in full force and effect subsequent to and notwithstanding this Agreement's expiration or termination.

I.      Gender. All references herein to the masculine, neuter, or singular will be construed to include the masculine, feminine, neuter, or plural, where applicable. Without limiting the obligations individually undertaken by the Principals under this Agreement, all acknowledgments, promises, covenants, agreements, and obligations made or undertaken by Franchisee in this Agreement will be deemed, jointly and severally, undertaken by all of the Principals.

J.      Remedies Cumulative. All rights and remedies of the parties to this Agreement are cumulative and not alternative, in addition to and not exclusive of any other rights or remedies which are provided for herein or which may be available at law or in equity in case of any breach, failure, or default

22

or threatened breach, failure, or default of any term, provision, or condition of this Agreement or any other agreement between Franchisee or any of its affiliates and Franchisor or any of its affiliates. The rights and remedies of the parties to this Agreement will be continuing and will not be exhausted by any one or more uses thereof and may be exercised at any time or from time to time as often as may be expedient; and any option or election to enforce any such right or remedy may be exercised or taken at any time and from time to time. The expiration, earlier termination, or exercise of Franchisor's rights pursuant to Section 10. of this Agreement will not discharge or release Franchisee or any of the Principals from any liability or obligation then accrued, or any liability or obligation continuing beyond, or arising out of, the expiration, the earlier termination, or the exercise of such rights under this Agreement. Additionally, Franchisee and the Principals will pay all court costs and reasonable attorneys' fees and costs incurred by Franchisor in obtaining any remedy available to Franchisor for any violation of this Agreement.

   K.    No Third-Party Beneficiary. Except as expressly provided to the contrary herein, nothing in this Agreement is intended, nor will be deemed, to confer upon any person or legal entity other than Franchisee, Franchisor, Franchisor's officers, directors, and personnel and such of Franchisee's and Franchisor's respective successors and assigns as may be contemplated (and, as to Franchisee, authorized by Section 9.) any rights or remedies under or as a result of this Agreement.

   L.    Further Assurances. The parties will promptly execute and deliver such further documents and take such further action as may be necessary in order to effectively carry out the intent and purposes of this Agreement.

   M.    Agreement Effective Upon Execution by Franchisor. This Agreement will not become effective until signed by an authorized representative of Franchisor.

   IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on the dates set forth below, each intending to be legally bound by its terms.

**FRANCHISOR:**
N2 Franchising, LLC

By: _Duane Hixon / (Heidi Heigel)_
      Duane Hixon /Heidi Heigel) (Nov 20, 2017)
      Duane Hixon, CEO

Date: _____

**FRANCHISEE:**

By: _Jacqueline M. Lyles_
      Jacqueline M. Lyles (Nov 17, 2017)

Name: Jacqueline Marie Lyles _____

Title: Franchisee _____

Date: 11-17-17 _____

23

## ATTACHMENT A

### DEFINITIONS

"**Administration Manual**" means Franchisor's confidential operations manual, which may consist of one or more manuals, containing Franchisor's mandatory and suggested standards, specifications, and operating procedures relating to the operation of the Franchised Business and Franchisee's obligations under this Agreement. The term also includes alternative or supplemental means of communicating information to Franchisee, including bulletins, video files, audio files, CD ROMs, and electronic communications.

"**Advertising Value**" means (1) the minimum value of the advertising in each N2 Publication, as determined by Franchisor or its affiliate in their discretion, or (2) the amount for which the advertising actually sold; whichever is greater.

An "**affiliate**" of a named person is any person or entity that is controlled by, controlling or under common control with such named person.

"**Business Day**" means each day other than a Saturday, Sunday, federal U.S. holiday, or any other day on which the Federal Reserve is not open for business in the United States.

"**Cash Received**" means all revenue actually received by Franchisor or it affiliate from advertisers, Communities, or other organizations under the terms of a Publication Contract or Advertising Contract related to a particular N2 Publication.

"**Commission**" means the amount equal to the total Cash Received for each N2 Publication for which Franchisee is responsible in the applicable month, minus the N2 Cost for such N2 Publication for the applicable month; minus the Publication Expense for such N2 Publication for the applicable month; minus the following applicable fees and/or deductions, if any: (1) additional samples fee for additional samples of N2 Publications requested by Franchisee; (2) adjustment fee; (3) missed deadline fee; (4) Cross-selling Fee; (5) Returnable Commissions; and/or (6) Negative Commissions resulting from this Agreement or any other agreement between Franchisee or its affiliate on the one hand and Franchisor or its affiliate on the other hand.

"**Confidential Information**" means information and know-how, oral or written, and documents relating to Franchisor or the N2 Publishing business, furnished by Franchisor, or representatives of Franchisor, to Franchisee. Franchisor's Confidential Information includes, without limitation, all trademarks, trade names, service marks, emblems, and indicia of origin used by Franchisor in connection with the operation of the N2 Publishing business, and all trade secrets or know-how, including, but not limited to, research, plans, products, services, customer lists, business plans, marketing data, software, forms, processes, methods of operation, and other business information disclosed to Franchisee by Franchisor or its representatives. The term Confidential Information does not include information which Franchisee or Principals can establish (a) is or becomes generally available to the public other than as a result of disclosure by Franchisor, or (b) becomes available to Franchisee from a source other than Franchisor or the representatives of Franchisor, provided that such source is not and was not bound by a non-disclosure or confidentiality agreement with Franchisor.

"**Copyrighted Materials**" means works of authorship which are owned by Franchisor and fixed in a tangible medium of expression including, without limitation, the contents of the Administration Manual, the design elements of the Marks, Franchisor's bulletins, correspondence, and communications with its franchisees, training, advertising and promotional materials, and the content and design of Franchisor's Website(s) and all N2 Publishing publications, and other written materials relating to the operation of the Franchised Business and the System.

"**Cross-selling Fee**" means 25% of the monthly advertising value of each advertising contract sold

Case 7:19-cv-00089-BO   Document 1-4   Filed 05/03/19   Page 48 of 82

by someone other than Franchisee for Franchisee's N2 Publication(s).

"**N2 Cost**" means 15% of the Advertising Value of each N2 Publication, whether or not Franchisor or its affiliate actually receives payment for the advertisements.

"**Negative Commissions**" means the negative amount that occurs when the N2 Cost, Publication Expenses, and other applicable fees and deductions (including without limitation amounts owed Franchisor or its affiliate as a result of other agreements between Franchisee or its affiliate on the one hand and Franchisor or its affiliate on the other hand) exceed Cash Received.

"**Publication Expense**" means Franchisor's or its affiliates' cost to design, publish, print, and deliver each N2 Publication, including, without limitation, design fees, printing costs, postage, administrative costs, including allocable portions of salaries, computer systems, etc., and any miscellaneous fees, including, without limitation, ad creation fees. The Publication Expense for a particular N2 Publication is determined based on the number of homes to which the particular N2 Publication will be distributed ("**Home Count**") and the number of pages in the particular N2 Publication ("**Page Count**"). The Publication Expense for a particular N2 Publication can be determined by entering the Home Count and the Page Count in the Publication Calculator on Franchisor's Website or as otherwise provided by Franchisor. Franchisor determines the cost basis used for calculating the Publication Expense ("**Cost Basis**") on an annual basis, and that Cost Basis is implemented on September 1 of each year and is applied through August 31 of the following year ("**Calculation Year**"). Notwithstanding anything to the contrary in this Agreement, Franchisor will not increase the Cost Basis by more than the greater of (**a**) 10% per Calculation Year or (**b**) the percentage change in the Consumer Price Index – All Urban Consumers, which is determined and published by the Bureau of Statistics of the United States Department of Labor, for the immediately preceding Calculation Year.

"**Principals**" includes, collectively and individually, Franchisee's spouse, all officers and directors of Franchisee (including the officers and directors of any general partner of Franchisee) whom Franchisor designates as Franchisee's Principals, and all holders of a direct or indirect ownership interest in Franchisee and of any entity directly or indirectly controlling Franchisee.

"**Software Programs**" means the proprietary or other software programs developed or acquired by or on behalf of Franchisor for use in connection with the Franchised Business.

