**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**

CIVIL ACTION FILE NO.: 7:19-cv-89-BO

| | |
|---|---|
| NEIGHBORHOOD NETWORKS PUBLISHING, INC. and N2 FRANCHISING, LLC,, | DEFENDANT LIFESTYLE PUBLICATIONS, LLC'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM |
| Plaintiffs, | |
| v. | |
| JACQUELINE MARIE LYLES and LIFESTYLE PUBLICATIONS, LLC, | |
| Defendants. | |

Defendant Lifestyle Publications, LLC ("Lifestyle") moves for summary judgment on all of Plaintiffs' claims. This motion is supported by the following Memorandum and the separately-filed Statement of Facts ("SOF").

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Plaintiffs are newspaper publishers who, after learning that their former employee Jacqueline Lyles ("Lyles") dared to work for another publishing company, sued Lyles and Lifestyle, who is not even Plaintiffs' employer but merely a company associated with another company that contracted with Lyles. Plaintiffs allege that Lyles breached her non-competition agreement and misappropriated confidential information to benefit Lifestyle. In their haste to litigate, Plaintiffs failed to note that the non-competition agreement is unenforceable as a matter of law, that the single instance of supposed confidential information was in fact a copy of a *published* magazine advertisement that Plaintiffs voluntarily provided in response to a request by

Lyles, and that Lifestyle never even employed Lyles. All of Plaintiffs' claims are unsupported by the law and the evidence, and summary judgment in Lifestyle's favor is appropriate.

I.    **BACKGROUND**

Plaintiff Neighborhood Networks Publishing, Inc. ("N2") owns and publishes "around 900 different community publications, which are published in 47 states." (SOF ¶ 1). These publications are "hyper-local" magazines that target specific affluent areas of cities and suburbs, and local businesses place advertisements in them. N2 offers franchises in each of these specific local areas; its franchisees are called "Area Directors." (SOF ¶ 2). N2 has approximately 800 Area Directors that sell advertising for their respective N2 magazines. (SOF ¶ 3). Each magazine covers one of these nearly one thousand distinct, miniature geographical areas. (SOF ¶ 4).

Lyles was an Area Director for N2 from approximately February 1, 2016 until August 31, 2018. (SOF ¶ 5). Her franchise was the Peachtree Battle community in Atlanta, Georgia, and her N2 magazine was titled *Peachtree Battle Living*. (SOF ¶ 6). The Peachtree Battle community is just a few hundred acres in Atlanta—well under a square mile. (SOF ¶ 8).

A.    **Lyle's Franchise Agreement**

As part of her appointment as the Peachtree Battle franchisee with N2, Lyles was required to execute a Franchise Agreement. (SOF ¶ 9). The Franchise Agreement contained non-competition, non-solicitation, and confidentiality provisions. It defined Lyles' Territory as "The Community of Peachtree Battle; in the State of Georgia, county of Fulton and in the zip code of 30305 as defined on October 18, 2017." (SOF ¶ 10). In fact, the Franchise Agreement outright prohibited Lyles from even soliciting "any Community that is not within Franchisee's Territory without Franchisor's prior written consent." (SOF ¶ 11).

The non-competition provision provided that "[f]or a period of 24 months immediately following the expiration, termination, or transfer of this Agreement ('Non-Compete Period'),

neither Franchisee nor any Principal will compete, directly or indirectly, with Franchisor...or engage in any capacity, by any individual, organization, or company, in any Competitive Business within the Territory; within a 15-mile radius around the perimeter of the Territory; or within a 15-mile radius around the perimeter of the territory of any other N2 Publishing franchisee, directly or indirectly..." (SOF ¶ 12). The non-compete clause also prohibited Lyles from directly or indirectly "solicit[ing] business from Consumers, Communities, clients (including advertisers) of Franchisor or of any N2 Publishing franchisee (within the geography defined above), nor engag[ing] in any business activities that are the same as or similar to those of Franchisor or its franchisees." (SOF ¶ 13).

The non-solicitation clause prohibited Lyles from "soliciting advertising with any N2 Publishing customers that Franchisee has obtained as a result of Franchisor's Confidential Information." (SOF ¶ 14).

### B.    Lyles Sells Her Franchise

On August 31, 2018, Lyles sold her franchise to Craig O'Neal. (SOF ¶ 16). N2's consent was required for Lyles to sell the franchise, and N2 consented. (SOF ¶ 17). After O'Neal became the Area Director for the Territory, Lyles worked with O'Neal from September through November 2018 to help O'Neal publish *Peachtree Battle Living*. (SOF ¶ 18).

When Lyles had become an Area Director, N2 granted her access to its computer systems N2 Portal and PubManager, which are cloud-based software systems that Area Directors "use to manage and process customer advertising contracts and orders" and to "upload and manage files containing articles and customer advertisements for publication in N2's magazines." (SOF ¶ 19). N2 not only knew of Lyles' sale of her franchise, but had to approve it in writing. Despite this, when Lyles sold to O'Neal, N2 chose to not terminate her access to N2 Portal and PubManager. (SOF ¶ 20). N2 did not terminate Lyles' access until March 27, 2019 (SOF ¶ 21).