Case 7:19-cv-00089-BO   Document 1-4   Filed 05/03/19   Page 49 of 82

## ATTACHMENT B

## TERRITORY AND PUBLICATION DEADLINE

Franchisee has the right to solicit Communities for the sale of publication contracts in the Territory described below, and only in the Territory described below.

Franchisee's Territory is defined as: The Community of Peachtree Battle; in the State of Georgia,

county of Fulton and in the zip code of 30305 as defined on October 18, 2017.

Franchisee's monthly publication deadline is: the 5th of every month.

Attachment B

## ATTACHMENT C

### PRINCIPALS' UNDERTAKING

In consideration of, and as an inducement to, the execution of that certain Franchise Agreement, and any revisions, modifications, and amendments thereto, (collectively, "**Agreement**") by and between N2 Franchising, LLC ("**Franchisor**"), and Jacqueline Marie Lyles , ("**Franchisee**"), and dated October 18, 2017 the undersigned ("**Principal**") agrees as follows:

1.      Principal acknowledges and agrees as follows:

(a)      The undersigned is a "Principal," as defined in the Agreement, and has read the terms and conditions of the Agreement and acknowledges that the execution of this Principal's Undertaking is in partial consideration for, and a condition to, Franchisor entering into the Agreement with Franchisee and that Franchisor would not have entered into the Agreement without the execution of this Principal's Undertaking; and

(b)      Without limiting any of Franchisee's obligations under the Agreement, Principal (i) makes all of the covenants, representations, warranties, and agreements set forth in Section 5.L. (Legal Compliance), Section 7. (Confidentiality, Non-Competition, Non-Solicitation), Section 8. (Use of Marks and Copyrighted Materials), Section 9. (Transfer and Assignment), and Section 14. (Applicable Law and Dispute Resolution) of the Agreement and is obligated to perform thereunder; and (ii) represents that each and every representation of Franchisee made in connection with the Agreement is true, correct, and complete in all respects as of the time given and as of the time of the undersigned's execution of this Principals' Undertaking.

2.      The obligations of Principal are independent of the obligations of Franchisee, and a separate action or actions may be brought and prosecuted against Principal, whether or not actions are brought against Franchisee or whether or not Franchisee is joined in any such action.

3.      This Principal's Undertaking is governed by and interpreted in accordance with the laws of the State of North Carolina, without regard to its conflicts of law principles. This Principal's Undertaking is enforceable by and against the respective administrators, executors, successors, and assigns of the Principal, and the death of any Principal will not terminate the liability of such Principal or limit the liability of other Principals hereunder.

IN WITNESS WHEREOF, the undersigned execute this Principals' Undertaking effective as of the date(s) set forth below.

**PRINCIPAL(S)**

_Jacqueline M. Lyles_
Jacqueline M. Lyles (Nov 17, 2017)

(Signed as an Individual)

Name: Jacqueline Marie Lyles

Date: 11-17-17

_____

(Signed as an Individual)

Name: _____

Date: _____

Case 7:19-cv-00089-BO   Document 1-4   Filed 05/03/19   Page 51 of 82

## ATTACHMENT D

### CONFIDENTIALITY AGREEMENT AND ANCILLARY
### COVENANTS NOT TO COMPETE

This Agreement is made and entered into this ____ day of _____, 20___ between _____ ("**Franchisee**") and _____ ("**Covenantor**") in connection with a franchise agreement between N2 Franchising, LLC ("**Franchisor**") and Franchisee dated _____, 20___ ("**Franchise Agreement**"). Initially capitalized terms used, but not defined in this Agreement, have the meanings contained in the Franchise Agreement.

### RECITALS

Franchisor has the right to use and license the use of a system ("**System**") for the establishment and operation of franchised businesses that sell advertising for N2 Publications under the Marks ("**Franchised Business**").

The System is identified by certain Marks including, the trademark "N2 Publishing," and includes certain Confidential Information which provides economic advantages to Franchisor and licensed users of the System.

Franchisor has granted Franchisee the right to operate an N2 Franchised Business pursuant to the Franchise Agreement.

In connection with his or her duties, it will be necessary for Covenantor to have access to some or all of the Confidential Information.

Franchisor and Franchisee have agreed on the importance of restricting the use, access, and dissemination of the Confidential Information, and Franchisee therefore has agreed to obtain from Covenantor a written agreement protecting the Confidential Information and further protecting the System against unfair competition.

Covenantor acknowledges that receipt of and the right to use the Confidential Information constitutes independent valuable consideration for the representations, promises, and covenants made by Covenantor herein.

NOW, THEREFORE, in consideration of the mutual covenants and obligations contained herein, the parties agree as follows:

### AGREEMENT

#### Confidentiality Agreement

1.      Covenantor will, at all times, maintain the confidentiality of the Confidential Information and will use such Confidential Information only in the course of his or her employment by or association with Franchisee in connection with the operation of the N2 Franchised Business under the Franchise Agreement.

2.      Covenantor will not at any time make copies of any documents or compilations containing some or all of the Confidential Information without Franchisor's express written permission.

3.      Covenantor will not at any time disclose or permit the disclosure of the Confidential Information except to other employees of Franchisee and only to the limited extent necessary to train or assist other employees of Franchisee in the operation of the Franchised Business.

4.      Covenantor will surrender any material containing some or all of the Confidential Information to Franchisee or Franchisor, upon request, or upon termination of employment by Franchisee.

Case 7:19-cv-00089-BO   Document 1-4   Filed 05/03/19   Page 52 of 82

5. Covenantor will not at any time, directly or indirectly, do any act or omit to do any act that would or would likely be injurious or prejudicial to the goodwill associated with the System.

6. Covenantor acknowledges that Franchisor grants Franchisee access to the Administration Manual for limited purposes only and that the Administration Manual remains the property of Franchisor. Covenantor agrees that no Administration Manual may be reproduced, in whole or in part, without Franchisor's written consent.

## Covenants Not to Compete

In order to protect the goodwill of the System, and in consideration for the disclosure of the Confidential Information to Covenantor, Covenantor agrees that, during the term of his or her association with or employment by Franchisee, and for a period of two years following the earlier of (i) the termination thereof, or (ii) the termination, expiration, or transfer of Franchisee's interest in the Franchise Agreement, Covenantor will not, without Franchisor's prior written consent or as permitted under valid franchise agreements for N2 Publishing franchised businesses:

1. Directly or indirectly divert, or attempt to divert, to any competitor, any business that is the same as or similar to an N2 Publishing business and which is, or is intended to be, located within Franchisee's Territory; within a 15-mile radius around the perimeter of Franchisee's Territory; or within a 15-mile radius around the perimeter of the territory of any other N2 Publishing franchisee; and

2. Directly or indirectly, for himself or through, on behalf of, or in conjunction with any other person, persons, partnership, corporation, limited liability company, or other association, or entity, own, maintain, operate, engage in, or have any financial or beneficial interest in, advise, assist, or make loans to, any business which is the same as or similar to any business that is the same as or similar to an N2 Publishing business and which is, or is intended to be, located within Franchisee's Territory; within a 15-mile radius around the perimeter of Franchisee's Territory; or within a 15-mile radius around the perimeter of the territory of any other N2 Publishing franchisee, directly or indirectly through any type of sales person or agent (as the capitalized terms use in this Section are defined in the Franchise Agreement).

## Miscellaneous

1. Franchisee will make all commercially reasonable efforts to ensure that Covenantor acts as required by this Agreement.

2. Covenantor agrees that:

a. Each of the covenants herein contain reasonable limitations as to time, geographical area, and scope of activity to be restrained and do not impose a greater restraint than is necessary to protect the goodwill or other business interests of Franchisor.

b. Each of the foregoing covenants will be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in any unappealed final decision to which Franchisor is a party, Covenantor will be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

c. In the event of a breach of this Agreement, Franchisor would be irreparably injured and without an adequate remedy at law and, therefore, upon any such breach or attempted breach of any provision hereof, Franchisor will be entitled, in addition to any other remedies which it may have at law or in equity, to a temporary and/or permanent injunction and a decree for the specific performance of the terms of this Agreement, without the necessity of showing actual or threatened harm and without being required to furnish a bond or other security. The time periods relating to the obligations described in this Agreement will be tolled during any period of noncompliance.