While Lyles was helping O'Neal with *Peachtree Battle Living*, and continuing through March 2019, Lyles accessed N2 Portal and PubManager using her same N2-supplied credentials. (SOF ¶ 22). She viewed "the identity of certain of N2's clients, the nature of the ads those clients were running, the contact information for certain of N2's clients, and the identity of certain N2 clients who had not yet paid N2." (SOF ¶ 23). She viewed the identities and advertisements for 11 N2 advertisers. (SOF ¶ 24). She viewed the "content and proofs related to multiple N2 publications circulated in Buckhead and Peachtree Battle areas of Atlanta." (SOF ¶ 25). N2 continued to supply Lyles with active credentials to N2 Portal and PubManager until March 2019. (SOF ¶ 26).

### C.    Lyles Works with Lifestyle Publishing, S.E., LLC

In February 2019, Lyles began working as an independent contractor for Lifestyle Publications S.E., LLC ("Publications S.E."). (SOF ¶ 28). Publications S.E. is an independent contractor for Lifestyle. (SOF ¶ 29). Publications S.E. publishes four magazines, *Alpharetta Lifestyle*, *BuckHaven Lifestyle*, *Johns Creek Lifestyle*, and *Perimeter North Lifestyle*. (SOF ¶ 31). None of these magazines specifically target the Peachtree Battle area. (SOF ¶ 32).

On March 28, 2019, Lyles contacted N2 from her personal email address, stating that she used to work for N2 and was "retired," and that a N2 client had contacted her for a copy of an advertisement that it had run in the February 2019 issue of *Peachtree Battle Living*. (SOF ¶ 33). Lyles copied the customer, Cunningham Associates, on the email, and asked N2 to email Jere Smith, the Cunningham contact, a copy of the ad. (SOF ¶ 34). Kate Silberfeld of N2 responded and emailed a copy of the ad only to Lyles, who responded and said she would forward to Cunningham. (SOF ¶ 35).

N2 then filed this lawsuit against Lyles and Lifestyle (but inexplicably not against Publications S.E.). She claims against Lifestyle for misappropriation of trade secrets, computer

CORE/3506595.0005/158963074.2

trespass, tortious interference with contract, unfair and deceptive practices, constructive trust, fraudulent misrepresentation/fraudulent concealment, and punitive damages. (Compl.)

## II.    LIFESTYLE IS ENTITLED TO SUMMARY JUDGMENT ON ALL CLAIMS

### A.    Lifestyle did not tortiously interfere with the Franchise Agreement because it neither induced Lyles to breach, nor did Lyles actually breach, a valid contract.

N2's claim for tortious interference fails for several independent reasons. First, tortious interference requires knowledge of the contract and intentional inducement to breach, and Lifestyle never even knew of the Franchise Agreement and never employed Lyles, so it could not have intentionally induced any breach. Second, tortious interference also requires the breach of a valid contract, and Lyles did not breach a valid contract because the Franchise Agreement's non-compete clause is unenforceable, she never violated the non-solicitation clause, and she never used N2's confidential information for her own benefit in competing with N2.

#### 1.    Lifestyle never knew of the Franchise Agreement and never employed Lyles, so it could not tortiously interfere any breach.

Lifestyle never employed or contracted with Lyles, and never knew the Franchise Agreement existed, which negates two elements of N2's tortious interference claim—that "the defendant knows of the contract" and "the defendant intentionally induces the third person not to perform the contract." *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988).

Lyles contracted with Publications S.E., not Lifestyle. (SOF ¶ 28). Until N2 initiated this litigation, Lifestyle never knew of the existence of any contracts between Lyles and N2, including the Franchise Agreement. (SOF ¶ 36). Because Lifestyle had no knowledge of the Franchise Agreement at the time of Lyles' alleged breach of the Franchise Agreement, Lifestyle

cannot be liable for tortious interference of that agreement, and N2's claim fails as a matter of law.

Furthermore, the tortious interference claim additionally fails because Lifestyle never intentionally induced Lyles to breach the Franchise Agreement. No one employed at Lifestyle ever directed Lyles to access N2's computer systems or to solicit customers of N2. (SOF ¶ 37). Without any evidence of intentional inducement, N2's tortious interference claim fails on this element as well.

> **2.    Lifestyle did not tortiously interference with the non-compete provision in the Franchise Agreement because that provision is unenforceable as a matter of law.**

The second independent reason why N2's tortious interference claim fails is because the supposedly-breached provisions in the Franchise Agreement are unenforceable. The first basis of N2's tortious interference claim is Lifestyle's alleged interference with the non-compete provision of the Franchise Agreement. (Compl. ¶¶ 92-94). But that provision is unenforceable as a matter of law because it prohibits Lyles from working for a competitor *in any capacity anywhere in the world*. North Carolina courts have repeatedly invalidated such overly-broad non-compete agreements, and because tortious interference requires interference with a "valid contract," N2's claim fails. *United Labs.*, 322 N.C. at 661, 370 S.E.2d at 387.