Attachment D

3.    Covenantor agrees to pay all expenses (including court costs and reasonable attorneys' fees and costs) incurred by Franchisor and Franchisee in enforcing this Agreement.

4.    Any failure by Franchisor or the Franchisee to object to or take action with respect to any breach of any provision of this Agreement by Covenantor will not operate or be construed as a waiver of or consent to that breach of any subsequent breach by Covenantor.

5.    **THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NORTH CAROLINA, WITHOUT REFERENCE TO NORTH CAROLINA CONFLICT OF LAW PRINCIPLES. COVENANTOR HEREBY IRREVOCABLY SUBMITS HIMSELF TO THE JURISDICTION OF THE STATE AND FEDERAL DISTRICT COURTS LOCATED IN THE STATE, COUNTY, OR JUDICIAL DISTRICT IN WHICH FRANCHISOR'S PRINCIPAL PLACE OF BUSINESS IS LOCATED. COVENANTOR HEREBY WAIVES ALL QUESTIONS OF PERSONAL JURISDICTION OR VENUE FOR THE PURPOSE OF CARRYING OUT THIS PROVISION. COVENANTOR HEREBY AGREES THAT SERVICE OF PROCESS MAY BE MADE UPON HIM IN ANY PROCEEDING RELATING TO OR ARISING UNDER THIS AGREEMENT OR THE RELATIONSHIP CREATED BY THIS AGREEMENT BY ANY MEANS ALLOWED BY NORTH CAROLINA OR FEDERAL LAW. COVENANTOR FURTHER AGREES THAT VENUE FOR ANY PROCEEDING RELATING TO OR ARISING OUT OF THIS AGREEMENT WILL BE THE COUNTY OR JUDICIAL DISTRICT IN WHICH THE FRANCHISOR'S PRINCIPAL PLACE OF BUSINESS IS LOCATED; PROVIDED, HOWEVER, WITH RESPECT TO ANY ACTION WHICH INCLUDES INJUNCTIVE RELIEF OR OTHER EXTRAORDINARY RELIEF, FRANCHISOR OR FRANCHISEE MAY BRING SUCH ACTION IN ANY COURT IN ANY STATE WHICH HAS JURISDICTION.**

6.    **FRANCHISEE AND COVENANTOR HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVE ANY RIGHT TO A JURY TRIAL IN ANY ACTION ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS WRITTEN CONSENT TO A TRIAL BY THE COURT.**

7.    Franchisor and Franchisor's successors and assigns will be third-party beneficiaries of this Agreement, with the full and independent right, at Franchisor's and their option and in Franchisor's and their sole discretion, to enforce this Agreement.

8.    This Agreement contains the entire agreement of the parties regarding the subject matter hereof. This Agreement may be modified only by a duly authorized writing executed by all parties.

9.    Any and all notices required or permitted under this Agreement will be in writing and will be personally delivered or mailed by expedited delivery service or certified or registered mail, return receipt requested, first-class postage prepaid, or sent by facsimile or electronic mail to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other parties.

If directed to Franchisor, the notice will be addressed to:

N2 Franchising, LLC
5051 New Centre Drive
Wilmington, North Carolina 28403
Attention: President

Attachment D

If directed to Franchisee, the notice will be addressed to:

_____
_____
_____
Attention:  _____
Facsimile:  _____

If directed to Covenantor, the notice will be addressed to:

_____
_____
_____
Attention:  _____
Facsimile:  _____

Any notice will be deemed to have been given at the time of personal delivery or, in the case of expedited delivery service on the next Business Day, or, in the case of or registered or certified mail, three Business Days after the date and time of mailing, or, in the case of facsimile or electronic mail, upon transmission (provided confirmation is sent by expedited delivery service or registered or certified mail).

10.     The rights and remedies of Franchisor under this Agreement are fully assignable and transferable and will insure to the benefit of its respective affiliates, successors and assigns. The respective obligations of Franchisee and Covenantor hereunder may not be assigned by Franchisee or Covenantor, without the prior written consent of Franchisor.

IN WITNESS WHEREOF, the undersigned have entered into this Agreement as witnessed by their signatures below.

**FRANCHISEE:**

_____

By: _____
    Name: _____
    Title: _____
    Date: _____

**COVENANTOR:**

By: _____
    Name: _____
    Title: _____
    Date: _____

Attachment D

## ATTACHMENT E

### STATEMENT OF OWNERSHIP INTERESTS AND MANAGEMENT INFORMATION

1. The following is a list of all shareholders, partners, members, or other investors owning a direct or indirect interest in Franchisee and a description of the nature of their interest:

| Name | Ownership Interest in Franchisee | Nature of Interest |
|------|----------------------------------|--------------------|
|      |                                  |                    |
|      |                                  |                    |
|      |                                  |                    |
|      |                                  |                    |

2. The following is a list of all of Franchisee's Principals who are signing the Principals' Undertaking.

3. The following named Principal is the person responsible for the day-to-day operations and management of the Franchised Business.

Attachment E

**ATTACHMENT E**

**ELECTRONIC FUNDS TRANSFER AUTHORIZATION**

Attachment E

## ELECTRONIC FUNDS TRANSFER AUTHORIZATION

I hereby authorize N2 Franchising, LLC ("**Company**") to initiate credit and, if necessary, debit entries, and adjustments for any credit entries in error to the account indicated below, at the depository financial institution (Bank Name) named below, and to credit or debit the same from such account. I acknowledge that this authorization will remain in effect until I cancel or supersede the account information in writing and that the origination of ACH transactions to my account must comply with the provisions of U.S. law. This authorization will remain in effect until Company has received advanced written notice of cancellation from me in such time and in such manner as to afford Company a reasonable opportunity to act on it, and in no event will not be less than 30 days.

Bank Name: _____    Branch: _____

City: _____    State: _____  Zip: _____

Account Number: _____    Routing Number: __ __ __ __ __ __ __ __ __

Select one:  ☐ Checking    ☐ Savings

**Please attach a voided check here.**

Name on Account (Entity or Individual): _____

_____    _____    _____
Signature                              Date                        Print Name

_____
Title if Signing for Entity

publishing    5051 New Centre Drive | Wilmington, NC 28403 | p: 910.202.0917 | f: 910.202.1876 | www.n2pub.com

Attachment E

STATE SPECIFIC AMENDMENTS TO FRANCHISE AGREEMENT

Attachment E

**AMENDMENT TO N2 FRANCHISING, LLC**
**FRANCHISE AGREEMENT**
**FOR THE STATE OF CALIFORNIA**

The N2 Publishing Franchise Agreement between _____ ("**Franchisee**," "**you**," or "**your**") and N2 Franchising, LLC ("**Franchisor**") dated _____, 2017 ("**Agreement**"), is hereby amended by the addition of the following language, which will be considered an integral part of the Agreement ("**Amendment**"):

1.      The California Department of Business Oversight requires that certain provisions contained in franchise documents be amended to be consistent with California law, including the California Franchise Investment Law, CAL. CORP. CODE Section 31000 *et seq.*, and the California Franchise Relations Act, CAL. BUS. & PROF. CODE Section 20000 *et seq.* To the extent that the Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

        a.      California Business and Professions Code Sections 20000 through 20043 provide rights to the franchisee concerning termination or non-renewal of a franchise. If the franchise agreement contains a provision that is inconsistent with the law, the law will control.

        b.      The Agreement provides for termination upon bankruptcy. This provision may not be enforceable under federal bankruptcy law (11 U.S.C.A. Sec. 101 *et seq.*).

        c.      The Agreement contains a covenant not to compete which extends beyond the termination of the franchise. This provision may not be enforceable under California law.

        d.      The Agreement requires application of the laws of North Carolina. This provision may not be enforceable under California law.

2.      Section 3.A. of the Agreement is hereby supplemented with the following:

        Even though Franchisor has waived payment of the initial franchise fee, the California Department of Business Oversight has required Franchisor to defer Franchisee's obligation to pay the initial franchise fee until Franchisor has performed its pre-opening obligations and Franchisee begins operating the Franchised Business. Notwithstanding the foregoing, Franchisor's waiver of the initial franchise fee remains in full force and effect.