"A covenant 'must be no wider in scope than is necessary to protect the business of the employer.'" *Hartman v. W.H. Odell & Associates, Inc.*, 117 N.C. App. 307, 316, 450 S.E.2d 912, 919 (1994) (citation omitted). Restrictive covenants that are "too broad to be a reasonable protection to the employer's business will not be enforced." *Id.* To be enforceable, a covenant not to compete must be: "(1) in writing; (2) reasonable as to [the] terms, time, and territory; (3) made a part of the employment contract; (4) based on valuable consideration; and (5) not against public policy." *Triangle Leasing Co. v. McMahon*, 327 N.C. 224, 228, 393 S.E.2d 854, 857

(1990). North Carolina does not "blue pencil" covenants by rewriting or revising them to make them reasonable; they are simply not enforced. *Id.* at 317, 450 S.E.2d at 920. Moreover, N2—as the party seeking to enforce the covenant—bears the burden of proving that the covenant is reasonable, which is a question of law for the court to decide. *Id.* at 311, 450 S.E.2d at 916.

N2's non-compete provision reads as follows:

> For a period of 24 months immediately following the expiration, termination, or transfer of this Agreement ("Non-Compete Period"), neither Franchisee nor any Principal will compete, directly or indirectly, with Franchisor (or its successors or assigns) or engage in any capacity, by any individual, organization, or company, in any Competitive Business within the Territory; within a 15-mile radius around the perimeter of the Territory; or within a 15-mile radius around the perimeter of the territory of any other N2 Publishing franchisee, directly or indirectly, through any type of sales person or agent. Without limiting the foregoing whatsoever, during the Non-Compete Period, neither Franchisee nor any Principal will, directly or indirectly, solicit business from Consumers, Communities, clients (including advertisers) of Franchisor or of any other N2 Publishing franchisee (within the geography defined above), nor engage in any business activities that are the same as or similar to those of Franchisor or its franchisees.

Compl., Ex. A, ¶ 7B(2). "Competitive Business" is defined "as any business or group that provides newsletters, magazines, periodicals, Websites, or any similar media to any Consumer." (*Id.* ¶ 7B).

There are four fatal flaws in this non-compete provision. First, it does not limit Lyles' employment in a way that relates to her job duties for N2. The provision requires Lyles to not "engage *in any capacity*, by any individual, organization, or company, in any Competitive Business…" (Emphasis added). This violates North Carolina's "janitor rule," which holds that covenants that simply prevent an employee from working for a competitor are unenforceable because they sweep in employment that does not relate to directly competing with the former

employer. *Hartman*, 117 N.C. App. at 317, 450 S.E.2d at 920 (covenant providing that plaintiff "may not 'own, manage, lease, control, operate, participate, consult or assist' any 'entity' that provides 'actuarial services'" was unenforceable because it would "appear to prevent plaintiff from working as a custodian for any 'entity' which provides 'actuarial services'"); *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 508-09, 606 S.E.2d 359, 362 (2004) (covenant providing that employee "may not 'own, manage, be employed by or otherwise participate in, directly or indirectly, any business similar to Employer's'" was unenforceable because "James would not merely be prevented from engaging in work similar to that which he did for VisionAIR at VisionAIR competitors; James would be prevented from doing even wholly unrelated work at any firm similar to VisionAIR."); *see also Campbell All. Grp., Inc. v. Forrest*, No. 5:15-CV-667-D, 2018 WL 1513661, at *4 (E.D.N.C. Mar. 27, 2018) ("North Carolina law does not permit an employer to use a covenant not to compete to prevent an employee from working for a competitor in any capacity."); *JF Acquisition, LLC v. Pedchenko*, No. 5:18-CV-123-BO, 2018 WL 4154249, at *2 (E.D.N.C. Aug. 29, 2018) ("Agreements cannot outright prevent a former employee from working for a competitor.").

Just a few months ago, the North Carolina Court of Appeals reiterated that covenants preventing an employee from working for a competitor in any capacity are unenforceable. In *Andy-Oxy Co. v. Harris*, the covenant provided that the employee "shall not, directly or indirectly, on his account or in the service of others, be employed or otherwise participate in the field or area of supplying, retailing, wholesaling, or distributing compressed gases, welding products, or any other products sold by the company." 834 S.E.2d 195, 2019 WL 5742106, at *5 (N.C. Ct. App. 2019). The court found it problematic that the "covenant is not limited to a restriction preventing Harris from working 'in an identical position for a direct competitor.'" *Id.*

CORE/3506595.0005/158963074.2

"By preventing Harris from directly or indirectly being employed or otherwise participating in the field of services that Andy-Oxy provides, the covenant effectually precludes Harris from having any association with a business in the same field, even future work distinct from his duties as an outside salesman." *Id.* Citing the "janitor rule," the court held "the scope of the non-compete agreement is impermissibly broad and goes beyond what is necessary to protect the legitimate business interests of Andy-Oxy," and invalidated it as unenforceable. *Id.*

Here, the non-compete prohibits Lyles from "engaging *in any capacity* … in any Competitive Business" for 24 months." This restriction alone renders the non-compete unenforceable under clearly-established North Carolina law.

The second flaw in the non-compete provision that independently makes it unenforceable is that its geographical scope is *nationwide*, despite Lyles having only worked on one "hyper-local" magazine targeting the community of Peachtree Battle in Atlanta. N2's own Complaint describes that N2's magazines are each hyper-local, targeting "residents of affluent neighborhoods and communities." (Compl. ¶ 16). N2 further alleges that they sell advertising to "local businesses" in those communities. (Compl. ¶ 22). As an Area Director for *Peachtree Battle Living*, Lyles' duties were to facilitate "publication of, and selling advertising for, *Peachtree Battle Living*." (SOF ¶ 7). Furthermore, while Lyles worked for N2, her compensation was based only off of advertising sold in *Peachtree Battle Living*, and Lyles used N2's computer systems to enter information for advertisers in only *Peachtree Battle Living*. (SOF ¶ 15). In short, Lyles' duties and her advertising clients were all hyper-local, relating solely to the Peachtree Battle community of less than one-square-mile.