IN WITNESS WHEREOF, Franchisee, on behalf of itself and its owners, acknowledges that it has read and understands the contents of this Amendment, that it has had the opportunity to obtain the advice of counsel, and that it intends to comply with this Amendment and be bound thereby. The parties have duly executed and delivered this Amendment to the Agreement on _____, 2017.

**FRANCHISOR:**                          **FRANCHISEE:**
N2 Franchising, LLC
a Delaware limited liability company


By: _____                      By: _____

Name: Duane Hixon                        Name: _____

Title: CEO                               Title: Franchisee _____


Exhibit B

# AMENDMENT TO N2 FRANCHISING, LLC
## FRANCHISE AGREEMENT
## FOR THE STATE OF ILLINOIS

The N2 Publishing Franchise Agreement between _____ ("Franchisee," "you," or "your") and N2 Franchising, LLC ("Franchisor") dated _____, 2017 ("Agreement"), is hereby amended by the addition of the following language, which will be considered an integral part of the Agreement ("Amendment"):

1.      The Illinois Attorney General's Office requires that certain provisions contained in franchise documents be amended to be consistent with Illinois law, including the Franchise Disclosure Act of 1987, 815 ILCS 705/1 *et seq* ("Act"). To the extent that this Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

     a.      Paragraphs 705/19 and 705/20 of the Act provide rights to you concerning nonrenewal and termination of this Agreement. If this Agreement contains a provision that is inconsistent with the Act, the Act will control.

     b.      Any release of claims or acknowledgments of fact contained in the Agreement that would negate or remove from judicial review any statement, misrepresentation, or action that would violate the Act, or a rule or order under the Act, will be void and are hereby deleted with respect to claims under the Act.

     c.      If this Agreement requires litigation to be conducted in a forum other than the state of Illinois, the requirement is void with respect to claims under the Act.

     d.      If this Agreement requires that it be governed by a state's law, other than the state of Illinois, to the extent that such law conflicts with the Act, Illinois law governing claims arising under the Act will control.

2.      Section 3.A. of the Agreement is hereby supplemented with the following:

     Even though Franchisor has waived payment of the initial franchise fee, the Illinois Attorney General's Office has required Franchisor to defer Franchisee's obligation to pay the initial franchise fee until Franchisor has performed its pre-opening obligations and Franchisee begins operating the Franchised Business. Notwithstanding the foregoing, Franchisor's waiver of the initial franchise fee remains in full force and effect.

3.      Section 17., "Dispute Resolution," is hereby be amended by the addition of the following as the last sentence of the section:

     However, this Section will not act as a condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of the Illinois Franchise Disclosure Act of 1987 at Section 705/41.

4.      Each provision of this Amendment will be effective only to the extent that the jurisdictional requirements of the Act, with respect to each such provision, are met independent of this Amendment. This Amendment will have no force or effect if such jurisdictional requirements are not met.

IN WITNESS WHEREOF, Franchisee, on behalf of itself and its owners, acknowledges that it has read and understands the contents of this Amendment, that it has had the opportunity to obtain the advice of counsel, and that it intends to comply with this Amendment and be bound thereby. The parties have duly executed and delivered this Amendment to the Agreement on _____, 2017.

Exhibit B

**FRANCHISOR:**
N2 Franchising, LLC
a Delaware limited liability company

By: _____

Name, Title: <u>Duane Hixon, CEO</u>

**FRANCHISEE:**

By: _____

Name, Title: _____

Exhibit B

# AMENDMENT TO N2 FRANCHISING, LLC
## FRANCHISE AGREEMENT
### FOR THE STATE OF MARYLAND

The N2 Publishing Franchise Agreement between _____ ("Franchisee," "you," or "your") and N2 Franchising, LLC ("Franchisor") dated _____, 2017 ("Agreement"), is hereby amended by the addition of the following language, which will be considered an integral part of the Agreement ("Amendment"):

1.      The Maryland Securities Division requires that certain provisions contained in franchise documents be amended to be consistent with Maryland law, including the Maryland Franchise Registration and Disclosure Law, MD. BUS. REG. CODE ANN. § 14-201 *et seq.* (2015 Repl. Vol.) ("Law"). To the extent that this Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

        a.      The general release required as a condition of renewal, sale, assignment/transfer, refund of the initial fee, and/or a reduction in the size of the Territory will not apply to any liability under the Law.

        b.      Any acknowledgments or representations of Franchisee made in the Agreement which disclaim the occurrence and/or acknowledge the non-occurrence of acts that would constitute a violation of the Law are not intended to, nor will they, act as a release, estoppel, or waiver of any liability incurred under the Law.

        c.      A Franchisee may bring a lawsuit in Maryland for claims arising under the Law.

        d.      The limitation on the period of time when mediation and/or arbitration claims must be brought will not act to reduce the three-year statute of limitations afforded Franchisee for bringing a claim arising under the Law. Any claims arising under the Law must be brought within three years after the grant of the franchise.

2.      Each provision of this Amendment will be effective only to the extent that the jurisdictional requirements of the Law, with respect to each such provision, are met independent of this Amendment. This Amendment will have no force or effect if such jurisdictional requirements are not met.

IN WITNESS WHEREOF, Franchisee, on behalf of itself and its owners, acknowledges that it has read and understands the contents of this Amendment, that it has had the opportunity to obtain the advice of counsel, and that it intends to comply with this Amendment and be bound thereby. The parties have duly executed and delivered this Amendment to the Agreement on _____, 2017.

**FRANCHISOR:**                                   **FRANCHISEE:**
N2 Franchising, LLC
a Delaware limited liability company


By: _____            By: _____

Name: Duane Hixon                                Name: _____

Title: CEO                                       Title: Franchisee _____


Exhibit B

## AMENDMENT TO N2 FRANCHISING, LLC
## FRANCHISE AGREEMENT AND FRANCHISE DISCLOSURE DOCUMENT
## FOR THE STATE OF MINNESOTA

The N2 Publishing Franchise Agreement between _____ ("Franchisee," "you," or "your") and N2 Franchising, LLc ("Franchisor") dated _____, 2017 ("Agreement"), is hereby amended by the addition of the following language, which will be considered an integral part of the Agreement ("**Amendment**"):

1.    The Commissioner of Commerce for the State of Minnesota requires that certain provisions contained in franchise documents be amended to be consistent with the Minnesota Franchise Act, Minn. Stat. Section 80C.01 *et seq.*, and the rules and regulations promulgated thereunder (collectively, "**Franchise Act**"). To the extent that the Agreement/and or franchise disclosure document contains provisions that are inconsistent with the following, such provisions are hereby amended:

a.    The Minnesota Department of Commerce requires that franchisors indemnify Minnesota franchisees' against liability to third parties resulting from claims by third parties that the franchisees' use of the franchisor's proprietary marks infringes trademark rights of the third party.

b.    Minn. Stat. Sec. 80C.14, Subds. 3, 4., and 5 require, except in certain specified cases, that a franchisee be given 90 days notice of termination (with 60 days to cure) and 180 days notice for non-renewal of the franchise agreement. If the Agreement contains a provision that is inconsistent with the Franchise Act, the provisions of the Agreement will be superseded by the Act's requirements and will have no force or effect.

c.    If Franchisee is required in the Agreement to execute a release of claims or to acknowledge facts that would negate or remove from judicial review any statement, misrepresentation, or action that would violate the Franchise Act, such release will exclude claims arising under the Franchise Act, and such acknowledgments will be void with respect to claims under the Franchise Act.

d.    If the Agreement requires that it be governed by the law of a state other than the state of Minnesota or arbitration or mediation, those provisions will not in any way abrogate or reduce any rights of Franchisee as provided for in the Franchise Act, including the right to submit matters to the jurisdiction of the courts of Minnesota.

e.    Any provision that requires Franchisee to consent to a claims period that differs from the applicable statute of limitations period under Minn. Stat § 80C.17, Subd. 5. may not be enforceable under Minnesota law.

2.    Minn. Stat. §80C.21 and Minn. Rule 2860.4400J prohibit us from requiring litigation to be conducted outside Minnesota. In addition, nothing in the franchise disclosure document or Agreement can abrogate or reduce any of your rights as provided for in Minnesota Statutes, Chapter 80C, including your rights to any procedure, forum, or remedies provided for in such statute.