But N2 seeks to bar Lyles from working nationwide because the non-compete provision prohibits her from working "within a 15-mile radius around the perimeter of the territory of any

other N2 Publishing franchisee" for 24 months. (SOF ¶ 12). N2 has 800 publishing franchisees covering 900 local areas in 47 states across the country. (SOF ¶¶ 1, 3). Thus, the non-compete prohibits Lyles from working anywhere in 900 areas across the U.S. Moreover, although each magazine is hyper-local, the 15-mile radius restriction for each of the 900 areas is a circle 30 miles in diameter, essentially barring entire metro areas. On its face, the covenant is unenforceable because it imposes a nationwide restriction despite Lyles' work at N2 being limited to the Peachtree Battle community. *See Hartman*, 117 N.C. App. at 316-17, 450 S.E.2d at 919 (covenant was unenforceable because it was "not limited so as to prevent plaintiff's 'competition for [defendant's] customers' only in the applicable territory."); *AMV Holdings, LLC v. Am. Vapes, Inc.*, No. 5:19-cv-00037-KDB-DCK, 2019 WL 3406315, at *7-8 (W.D.N.C. July 26, 2019) (concluding that covenant encompassing "a population of millions or [] multiple states" was "plainly overbroad" where defendant-franchisee's territory was "a limited area encompassing a working population of approximately 15,000," plaintiffs' business was "directed to individual local customers," and plaintiffs failed to show "where its customers [we]re located and that the geographic scope of the covenant [was] necessary to maintain those customer relationships"). Lyles worked only with advertisers in *Peachtree Battle Living*, but the non-compete provision on its face is a nationwide prohibition upon working in 30-mile diameter circles surrounding 900 cities in 47 states. That is overly broad and unenforceable.

The third flaw in the non-compete provision is that it prohibits Lyles from working for almost any company in the entire country, even for companies that do not compete with N2. The non-compete prohibits Lyles from "engaging in any Competitive Business." (Compl. Ex. A, ¶ 7B(2). Again, "Competitive Business" is broadly defined "as any business or group that provides newsletters, magazines, periodicals, Websites, or any similar media to any Consumer." (*Id.* ¶

7B). And "Consumer" means "neighborhoods, residential communities, homeowners' associations (HOAs), and ... any specific commercial or professional industry or group." (*Id.*)

This amounts to a total ban on employment. First, by way of example, even if Lyles worked as an editor for a trade journal in the adult film industry—which surely is not N2's business—that would be prohibited as a business providing a "newsletter" to a "specific … professional industry or group." This alone renders the non-compete unenforceable because it is overly broad and N2 has no legitimate business interest in categorically prohibiting Lyles from employment in unrelated industries.

Second, and more significantly, the actual effect of this provision is far broader than that already-absurd example. The provision includes any company that provides websites to *any* "Consumer." Virtually every company in the United States provides a website to the public, which includes the groups defined as a "Consumer." Thus, the non-compete prohibits Lyles from working for 24 months for *any company in America that provides a website*. On its face, the non-compete totally bars her employment for twenty-four months. It is shocking, **and surely the clearest example of an overly broad non-compete provision that this Court will ever see.**

The fourth flaw in the non-compete provision is that in addition to the nationwide geographic restriction, the second sentence of the provision prohibits Lyles from "engag[ing] in any business activities that are the same or similar to those of Franchisor or its franchisees" for 24 months without any geographic restriction whatsoever. Thus, the provision prohibits Lyles from engaging in "similar" business activities anywhere in the world for 24 months. It is patently overbroad and unenforceable. *See Elec. S., Inc. v. Lewis*, 96 N.C. App. 160, 168, 385 S.E.2d 352, 357 (1989) (non-compete prohibiting "Employee's association with an employer anywhere in the world if the new employer indirectly competes with the Company in the Greensboro locale" was

a "shotgun approach" creating "oppressive" results and unenforceable); *Clinical Staffing, Inc. v. Worldwide Travel Staffing Ltd.*, 60 F. Supp. 3d 618, 625 (E.D.N.C. 2013) (non-compete provision restricting employee from providing services to plaintiff's clients "anywhere in the world for six months" was overbroad and unenforceable).

For all of these reasons, the Franchise Agreement's non-compete provision is unenforceable, and cannot be the basis for a tortious interference claim against Lifestyle.

### 3. Lyles did not breach the non-solicitation provision of the Franchise Agreement.

N2's other basis for its tortious interference claim is Lyles' supposed breach of the non-solicitation provision of the Franchise Agreement. But Lyles never breached this provision because there is no evidence she solicited any N2 customers using N2's confidential information. The non-solicitation provision provides that for 24 months after leaving N2, Lyles "will not have direct or indirect communications for the purpose of soliciting advertising with any N2 Publishing customers that Franchisee has obtained as a result of Franchisor's Confidential Information." (SOF ¶ 14). N2 cannot identify even *one solicitation* by Lyles of a N2 customer.