3.    The Agreement/and or franchise disclosure document is hereby amended to delete all references to liquidated damages (as defined) in violation of Minnesota law; provided, that no such deletion will excuse Franchisee from liability for actual or other damages, and the formula for liquidated damages in the Agreement/and or franchise disclosure document will be admissible as evidence of actual damages.

4.    To the extent required by Minnesota law, the Agreement/and or franchise disclosure document is amended to delete all references to a waiver of jury trial.

Exhibit B

5.     All sections of the Agreement/and or franchise disclosure document referencing Franchisor's right to obtain injunctive relief are hereby amended to refer to Franchisor's right to seek to obtain injunctive relief.

6.     Each provision of this Agreement will be effective only to the extent that the jurisdictional requirements of the Franchise Act or other Minnesota law applicable to the provision are met independent of this Amendment. This Amendment will have no force or effect if such jurisdictional requirements are not met.

IN WITNESS WHEREOF, the Franchisee on behalf of itself and its owners acknowledges that it has read and understands the contents of this Amendment, that it has had the opportunity to obtain the advice of counsel, and that it intends to comply with this Amendment and be bound thereby. The parties have duly executed and delivered this Amendment on _____, 2017.

**FRANCHISOR:**
N2 Franchising, LLC
a Delaware limited liability company

**FRANCHISEE:**

By: _____

By: _____

Name: <u>Duane Hixon</u>

Name: _____

Title: <u>CEO</u>

Title: _____ Franchisee _____

Exhibit B

### AMENDMENT TO N2 FRANCHISING, LLC
### FRANCHISE AGREEMENT
### FOR THE STATE OF NEW YORK

The N2 Publishing Franchise Agreement between _____ ("Franchisee," "you," or "your") and N2 Franchising, LLC ("Franchisor") dated _____, 2017 ("Agreement"), is hereby amended by the addition of the following language, which will be considered an integral part of the Agreement ("Amendment"):

1.     The New York Department of Law requires that certain provisions contained in franchise documents be amended to be consistent with New York law, including the General Business Law, Article 33, Sections 680 through 695 (1989). To the extent that the Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

        a.     If Franchisee is required in the Agreement to execute a release of claims or to acknowledge facts that would negate or remove from judicial review any statement, misrepresentation, or action that would violate the General Business Law, regulation, rule, or order under New York law, such release will exclude claims arising under the New York General Business Law, Article 33, Section 680 through 695 and the regulations promulgated thereunder, and such acknowledgments will be void. It is the intent of this provision that non-waiver provisions of Sections 687.4 and 687.5 of the General Business Law be satisfied.

        b.     If the Agreement requires that it be governed by the law of a state, other than the state of New York, the choice of law provision will not be considered to waive any rights conferred upon Franchisee under the New York General Business Law, Article 33, Sections 680 through 695.

2.     Each provision of this Amendment will be effective only to the extent that the jurisdictional requirements of the New York General Business Law, with respect to each such provision, are met independent of this Amendment. This Amendment will have no force or effect if such jurisdictional requirements are not met.

IN WITNESS WHEREOF, the Franchisee on behalf of itself and its owners acknowledges that it has read and understands the contents of this Amendment, that it has had the opportunity to obtain the advice of counsel, and that it intends to comply with this Amendment and be bound thereby. The parties have duly executed and delivered this Amendment on _____, 2017.

**FRANCHISOR:**
N2 Franchising, LLC
a Delaware limited liability company

**FRANCHISEE:**

By: _____

By: _____

Name: <u>Duane Hixon</u>

Name: _____

Title: <u>CEO</u>

Title: <u>Franchisee</u>

Exhibit B

Case 7:19-cv-00089-BO    Document 1-4    Filed 05/03/19    Page 66 of 82

# AMENDMENT TO N2 FRANCHISING, LLC
# FRANCHISE AGREEMENT
# FOR THE STATE OF NORTH DAKOTA

The N2 Publishing Franchise Agreement between _____ ("Franchisee," "you," or "your") and N2 Franchising, LLC ("Franchisor") dated _____, 2017 ("Franchise Agreement"), is hereby amended by the addition of the following language, which will be considered an integral part of the Agreement ("Amendment"):

1.      The State of North Dakota has determined that the following types of provisions are deemed to be contrary to North Dakota Law:

   (a)   A provision requiring a North Dakota franchisee to sign a general release upon renewal of the Franchise Agreement;

   (b)   A provision requiring a North Dakota franchisee to consent to termination penalties or liquidated damages;

   (c)   A provision requiring a North Dakota franchisee to consent to the jurisdiction of courts outside the state of North Dakota;

   (d)   A provision restricting the time in which a North Dakota franchisee may make a claim to less than the applicable North Dakota statute of limitations;

   (e)   A provision calling for the waiver by a North Dakota franchisee of the right to trial by jury;

   (f)   A provision requiring a North Dakota franchisee to consent to a waiver of exemplary and punitive damages.

Any and all provisions in the Franchise Agreement that are in violation of Section 1.(a-f) above are hereby deleted.

2.      The following is hereby added to Section 3.A. of the Franchise Agreement:

The North Dakota Securities Department has required that Franchisor defer Franchisee's obligation to pay initial fees under the Agreement until Franchisee's has commenced operating its Franchised Business and Franchisor has met its initial obligations. Therefore, notwithstanding anything to the contrary in Section 3.A. of the Agreement, during the period that such fee deferral requirement is imposed on Franchisor ("Fee Deferral Period"), Franchisee will not be required to pay the initial fees under the Franchise Agreement until Franchisee's begins operating its Franchised Business and Franchisor has met its initial obligations. Immediately upon notice from Franchisor that the Fee Deferral Period has ended, Franchisee must pay the full, initial franchise fee and all other initial fees and amounts as provided in the Franchise Agreement.

3.      The following is hereby added to Section 7. of the Franchise Agreement:

North Dakota Century Code Section 9-08-06 subjects covenants not to compete to the provisions of that statute. The covenants not to compete contained within the Franchise Agreement are subject to Section 9-08-06 and may be unenforceable under North Dakota law.

4.      In Section 14.A., "North Carolina" is hereby replaced with "North Dakota."

5.      The following is hereby added to Section 14. of the Franchise Agreement.

The site of any mediation or arbitration of the parties' disputes will be at a site mutually agreeable to all parties. If all parties cannot agree upon a location, the arbitration or mediation will be in Fargo, North Dakota.

Exhibit B

6.     In the event of any conflict between the terms of this Amendment and the terms of the Agreement, the terms of this Amendment will prevail.

7.     Each provision of this Amendment will be effective only to the extent, with respect to such provision, that the jurisdictional requirements of North Dakota Law are met independently without reference to this Amendment.

IN WITNESS WHEREOF, the Franchisee on behalf of itself and its owners acknowledges that it has read and understands the contents of this Amendment, that it has had the opportunity to obtain the advice of counsel, and that it intends to comply with this Amendment and be bound thereby. The parties have duly executed and delivered this Amendment on _____, 2017.

**FRANCHISOR:**
N2 Franchising, LLC
a Delaware limited liability company

**FRANCHISEE:**

By: _____

By: _____

Name: Duane Hixon

Name: _____

Title: CEO

Title: Franchisee

Exhibit B

## AMENDMENT TO N2 FRANCHISING, LLC
## FRANCHISE AGREEMENT
## FOR THE STATE OF RHODE ISLAND

The N2 Publishing Franchise Agreement between _____ ("**Franchisee**," "**you**," or "**your**") and N2 Franchising, LLC ("**Franchisor**") dated _____, 2017 ("**Agreement**"), is hereby amended by the addition of the following language, which will be considered an integral part of the Agreement ("**Amendment**"):

1.      The following are hereby added to Section C.(1). of the Agreement:

Rhode Island Law provides that a provision in a franchise agreement restricting jurisdiction or venue to a forum outside this state or requiring the application of the laws of another state is void with respect to a claim otherwise enforceable under Rhode Island Law.

2.      In the event of any conflict between the terms of this Amendment and the terms of the Agreement, the terms of this Amendment will prevail.

3.      Each provision of this Amendment will be effective only to the extent, with respect to such provision, that the jurisdictional requirements of Rhode Island Law are met independently without reference to this Amendment.