Instead, N2 relies solely on Lyles' limited contact with Cunningham Associates. (Compl. ¶ 50). This is insufficient to establish a violation of the non-solicitation provision for two reasons. First, N2 has no evidence that Lyles communicated with Cunningham Associates "for the purpose of soliciting advertising" with Cunningham. Indeed, the emails are clear that Cunningham initiated communication with Lyles to obtain a copy of the advertisement that it had run in *Peachtree Battle Living*. (Compl. Ex. C Ex. A). Consequently, Lyles wrote to N2 to request that they send a copy of the publicly-published ad directly to Cunningham. Even on N2's planet, that is not a solicitation of advertising. Lyles did not solicit any advertising from Cunningham and for this reason alone did not violate the non-solicitation provision.

CORE/3506595.0005/158963074.2

Second, even aside from the total absence of any solicitation by Lyles, the provision also requires that Cunningham was a "customer that [Lyles] obtained as a result of [N2's] Confidential Information." N2 has no evidence that Lyles had used Confidential Information to obtain Cunningham as a customer. N2 has no evidence that Lyles in fact had obtained Cunningham as a customer while working for N2. And Cunningham's status as an advertiser in *Peachtree Battle Living* was a public fact, readily ascertainable by flipping through the published magazines distributed to residents. In sum, Lyles never solicited any advertising with N2 customers that she had obtained through N2's confidential information. She did not violate the non-solicitation provision, and it cannot serve as the basis for a tortious interference claim.

### 4. Lyles did not use N2's confidential information or trade secrets to compete with N2.

N2 claims Lyles also breached the Franchise Agreement by taking and using "N2's Confidential Information and Trade Secrets for her own use and benefit in furtherance of publishing community magazines that compete directly with N2 Publications." (Compl. ¶ 61(a)). This claim is largely duplicative of the misappropriation of trade secrets claim, discussed in the next section, but it suffices that N2 has no evidence that Lyles ever took or used any "Confidential Information and Trade Secrets" for her own benefit in competing with N2. Access to trade secrets alone is insufficient to establish that a defendant misappropriated them. *See Wells Fargo Ins. Services USA, Inc. v. Link*, 372 N.C. 260, 281, 827 S.E.2d 458, 474 (2019). Because N2 has no evidence of misappropriation, N2's claim fails.

### B. Lifestyle has not misappropriated N2's trade secrets.

N2's next claim against Lifestyle is for misappropriation of trade secrets. This claim fails for three reasons. First, N2 authorized Lyles to access its computer system, so the necessary element of unauthorized access does not exist. Second, N2 failed to take reasonable steps to

CORE/3506595.0005/158963074.2

protect its supposed trade secrets, also negating an element of misappropriation. Third, even if Lyles had misappropriated trade secrets, she did so entirely without the knowledge or direction of Lifestyle, and thus Lifestyle is not liable.

### 1. N2 authorized Lyles to access its computer systems for seven months after she sold her franchise.

Misappropriation of a trade secret requires that the defendant have acquired, disclosed, or used "a trade secret of another without express or implied authority or consent." N.C. Gen. Stat. § 66-152(1). The sole basis for N2's misappropriation claim is Lyles' conduct in accessing N2 Portal, but N2 continuously authorized Lyles to access N2 Portal from the beginning of her tenure as Area Director in February 2016 until N2 terminated her access on March 27, 2019. (SOF ¶ 27). N2 had no qualms about allowing Lyles to access its computer systems to help O'Neal with her franchise after she no longer had a direct ongoing relationship with N2—N2's own Complaint makes this clear. (Compl. ¶ 36). N2 controlled Lyles' access to N2 Portal, and could have terminated that access at any time. It did not, and cannot now claim that Lyles somehow accessed N2 Portal without "express or implied authority or consent." N2 has no evidence that Lyles acquired any N2 trade secrets after March 27, 2019. She did not misappropriate any trade secrets.

### 2. N2 did not take reasonable steps to protect its trade secrets.

One cannot be sloppy in protecting trade secrets and then sue for their misappropriation. A trade secret exists only if it is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." N.C. Gen. Stat. § 66.152(3). N2 cannot credibly argue that it attempted to maintain the secrecy of any information in the N2 Portal when it allowed Lyles to access that system for *seven months* after she sold her franchise. For example, the North Carolina Court of Appeals has noted the importance of ensuring that electronic access to trade secrets is carefully limited to only those who need to work with them. *TSG Finishing, LLC v.*

*Bollinger*, 238 N.C. App. 586, 594, 767 S.E.2d 870, 877 (2014) ("Security measures were in place such that only top-level employees were familiar with the proprietary information defendant was in charge of developing."). Not only did N2 freely grant Lyles access to N2 Portal, but it continued to provide that access for *seven months* after she had sold her franchise. N2 took no efforts to revoke Lyles' access until March 27, 2019. N2 cannot establish that it used reasonable efforts to protect whatever information N2 apparently believes is a trade secret. The misappropriation claim fails on this ground as well.

### 3. Lifestyle never directed Lyles to misappropriate any trade secrets and had no knowledge of Lyles' use of the N2 Portal.