IN WITNESS WHEREOF, the Franchisee on behalf of itself and its owners acknowledges that it has read and understands the contents of this Amendment, that it has had the opportunity to obtain the advice of counsel, and that it intends to comply with this Amendment and be bound thereby. The parties have duly executed and delivered this Amendment on _____, 2017.

**FRANCHISOR:**                                        **FRANCHISEE:**
N2 Franchising, LLC
a Delaware limited liability company


By: _____          By: _____

Name: Duane Hixon                                      Name: _____

Title: CEO                                                    Title: Franchisee


Exhibit B

**AMENDMENT TO N2 FRANCHISING, LLC**
**FRANCHISE AGREEMENT**
**FOR THE STATE OF SOUTH DAKOTA**

The N2 Publishing Franchise Agreement between _____ ("**Franchisee**," "**you**," or "**your**") and N2 Franchising, LLC ("**Franchisor**") dated _____, 2017 ("**Agreement**"), is hereby amended by the addition of the following language, which will be considered an integral part of the Agreement ("**Amendment**"):

1.  Section 3.A. of the Agreement is hereby supplemented with the following:

     Even though Franchisor has waived payment of the initial franchise fee, the South Dakota Department of Labor Relations Division of Securities has required Franchisor to defer Franchisee's obligation to pay the initial franchise fee until such time as the Franchised Business is operational. Notwithstanding the foregoing, Franchisor's waiver of the initial franchise fee remains in full force and effect.

2.  Each provision of this Amendment will be effective only to the extent that the jurisdictional requirements of South Dakota law applicable to the provision are met independent of this Amendment. This Amendment will have no force or effect if such jurisdictional requirements are not met.

IN WITNESS WHEREOF, Franchisee on behalf of itself and its owners acknowledges that it has read and understands the contents of this Amendment, that it has had the opportunity to obtain the advice of counsel, and that it intends to comply with this Amendment and be bound thereby. The parties have duly executed and delivered this Amendment on _____, 2017.

**FRANCHISOR:**                                           **FRANCHISEE:**
N2 Franchising, LLC
a Delaware limited liability company


By: _____        By: _____

Name, Title: <u>Duane Hixon, CEO</u>_____        Name, Title: _____


Exhibit B

**AMENDMENT TO N2 FRANCHISING, LLC
FRANCHISE AGREEMENT
FOR THE STATE OF VIRGINIA**

The N2 Publishing Franchise Agreement between _____ ("Franchisee," "you," or "your") and N2 Franchising, LLC ("**Franchisor**") dated _____, 2017 ("**Agreement**"), is hereby amended by the addition of the following language, which will be considered an integral part of the Agreement ("**Amendment**"):

1.    Section 3.A. of the Agreement is hereby supplemented with the following:

Even though Franchisor has waived payment of the initial franchise fee, the Virginia State Corporation Commission's Division of Securities and Retail Franchising has required Franchisor to defer Franchisee's obligation to pay the initial franchise fee and other initial payments until Franchisor has performed its pre-opening obligations under the franchise agreement. Notwithstanding the foregoing, Franchisor's waiver of the initial franchise fee remains in full force and effect.

2.    Each provision of this Amendment will be effective only to the extent that the jurisdictional requirements of Virginia law applicable to the provision are met independent of this Amendment. This Amendment will have no force or effect if such jurisdictional requirements are not met.

IN WITNESS WHEREOF, Franchisee on behalf of itself and its owners acknowledges that it has read and understands the contents of this Amendment, that it has had the opportunity to obtain the advice of counsel, and that it intends to comply with this Amendment and be bound thereby. The parties have duly executed and delivered this Amendment on _____, 2017.

**FRANCHISOR:**                                    **FRANCHISEE:**
N2 Franchising, LLC
a Delaware limited liability company


By: _____          By: _____

Name, Title: <u>Duane Hixon, CEO</u>              Name, Title: _____

Exhibit B

# AMENDMENT TO N2 FRANCHISING, LLC
## FRANCHISE AGREEMENT
## FOR THE STATE OF WASHINGTON

The N2 Publishing Franchise Agreement between _____ ("Franchisee," "you," or "your") and N2 Franchising, LLC ("Franchisor") dated _____, 2017 ("Agreement"), is hereby amended by the addition of the following language, which will be considered an integral part of the Agreement ("Amendment"):

1.    The Director of the Washington Department of Financial Institutions requires that certain provisions contained in franchise documents be amended to be consistent with Washington law, including the Washington Franchise Investment Protection Act, WA Rev. Code §§ 19.100.010 to 19.100.940 (1994) ("Act"). To the extent that the Agreement contains provisions that are inconsistent with the following, such provisions are hereby amended:

        a.    The Act provides rights to you concerning nonrenewal and termination of the Agreement. If the Agreement contains a provision that is inconsistent with the Act, the Act will control.

        b.    If Franchisee is required in the Agreement to execute a release of claims, such release will exclude claims arising under the Act; except when the release is executed under a negotiated settlement after the Agreement is in effect and where the parties are represented by independent counsel. If there are provisions in the Agreement that unreasonably restrict or limit the statute of limitations period for claims brought under the Act, or other rights or remedies under the Act, those provisions may be unenforceable.

        c.    If the Agreement requires litigation, arbitration, or mediation to be conducted in a forum other than the state of Washington, the requirement may be unenforceable under Washington law. Arbitration involving a franchise purchased in the state of Washington must either be held in the state of Washington or in a place mutually agreed upon at the time of the arbitration, or as determined by the arbitrator.

        d.    If the Agreement requires that it be governed by the law of a state, other than the state of Washington, and there is a conflict between the law and the Act, the Act will control.

        e.    Transfer fees are collectable to the extent that they reflect Franchisor's reasonable estimated or actual costs in effecting a transfer.

2.    <u>Section 3.A.</u> of the Agreement is hereby supplemented with the following:

Notwithstanding the foregoing, Franchisee's obligation to pay the initial franchise fee is hereby deferred until Franchisor has performed its pre-opening obligations and Franchisee begins operating the Franchised Business, at which time, Franchisee must pay the initial franchise fee immediately upon notice by Franchisor.

3.    Each provision of this Amendment will be effective only to the extent that the jurisdictional requirements of Washington law applicable to the provision are met independent of this Amendment. This Amendment will have no force or effect if such jurisdictional requirements are not met.

IN WITNESS WHEREOF, the Franchisee on behalf of itself and its owners acknowledges that it has read and understands the contents of this Amendment, that it has had the opportunity to obtain the advice of counsel, and that it intends to comply with this Amendment and be bound thereby. The parties have duly

Exhibit B

executed and delivered this Amendment on _____, 2017.

**FRANCHISOR:**
N2 Franchising, LLC
a Delaware limited liability company

**FRANCHISEE:**

By: _____

By: _____

Name, Title: Duane Hixon, CEO _____

Name, Title: _____

Exhibit B

DocuSign Envelope ID: 1B6D85B3-A8BB-4C9C-8667-30801B606B5A

## TRANSFER AGREEMENT AND CONSENT

THIS TRANSFER AGREEMENT AND CONSENT ("**Transfer Agreement**") is made and entered into by and between N2 Franchising, LLC, a Delaware limited liability company ("**Franchisor**"), Jacqueline Marie Lyles, an adult individual ("**Transferor**"), ("**Transferor Principals**"), William Craig O'Neal, Jr., an adult individual ("**Transferee**"), and [names of individual(s) who are named as Principals in the new franchise agreement], [an] adult individual[s] ("**Transferee Principals**"). This Transfer Agreement will be effective upon execution by Franchisor ("**Effective Date**").

## RECITALS

A. Transferor is the Franchisee under that certain N2 Franchising, LLC Franchise Agreement dated October 18, 2017 between Franchisor and Transferor ("**Franchise Agreement**") for the Territory listed in Attachment B to the Franchise Agreement, and Transferor Principals are personally bound by certain covenants set forth in the Franchise Agreement.

B. Transferor operates its N2 Publishing business ("**Franchisee's Business**"), pursuant to the terms and conditions of the Franchise Agreement.