Even if Lyles somehow had misappropriated trade secrets, Lifestyle would not be liable unless it had acquired or used the trade secrets. *See* N.C. Gen. Stat. § 66-152(1). Two insurmountable obstacles defeat N2's claim against Lifestyle. First, Lyles never contracted with Lifestyle; she contracted with Publications S.E. and Publications S.E. never consulted with Lifestyle before contracting with Lyles. (SOF ¶ 30). Second, neither Lifestyle nor Publications S.E. ever directed Lyles to solicit any business away from N2 or to use any of N2's confidential information or trade secrets.

Publications S.E. never directed Lyles to access N2 Portal. (SOF ¶ 38). It never directed Lyles to solicit any of N2's customers. (SOF ¶ 39). Although one of Publication S.E.'s magazines, *Buckhaven Lifestyles* ran an ad for Cunningham Associates, no one employed at Publications S.E. knew of any contractual prohibition on Lyles from working with Cunningham. (SOF ¶¶ 40-41). Publications S.E. never directed Lyles to contact N2 to obtain any copy of an ad for Cunningham. (SOF ¶ 42). Publications S.E. never directed Lyles to solicit any of N2's customers using any of N2's confidential information or trade secrets. (SOF ¶ 43). Publications S.E. has never had in its possession any information obtained through Lyles from N2 Portal or

PubManager. (SOF ¶ 44). Publications S.E. has never had any of N2's confidential information or trade secrets in its possession. (SOF ¶ 45). Lyles never shared with Publications S.E. any confidential information or trade secrets that she had obtained from N2. (SOF ¶ 46).

Lifestyle is even further removed; not only was it never consulted when Publications S.E. contracted with Lyles, but it also had no knowledge prior to this litigation of any contract between Lyles and N2. (SOF ¶ 36). Lifestyle has never directed Lyles to access N2's computer systems. (SOF ¶ 37). Lifestyle has never directed Lyles to solicit N2's customers. (SOF ¶ 48). Lifestyle has never directed Lyles to obtain any of N2's confidential information or trade secrets. (SOF ¶ 49). Lifestyle never directed Lyles to contact or mislead N2 regarding obtaining a copy of the Cunningham ad. (SOF ¶ 50). Lifestyle has never had in its possession any of N2's confidential information or trade secrets. (SOF ¶ 51).

It is especially significant that N2 did not sue Publications, S.E., the actual entity that contracted with Lyles. Instead, N2 chose to sue Lifestyle, which did not even know that Publications, S.E. was contracting with Lyles. Because Lifestyle did not direct Lyles to acquire or use any of N2's trade secrets, N2 cannot maintain a claim for misappropriation of trade secrets.

**C.    Lyles did not commit computer trespass, and certainly not did not commit computer trespass as an agent of Lifestyle.**

N2's next bogus claim is for computer trespass under N.C. Gen. Stat. § 14-458. As an initial matter, N2 appears confused on the elements of the civil offense. Although N2 cites in its Complaint to the entire chapter of North Carolina's statutes involving computer trespass, the only statute that allows for a private right of action is § 14-458. Under that statute, liability exists only if Lyles accessed N2's computer systems "without authority" and performed one of several enumerated acts: disabling computer data, causing a malfunction, altering or erasing data,

causing physical injury to property, making unauthorized copies of data, or sending spam. § 14-458(a). Instead of tracking the elements of a claim under § 14-458, however, N2 has alleged that Lyles accessed N2's systems for the "for the purpose of (1) devising or executing a scheme or artifice to defraud; and/or (2) obtaining property." (Compl. ¶ 84). N2 erroneously derives its allegations from § 14-454, but that is a criminal statute and there is no private right of action. *See Wilson By & Through Wilson v. Bellamy*, 105 N.C. App. 446, 464, 414 S.E.2d 347, 357 (1992) ("no civil right can be predicated upon a mere violation of a criminal statute").

N2 has no claim under § 14-458, either. First, the statute requires that Lyles accessed N2's systems "without authority," but as discussed, *supra*, on the misappropriation claim, N2 continuously authorized Lyles to access N2 Portal from the beginning of her tenure as Area Director in February 2016 until N2 terminated her access on March 27, 2019. (SOF ¶ 27). Thus, N2 cannot establish that Lyles access of the N2 Portal was "without authority" and for this reason, the computer trespass claim fails.

Moreover, Lyles did not destroy any data, disable any computer systems, or commit any of the other acts enumerated in § 14-458(a). The sole act that N2 alleges she undertook was to view "the identity of certain of N2's clients, the nature of the ads that those clients were running, the contact information for certain of N2's clients, and the identity of certain of N2's clients who had not yet paid N2 for the period of January to April 2019." (Compl. ¶ 82). Section 14-458 concerns intentional harm to computer systems and stolen data; it does not create a right of action for Lyles having allegedly viewed data that N2—despite allowing her access to view that data—now claims it did not want her to see. *See, e.g.*, *Spirax Sarco, Inc. v. SSI Eng'g, Inc.*, 122 F. Supp. 3d 408, 418 (E.D.N.C. 2015) (complaint stated claim for § 14-458 violation where employee downloaded and deleted "vast quantities of computer files" without authorization);

CORE/3506595.0005/158963074.2

*McKeown v. Tectran Mfg., Inc.*, 5:17-CV-00109, 2018 WL 2207139, at *3 (W.D.N.C. May 14, 2018) (former employee copied files to his personal drive and then deleted them from his work computer)

Finally, even if Lyles had committed computer trespass (and she did not), Lifestyle would still not be liable because Lifestyle neither directed or knew about Lyles' access of N2's computer systems. (SOF ¶¶ 37, 53). Indeed, even Publications S.E., which—unlike Lyles—contracted with Lyles, did not direct Lyles to access N2's computer systems, nor did it know about her access. (SOF ¶¶ 38, 47). Thus, Lyles certainly was not an agent of Lifestyle when she accessed N2's systems, and N2's claim against Lifestyle fails for this reason as well.