C. Transferor desires to transfer, convey, and assign to Transferee all of its interest in and to the Franchise Agreement as provided for in this Transfer Agreement and to sell certain assets used in the operation of Franchisee's Business, as defined in that certain purchase agreement dated September 5, 2018 between Transferor as seller and Transferee as buyer ("**Purchase Agreement**"), such transaction to be effective as of the date specified in the Purchase Agreement or otherwise mutually agreed to by the parties ("**Closing**").

D. Transferee desires to assume the duties and obligations of Transferor under a New Franchise Agreement (defined below), subject to the terms, conditions, and covenants contained herein.

E. Franchisor desires to consent to the transfer contemplated by this Transfer Agreement, subject to the terms, conditions, and covenants set forth below.

NOW THEREFORE, FOR AND IN CONSIDERATION of the premises, the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt, sufficiency, and adequacy of which are expressly acknowledged by the parties, each intending to be legally bound, do hereby agree as follows:

## AGREEMENT

1. Consent to Transfer. Franchisor hereby consents to the transfer contemplated by this Transfer Agreement, provided that all of the terms and conditions set forth herein are met. All future transfers subject to the terms of the New Franchise Agreement remain subject to Franchisor's further consent.

2. Payment of Fees. Upon execution of this Transfer Agreement by Franchisor, Transferor must have paid Franchisor all sums owed to Franchisor by Transferor, including but not limited to the required transfer fee and all Returnable Commissions.

3. Termination of Franchise Agreement; Survival of Certain Covenants and Obligations. Except as provided for in Section 9. of this Transfer Agreement, upon execution of this Transfer Agreement by Franchisor, the Franchise Agreement will terminate automatically; however, Transferor and Transferor Principals, and each of them, remain bound by, and must comply with, those provisions of the Franchise Agreement, which by their nature survive termination and include, but are not limited to, confidentiality and noncompetition; payment of debts and taxes; indemnification; and the post-term obligations set forth in Section 11. **Further, Transferor and Transferor Principals will remain bound by the dispute resolution provisions set forth in Section 14. of the Franchise Agreement.**

1



DocuSign Envelope ID: 1B6D85B3-A8BB-4C9C-8667-30801B606B5A

4.    New Franchise Agreement. Transferee and Transferee's Principals have read and understand Franchisor's current form of franchise agreement with related attachments, if any (collectively, "**New Franchise Agreement**"), and agree that on or before Closing, Transferee will enter into the New Franchise Agreement with Franchisor and execute or cause to be executed all attachments thereto, and Transferee Principals will each execute the Principals' Undertaking (Attachment C to the New Franchise Agreement).

5.    Releases

a.    By Franchisor. Except for the obligations set forth in this Transfer Agreement, Franchisor irrevocably and unconditionally releases, acquits, and forever discharges Transferor and each Transferor Principal ("**Transferor Parties**") from all actions, causes of action, suits, debts, liens, obligations, promises, liabilities, claims, rights, demands, damages, controversies, losses, costs, and expenses (including attorneys' fees and costs actually incurred), known or unknown, suspected or unsuspected, fixed or contingent, which Franchisor now has, owns, holds, claims to have, claims to own, or claims to hold, or at any time heretofore had owned, held, claimed to have, claimed to own, or claimed to hold against any Transferor Party arising out of or relating to the Franchise Agreement.

b.    By Transferor. Transferor and each Transferor Principal, for themselves and on behalf of all other persons or entities acting on any of their behalves or claiming under any of them ("**Releasing Parties**"), hereby irrevocably and unconditionally release, acquit, and forever discharge Franchisor and its owners, stockholders, predecessors, assigns, agents, directors, officers, employees, representatives, attorneys, subsidiaries, and affiliates, past and present, and all persons acting by, through, under or in concert with any of them ("**Franchisor Releasees**") or any of them, from all actions, causes of action, suits, debts, liens, obligations, promises, liabilities, claims, rights, demands, damages, controversies, losses, costs, and expenses (including attorneys' fees and costs actually incurred), known or unknown, suspected or unsuspected, fixed or contingent, which any of them now has, owns, holds, claims to have, claims to own, or claims to hold, or at any time heretofore had, owned, held, claimed to have, claimed to own, or claimed to hold (collectively, "**claims**") against each or any of the Franchisor Releasees, including but not limited to those arising out of or relating to the Franchise Agreement and the relationships created thereby, any other agreement between any Franchisor Releasee on the one hand and any Releasing Party on the other hand, and the offer or sale of the N2 Publishing franchise opportunity.

6.    Covenant Not to Sue. Each of the parties hereto covenant and agree for themselves and for their assigns, heirs, representatives, agents, family members, and all other persons acting on their behalf or claiming under them (collectively, "**Covenantors**") not to participate in, bring, or allow to be brought on behalf of any Covenantor, any action, cause of action, suit, or other proceeding of any kind, which has accrued or which may ever accrue, whether based in the Constitution, common law, or statute, contract, tort, or in equity, for actual or punitive damages or other relief, against one another arising out of, resulting from, or in any manner related to the matters released in Sections 5.a. and 5.b

7.    Acknowledgments Regarding Releases. By affixing their signatures to this Transfer Agreement, the parties acknowledge that they have carefully read and fully understand the provisions of this Agreement, including, specifically, the release of claims set forth in Sections 5.a. and 5.b. of this Agreement, and that their release of such claims is knowing and voluntary. Transferor and each Transferor Principal acknowledges that it has had a reasonable opportunity to consult with an attorney prior to executing this Transfer Agreement and that the execution of this Transfer Agreement is voluntary. Transferor and each Transferor Principal further acknowledge that Franchisor has advised them to consult with an attorney before executing this Transfer Agreement. Each party represents that it does not rely, and has not relied upon, any representation or statement made by any of the Franchisor Releasees or any of the Transferor Parties, as the case may be, or any of their representatives, with regard to the subject matter, basis, or effect of this Agreement.

Case 7:19-cv-00089-BO   Document 1-4   Filed 05/03/19   Page 75 of 82

DocuSign Envelope ID: 1B6D85B3-A8BB-4C9C-8687-30801B606B5A

8.    Indemnity. The parties acknowledge and agree that except for those matters relative to its consent, Franchisor has exercised no influence over and has taken no part in the transfer of the Franchise Agreement or Franchisee's Business. Accordingly, Transferor, each Transferor Principal, Transferee, and each Transferee Principal hereby agree to, and will at all times, indemnify and hold each of the Franchisor Releasees harmless, to the fullest extent permitted by law, from all losses and expenses incurred in connection with any action, suit, proceeding, claim, demand, investigation, or inquiry (formal or informal), or any settlement thereof (whether or not a formal proceeding or action has been instituted), which arises out of or is based upon the transactions contemplated by this Transfer Agreement. "**Losses and expenses**" includes, without limitation, all losses, compensatory, exemplary, or punitive damages, fines, charges, costs, expenses, lost profits, reasonable attorneys' fees, investigative fees, court costs, settlement amounts, judgments, compensation for damages to Franchisor's reputation and goodwill, and other such amounts incurred in connection with such matters.

9.    Failure to Close. If Closing does not take place as provided herein, then Franchisor's approval of the transfer contemplated by this Transfer Agreement will be deemed withdrawn, unapproved, and without any force or effect, and Transferor and Transferor Principals will remain bound by the terms of the Franchise Agreement, which will remain in full force and effect.

10.    Notices. Any and all notices required or permitted under this Transfer Agreement must be in writing and personally delivered or mailed by expedited delivery service or certified or registered mail, return receipt requested, first class postage prepaid, or sent by prepaid facsimile (provided that the sender confirms the facsimile by sending an original confirmation copy by certified or registered mail or expedited delivery service within three business days after transmission) to the parties at the following addresses until a different address is designated by written notice to the other party:

| Notices to Franchisor: | N2 Franchising, LLC |
| | 5051 New Centre Drive |
| | Wilmington, North Carolina 28403 |
| | Attention: President |
| | Facsimile: 910-202-1876 |

| Notices to Transferor and Transferor Principals: | Jacqueline Marie Lyles |
| | 4285 Wickersham Dr., NW |
| | Atlanta, GA 30327 |
| | Attention: Jacqueline Marie Lyles |
| | |
| | Telephone: (404) 936-0499 |

| Notices to Transferee and Transferee Principals: | William Craig O'Neal, Jr. |
| | 4420 Peachtree Rd. NE Apt 2343 |
| | Brookhaven, GA 30319 |
| | Attention: William Craig O'Neal, Jr. |
| | |
| | Telephone: 478-951-5186 |

11.    Governing Law. This Transfer Agreement will be interpreted and construed under the laws of the state of North Carolina, without regard to the application of North Carolina conflict of law rules.