### D.    N2's fraud claim fails because Lyles did not make any misrepresentations and there has been no reasonable reliance.

N2's common-law fraud claim against Lifestyle is premised on the single email that Lyles sent to N2 asking for a copy of the Cunningham Associates advertisement. (Compl. ¶¶109-122). But Lyles never made any misrepresentations or concealed any material facts in this email. Thus, N2 cannot prove two elements of fraud—misrepresentation and reasonable reliance. Moreover, even if Lyles had committed fraud (and she did not), Lifestyle still cannot be liable because Lyles was not acting on behalf of Lifestyle when she sent that email.

Lyles' email to N2 was straightforward. She stated that she used to work for N2 but had "retired" from N2, that she previously had a client (Cunningham) who wanted a copy of an ad it had published in *Peachtree Battle Living*, and that Cunningham was copied on the email. (Compl. Ex. C Ex. A). In fact, Cunningham was copied on the email. (*Id.*). N2 accuses Lyles of concealing that she was supposedly working for Lifestyle. (Compl. ¶¶ 111-112). But concealment is only relevant to a fraud claim if the concealed fact was *material. See Rowan County Bd. of Educ. v. U.S. Gypsum Co.*, 332 N.C. 1, 17, 418 S.E.2d 648, 658 (1992) (elements

of fraud). N2 cannot explain how any alleged concealment of Lyles' current employment was material to a request *by N2's prior customer for its own previously-published ad*. Recall that Lyles not only copied Cunningham on the email, but also asked that N2 send the ad directly to Cunningham. (Compl. Ex. C Ex. A).

The other contentions in N2's Complaint are similarly absurd. It was not a misrepresentation for Lyles to say that she had "retired" from N2—after all, she had sold her franchise to O'Neal. And although N2 alleged that Lyles was lying about Cunningham having requested a copy of its ad, (Compl. ¶ 113), that does not even make sense given that Lyles copied Cunningham on the email and the sole request in the email was for N2 to send a copy of the ad to Cunningham. N2 also alleges that Lyles fraudulently omitted to say that Cunningham wanted a copy of the ad to use in a publication for Lifestyle, (*id.*), but absolutely nothing in Lyles' email states any reason why Cunningham wanted the ad. And N2 never asked—it just sent a copy of the ad. (Compl. Ex. C Ex. A). Thus, any concealment was not of a material fact, and cannot be the basis for a fraud claim.

For these same reasons, N2 also cannot prove the reasonable reliance of a fraud claim, which requires the recipient of a representation to use "reasonable care to ascertain the truth of that representation." *Solum v. Certainteed Corp.,* 147 F. Supp. 3d 404, 411 (E.D.N.C. 2015). N2 never followed up with Lyles to ask where she was working, although it knew she was no longer an Area Director for N2. It never asked the purpose for the request. It never asked Cunningham to verify whether Cunningham had actually asked for the ad. N2 did no investigation. In sum, N2 knew that a former Area Director was asking it to send a previously published ad to the ad client, and N2 did so without any investigation whatsoever. N2 cannot show that it reasonably relied upon any statements in Lyles' email.

Finally, Lyles was not acting on behalf of Lifestyle when she sent the email. (SOF ¶¶ 42, 50). Thus, even if Lyles did commit fraud, Lifestyle is not liable.

### E.    Lifestyle did not commit deceptive trade practices.

Closely related to N2's fraud claim, and equally deficient, is N2's claim against Lifestyle for unfair and deceptive trade practices ("UDTPA") pursuant to N.C. Gen. Stat. § 75-1.1. The claim requires that the defendant have (1) committed an "unfair or deceptive act or practice, (2) the act or practice was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Solum*, 147 F. Supp. 3d at 411. "An act is unfair 'when it offends established public policy,' 'is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers,' or 'amounts to an inequitable assertion of ... power or position.'" *Id.* (citations omitted). "Whether an act or practice is unfair or deceptive under the UDTPA is a question of law for the court." *Id.*

Neither N2's fraud allegations nor its breach of the Franchise Agreement allegations support a UDTPA claim. With respect to the fraud allegations, as already discussed, N2 cannot show reasonable reliance; this is fatal to its claim. "When the alleged UDTPA violation is a misrepresentation, a plaintiff must prove detrimental reliance on the alleged misrepresentation to satisfy the proximate cause requirement." *Id.* Detrimental reliance requires a showing of both actual reliance and reasonable reliance. *Id.* Thus, the fraud allegations cannot support a UDTPA claim.