12.    Severability. Except as expressly provided to the contrary herein, each portion, section, part, term, and provision of this Transfer Agreement will be considered severable; and if, for any reason, any

3

DocuSign Envelope ID: 1B6D85B3-A8BB-4C9C-8667-30801B606B5A

portion, section, part, term, or provision is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such determination will not impair the operation of, or have any other effect upon, the other portions, sections, parts, terms, or provisions of this Transfer Agreement that may remain otherwise intelligible, and the latter will continue to be given full force and effect and bind the parties; the invalid portions, sections, parts, terms, or provisions will be deemed not to be part of this Transfer Agreement; and such portion, section, part, term, or provision as similar as possible to that which was severed will automatically be added, which addition will be valid and not contrary to or in conflict with any law or regulation.

13.    Dispute Resolution; Venue. The parties hereto hereby irrevocably submit themselves to the jurisdiction of the state and federal district courts located in the state, county, or judicial district in which Franchisor's principal place of business is located, and the parties each waive all questions of personal jurisdiction for the purpose of carrying out this provision. The parties further agree that the venue for any proceeding relating to or arising out of this Transfer Agreement will be the state and federal district courts located in the county or judicial district in which Franchisor's principal place of business is located; provided however, that Franchisor may bring any action for injunctive or other extraordinary relief in any state or federal district court that has jurisdiction.

14.    Counterpart Execution; Facsimile Signatures. This Transfer Agreement may be executed in multiple counterparts, each of which when so executed will be an original, and all of which will constitute one and the same instrument. Facsimile signatures will be considered effective for execution purposes.

15.    Further Assurances. Transferor, Transferor Principals, Transferee, and Transferee Principals hereby irrevocably agree to execute, deliver, or cause to be executed and delivered any and all other documents that may now or hereafter be necessary to consummate the transactions contemplated hereby, as reasonably requested by Franchisor.

16.    Capitalized Terms. Initially capitalized terms used in this Transfer Agreement have the meanings given to them in the Franchise Agreement, unless otherwise defined herein.

IN WITNESS WHEREOF, the parties hereto have executed this Transfer Agreement on the dates set forth below.

(Signature page is the next page.)

4

DocuSign Envelope ID: 1B6D85B3-A8BB-4C9C-8667-30801B606B5A

**TRANSFEROR:**

*Jacqueline Lyles*

Jacqueline Marie Lyles, an Individual

Date: _____ 8/30/2018 7:05:56 PM PDT

**TRANSFEREE:**

*William Craig O'Neal*

William Craig O'Neal, Jr. an Individual

Date: _____ 8/31/2018 9:28:15 AM PDT

Franchisor hereby consents to the foregoing transfer on the term described in this Transfer Agreement.

**FRANCHISOR:**
N2 Franchising, LLC
a Delaware limited liability company

By: **Tracy Guardino**     Digitally signed by Tracy Guardino
Tracy Guardino, Contracts Compliance Specialist Date: 2018.08.31 13:49:05 -04'00'

Date: _____

5



EXHIBIT

C

STATE OF NORTH CAROLINA     IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
COUNTY OF NEW HANOVER     FILE NO. 19-CVS-_____

NEIGHBORHOOD NETWORKS )
PUBLISHING, INC. and N2 )
FRANCHISING, LLC, )
          Plaintiffs )
   )
   )         AFFIDAVIT OF
       v. )        KATE SILBERFELD
   )
JACQUELINE MARIE LYLES and )
LIFESTYLE PUBLICATIONS LLC, )
        Defendants )
   )

Kate Silberfeld, being first duly sworn, deposes and says:

1.    I am over 18 years of age, and I suffer from no mental disability. I am competent to testify concerning the matters stated herein, and the statements contained in this Affidavit are based upon my personal knowledge, except as to those matters stated on information and belief, which I believe to be true.

2.    I am the lead person for Plaintiff Neighborhood Networks Publishing, Inc.'s ("N2") Field Support team.

3.    The primary responsibility of N2's Field Support team is to provide non-sales related support to N2's Area Directors throughout the publishing cycle. For example, we help Area Directors with accessing and using N2's Portal and PubManager when they have problems or questions.

4.    Field Support uses the general email account fieldsupport@n2pub.com to communicate and otherwise help fulfill our responsibilities.

5.    On or about March 29, 2019, we received an email to that address from an email account jackielyles@att.net with subject line "former client requesting the ad we did for them". Attached and incorporated herein as Exhibit A

is a true and accurate copy of that email and all emails exchanged between me and jackielyles@att.net under that subject line and related to this matter.

6.  Upon information and belief, that email was sent by Jackie Lyles, who is a former N2 Area Director.

7.  The email opens by stating "I used to work for n2 and 'retired' recently." The email then goes onto to say that an N2 advertising client, who I later identified as Cunningham Associates, wanted a copy of the advertisement that N2 had designed and created for it. *See*, Ex. A.

8.  Relying on the statement that she was "retired", and wanting to help, which is a defining trait of N2 Field Support, I provided her with a link to PubManager so she could pull the requested advertisement directly. *See*, Ex. A.

9.  Although I did not know it when I responded to her email, I now know that Jackie Lyles is working for Lifestyle Publications whom I know to be a business competitor of N2.

10.  Had Jackie Lyles contacted Field Support using an @lifestylepubs.com email address or otherwise disclosed that she works with Lifestyle Publications, I would not have provided her access to a copy of the requested customer advertisement.

This the 18 day of April, 2019.

_____
Kate Silberfeld

NEW HANOVER COUNTY, NORTH CAROLINA

Sworn to (or affirmed) and subscribed before me this day by Kate Silberfeld.

Date 4/18/2019

_____
Signature of Notary Public
My commission expires: 02/28/2021

(Official Seal)



 **former client requesting the ad we did for them**
Hi field support :)

I used to work for n2 and "retired" recently.

I have a previous client in the Peachtree Battle Living publication (GA_Peachtree) that would like the ad we did for them emailed to them. They are copied on this email.

I don't have access to n2 and pub manager any longer.

Would you please email Jere Smith the last ad you all did for them?

Their last ad ran in the 2/2019 issue.

Many thanks! Hope you all are well!

Best,

Jackie Lyles

21d · ✉

jsmith@cunninghamhvac.com was added to the conversation by Jackie Lyles 21d ago

jsmith@cunninghamhvac.com was removed from the conversation by Kate Silberfeld 21d ago

Hi Jackie, 

I hope you're doing great!  Is this for Cunningham Associates?  If so, here's a link to the ad:
https://pubmanager.n2pub.com/share/ga/ohX4AfGu

I removed the client from this email chain.

                                                                 21d

Kate replied and closed this conversation 21d ago

Kate Silberfeld assigned this conversation to Kate Silberfeld and reopened it 21d ago

Kate closed this conversation 21d ago

 thank you Kate -

I will forward to Jere from Cunningham.

:)

jackie

21d · ✉

Kate closed this conversation 21d ago


EXHIBIT
A



Field Support <fieldsupport@n2pub.com>

## former client requesting the ad we did for them
1 message

**Jackie Lyles** <jackielyles@att.net>                                  Thu, Mar 28, 2019 at 12:23 PM
Reply-To: Jackie Lyles <jackielyles@att.net>
To: "fieldsupport@n2pub.com" <fieldsupport@n2pub.com>
Cc: Jere Smith <jsmith@cunninghamhvac.com>

Hi field support :)

I used to work for n2 and "retired" recently.

I have a previous client in the Peachtree Battle Living publication (GA_Peachtree) that would like
the ad we did for them emailed to them. They are copied on this email.

I don't have access to n2 and pub manager any longer.
Would you please email Jere Smith the last ad you all did for them?
Their last ad ran in the 2/2019 issue.

Many thanks! Hope you all are well!
Best,
Jackie Lyles

Case 7:19-cv-00089-BO    Document 1-4    Filed 05/03/19    Page 82 of 82