With respect to the alleged breach by Lyles of the Franchise Agreement, "a mere breach of contract cannot sustain a UDTPA claim without a showing of 'substantial aggravating circumstances.'" *Stack v. Abbott Labs., Inc.*, 979 F. Supp. 2d 658, 668 (M.D.N.C. 2013). Even intentional breach is not sufficient; "[t]he type of conduct that has been found sufficient to constitute a substantial aggravating factor has generally involved forged documents, lies, and

CORE/3506595.0005/158963074.2

fraudulent inducements." *Id.* N2 has no evidence that Lyles (or Lifestyle) forged documents or fraudulently induced N2 to enter into the Franchise Agreement at the time N2 and Lyles entered into that agreement. Thus, any alleged breach of the Franchise Agreement cannot support a UDTPA claim.

Finally, even if Lyles had engaged in deceptive trade practices, she was not acting as Lifestyle's agent. There is no basis for N2's UDTPA claim.

F.  **N2's constructive trust claim fails because it is not a real claim, there was no fiduciary relationship between N2 and Lifestyle, and N2 has an adequate remedy at law.**

N2 brings a claim for a "constructive trust." This is a remedy, not an independent cause of action. *Danielson v. Human*, No. 3:12–CV–00840–FDW, 2014 WL 1765168, at *5 n.4 (W.D.N.C. May 2, 2014) ("The Court fails to find any cause of action in North Carolina law for constructive trust . . . ."); *John Boyle & Co. v. Fasano*, No. CIV. 5:03CV47–V, 2006 WL 572183, at *1 n.3 (W.D.N.C. Mar. 3, 2006) ("[C]onstructive trust is a remedy rather than a separate cause of action or legal theory . . . ."). Moreover, Lifestyle and N2 are not contractual partners, much less fiduciaries, and N2 has an adequate remedy at law. *See Sec. Nat'l Bank of Greensboro v. Educators Mut. Life Ins. Co.*, 265 N.C. 86, 95, 143 S.E.2d 270, 276 (1965) ("A constructive trust does not arise where there is no fiduciary relationship and there is an adequate remedy at law.").

G.  **There is no evidence supporting punitive damages.**

Lifestyle is entitled to summary judgment because all of N2's substantive claims are unsupported by law or evidence. However, even if one of those claims survives, N2 is still not entitled to punitive damages. N2 incorrectly styles its request for punitive damages as a standalone claim. (Compl. ¶¶ 122-124). North Carolina courts have repeatedly held that "a claim

for punitive damages is not a stand-alone claim." *E.g.*, *Funderburk v. JPMorgan Chase Bank, N.A.*, 241 N.C. App. 415, 425, 775 S.E.2d 1 (2015).

However, N2 is not entitled to punitive damages even as a remedy. Punitive damages require the aggravating factors of fraud, malice, or willful or wanton conduct. N.C. Gen. Ann. § 1D-15. Malice is "a sense of personal ill will toward the claimant that activated or incited the defendant to perform the act or undertake the conduct that resulted in harm to the claimant." *Id.* § 1D-5(5). Willful or wanton conduct "means the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm." *Id.* 1D-5(7). There is no evidence that Lyles, let alone Lifestyle, acted with personal ill will toward N2 or intended to cause harm to N2. And any liability by Lifestyle for punitive damages must be based on Lifestyle's direct participation in the conduct—vicarious liability does not suffice. *Id.* § 1D-15.

## III. <u>CONCLUSION</u>

Lifestyle requests the Court grant its motion for summary judgment on all claims.

This 4th day of June, 2020.

/s/ Carrie M. Francis
CARRIE M. FRANCIS, #020453
carrie.francis@stinson.com
STINSON LLP
1850 North Central Avenue, Suite 2100
Phoenix, AZ 85004
Telephone:  602.279.1600
Facsimile:   602.240.6925

CORE/3506595.0005/158963074.2

/s/ Amy P. Hunt
Amy P. Hunt
Offit Kurman
301 South College Street, Suite 2600
Charlotte, NC 28202-6006
Telephone: (704)-377-2500
Facsimile: (704) 372-2619
Email: Amy.Hunt@offitkurman.com
NC State Bar No. 34166
Local Civil Rule 83.1(d) Counsel for
Lifestyles Publications, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2020, I electronically filed the foregoing DEFENDANT LIFESTYLE PUBLICATIONS, LLC'S MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Alexander C. Dale
email: acd@wardandsmith.com
Christopher S. Edwards
email: csedwards@wardandsmith.com
Ward and Smith, P.A.
Post Office Box 7068
Wilmington, NC 28406-7068
*Attorneys for Plaintiffs*

Matthew Nis Leerberg
email: mleerberg@foxrothschild.com
Jeffrey R. Whitley
email: jwhitley@foxrothschild.com
FOX ROTHSDCHILD, LLP
P.O. Box 27525
Raleigh, NC 27611
*Attorneys for Defendant Jacqueline M. Lyles*

This 4th day of June, 2020.

/s/ Carrie M. Francis
CARRIE M. FRANCIS, #020453
carrie.francis@stinson.com
STINSON LLP
1850 North Central Avenue, Suite 2100
Phoenix, AZ 85004
Telephone:   602.279.1600
Facsimile:    602.240.6925

/s/ Amy P. Hunt
Amy P. Hunt
Offit Kurman
301 South College Street, Suite 2600
Charlotte, NC 28202-6006
Telephone: 704.377.2500
Facsimile: 704.372.2619
Amy.Hunt@offitkurman.com
NC State Bar No. 34166
Local Civil Rule 83.1(d) Counsel for
Lifestyle Publications, LLC

CORE/3506595.0005/158963074.2