IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

CIVIL ACTION FILE NO.: 7:19-cv-89-BO

NEIGHBORHOOD NETWORKS                )
PUBLISHING, INC. and N2              )
FRANCHISING, LLC,                    )
                    Plaintiffs,      )
                                     )
          v.                         )
                                     )
JACQUELINE MARIE LYLES and           )
LIFESTYLE PUBLICATIONS, LLC,         )
                    Defendants.      )


**RESPONSE IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

Introduction ....................................................................................................... 1

Statement of Material Facts .............................................................................. 1

    I.    N2 Successfully Publishes Neighborhood and Community Publications, Using its Proprietary Trade Secret Information. ................................................... 1

    II.    Jackie Lyles, a Former N2 Area Director, Leaves N2 to Start Working for N2's Primary Competitor, Lifestyle........................................................... 2

    III.    While at Lifestyle, Lyles Used Her Relationship with N2; She Defrauded N2 and Accessed its Confidential Information Without Permission. ........................ 4

Procedural History............................................................................................. 5

Argument .......................................................................................................... 8

    I.    Lyles and Newman were Lifestyle's Agents; Lifestyle is thus Liable for Their Bad Acts................................................................................................... 8

        A.    Lyles acted on behalf of Lifestyle............................................... 8

        B.    Lifestyle controlled Lyles' actions.............................................. 9

        C.    Because Lyles is Lifestyle's agent, Lifestyle is liable for Lyles' actions.... 11

        D.    Lifestyle cannot hide behind Publications S.E............................. 14

    II.    This Court Should Deny Lifestyle's Motion for Summary Judgment. ......... 16

        A.    N2 elects to abandon its tortious interference claim. ................. 16

        B.    This Court should deny Lifestyle's Motion as to N2's trade secrets claim. 16

            1.    Though Lyles *had* authority to access N2's systems, N2 never authorized access on a competitor's behalf. ................................. 16

            2.    N2 took careful, calculated steps to protect its trade secrets from public disclosure.......................................................................... 17

            3.    Lifestyle's agent, Lyles, misappropriated N2's trade secrets for Lifestyle's benefit. ............................................................... 19

        C.    Lifestyle, through Lyles, committed a computer trespass; therefore, this Court should deny Lifestyle's Motion for Summary Judgment......................... 21

D.      Lifestyle obtained the Cunningham ad by fraud. ....................................... 23

E.      Lifestyle violated the UDPA. ...................................................................... 27

F.      Constructive trust is an appropriate remedy for Lifestyle's actions. ......... 30

    1.      Whether a constructive trust is a remedy or a claim is irrelevant; the
    relevant question is whether there are facts to support N2's demand. .......... 30

    2.      Viewing the facts in the light most favorable to N2, there are sufficient
    facts to justify N2's request for constructive trust. ......................................... 31

G.      Punitive damages are appropriate for N2's trade secrets, computer
    trespass, and fraud claims. .................................................................................. 31

III.    The Court Should Deny Lifestyle's Motion under Rule 56(d)(1), Because
Lifestyles Intentionally Destroyed Evidence. ............................................................ 32

CONCLUSION............................................................................................................... 33

## Introduction

Lifestyle Publications, LLC ("Lifestyle") asks this Court to grant it summary judgment on all of the claims brought by Plaintiffs Neighborhood Networks Publishing, Inc. and N2 Franchising, LLC (collectively, "N2"). The Court should deny Lifestyle's Motion. As shown below, Lifestyle's agent, Jackie Lyles, defrauded N2, invaded its computer systems, and misappropriated its tradesecrets. There are genuine disputes of fact that preclude summary judgment; this case should proceed to trial.

## Statement of Material Facts

I. **N2 Successfully Publishes Neighborhood and Community Publications, Using its Proprietary Trade Secret Information.**

N2 owns and publishes around 900 different community magazines. (Response to Statement of Material Facts ("Response") ¶ 1). Local businesses—specifically those interested in building their own brand using long-term advertising—advertise in N2's various publications. (*Id.* ¶ 19). N2 franchises the opportunity to manage each of its publications to franchisees, called Area Directors (*Id.* ¶ 2).

N2 gives its Area Directors access to its cloud-based software systems, N2 Portal and PubManager. (*Id.* ¶ 19). These systems allow Area Directors to manage unpublished articles and customer advertisements. (*Id.*). These systems also provide Area Directors with secret, commercially valuable information, which N2 works hard to protect ("Confidential Information"). For example, N2 Portal includes information about N2's advertisers, like contract expiration and renewal dates, as well as billing information and payment history. (*Id.*). This Confidential Information is

competitively sensitive, because it allows N2's Area Directors to focus their efforts on closing likely successful sales. (*Id.* ¶ 19). Because N2's Confidential Information is so valuable, it issues its Area Directors unique usernames and passwords to log on to its online systems (*Id.*). The only way to access N2's Confidential Information is through its online systems, and the only way into those systems is a unique username and password. (*Id.*).

To keep its Confidential Information secret, N2 requires its Area Directors to sign confidentiality agreements, which are part of their Franchise Agreements. (*Id.*). More specifically, N2 allows its Area Directors to access its Confidential Information, but only for the limited purpose of growing and maintaining their N2 franchise. (*Id.* ¶ 22). N2's Area Directors cannot use N2's Confidential Information for any other purpose, and N2 requires that they stop using N2's Confidential Information altogether when they stop operating their franchises. (*Id.*).

## II.  Jackie Lyles, a Former N2 Area Director, Leaves N2 to Start Working for N2's Primary Competitor, Lifestyle.

From February 2016 through August 2018, Jackie Lyles was one of N2's Area Directors. (*Id.* ¶ 5). She was responsible for the "Peachtree Battle" community in Atlanta, Georgia. (*Id.* ¶ 8). Lyles was responsible for managing and selling advertisements for N2's publication *Peachtree Battle Living*. (*Id.* ¶¶ 6–7). Lyles sold her franchise to a third-party in August 2018. (*Id.* ¶ 16).

Beginning in February 2019, Lyles began working in a similar position with Lifestyle, N2's primary competitor. Lyles was hired by Jim Newman, one of Lifestyle's agents, to sell advertisements for four Lifestyle's publications: *Alpharetta*

*Lifestyle*, *BuckHaven Lifestyle*, *Johns Creek Lifestyle*, and *Perimeter North Lifestyle*. (*Id.* ¶ 31). When she was hired by Lifestyle, Lyles was issued a "lifestylepubs.com" email address and Lifestyle business cards. (*See, e.g.*, *id.* ¶¶ 25, 28). She applied to Lifestyle using an application bearing Lifestyle's corporate logo, and Newman mentioned joining the Lifestyle "team." (*Id.* ¶ 28). Lyles even signed a non-compete, which prohibited her from competing with Lifestyle. (*Id.*). Though her contract said that Lyles was an independent contractor (*id.*), she was, for all intent-and-purposes, an agent of Lifestyle.

When Newman hired Lyles, her contract was with Lifestyle Publications S.E., LLC ("Publications S.E."). Though Publications S.E. was nominally a separate entity, Lifestyle has had, and currently has, tremendous control over Publications S.E.'s day-to-day activities. Some of these instances of control are ordinary. For example, Publications S.E. publishes Lifestyle's own magazines. (*Id.* ¶ 29). Moreover, its principal, Newman, has a non-compete that prohibits him from competing against Lifestyle. (*Id.*). Other instances of control are extraordinary. For example, during this litigation, Lifestyle directed Publications S.E. when it responded to a subpoena issued by N2. (*Id.*). Lifestyle coached Publications S.E. about the documents it should produce—and those that Publications S.E. should hold back. (*Id.*). This coaching came from Lifestyle's highest levels: it included not only Lifestyle's outside counsel, Carrie Francis, but also its general counsel, Deland Shore, and its CEO, Steven Schowengerdt. (*Id.*). Thus, while Lifestyle and Newman, as Publications S.E., are nominally distinct, in reality they are not.

## III. While at Lifestyle, Lyles Used Her Relationship with N2; She Defrauded N2 and Accessed its Confidential Information Without Permission.

While at Lifestyle, Lyles began using her relationship with N2 to harm the company. When Lyles started working at Lifestyle, N2 was unaware that she had taken on a new, competing role. (*Id.* ¶ 35). So when Lyles emailed N2, asking for an ad for a customer, N2 was none the wiser. More specifically, in March 2019, Lyles emailed N2's support staff and asked for an ad that N2 had created for its customer Cunningham & Associates ("Cunningham"). (*Id.*). Because Lyles had landed the Cunningham account, N2 had no trepidation about releasing the ad to Lyles for Cunningham's benefit. (*Id.*).

In her request for the Cunningham ad, Lyles misled N2, hiding that she had gone to work for Lifestyle. For instance, Lyles emailed N2 from her personal email address, not her "lifestylepubs.com" address (*id.* ¶ 33), because she knew that, if she had, N2 would not have given her the ad. Moreover, Lyles told N2 that she had "retired," which N2 thought meant that she had stopped working altogether. (*Id.* ¶ 35). She had sold her N2 franchise after all.

Lyles' subsequent activity shows that she was anything but retired. After N2 sent the Cunningham ad, she forwarded it to Newman. (*Id.* ¶ 33). At the time, she and Newman were trying to solicit Cunningham's business away from N2, as Cunningham's advertising agreement with N2 expired in February 2019. (*Id.*). Cunningham signed a multi-year contract worth nearly $30,000. (*Id.* ¶ 46). Lifestyle took at least 15% of that profit. (*Id.* ¶ 50).

At any rate, Lyles' abuse of N2 continued in other ways. For instance, in February and March 2019, Lyles logged on to N2 Portal and PubManager to access N2's Confidential Information. (*Id.* ¶ 23). In particular, Lyles used N2 Portal to access contract renewal dates for a number of customers, including Mercedes Benz-Buckhead, Hennessey Jaguar/Land Rover, Pharr Road Animal Hospital, and Catalyst Fitness. (*Id.* ¶ 45). At the time Lyles viewed the information for these customers, each of them was near the end of their contract with N2. (*Id.* ¶ 24). For example, like Cunningham, Pharr Road Animal Hospital's advertising contract was set to expire in February 2019. (*Id.*). So, too, was the advertising contract for Catalyst Fitness. (*Id.*). Unsurprisingly, in March and April 2019, Lyles reached out to these customers to solicit their business. (*Id.* ¶ 45).

Lyles also downloaded data from N2 Portal. On March 28, 2019, Lyles sent an email to Lifestyle attaching a digital copy of an ad for Verde Home, an N2 customer. (*Id.* ¶ 47). This digital ad ran in the February 2019 edition of *Peachtree Battle Living*, Lyles' former publication. (*Id.*). Lyles could have accessed this high-resolution advertisement from only one place: N2 Portal. (*Id.*).

## Procedural History

In April 2019, N2 sued Lifestyle and Lyles in New Hanover County Superior Court. N2 asserted claims for misappropriation of trade secrets, computer trespass, unfair and deceptive practices, constructive trust, fraud, and punitive damages against both defendants. N2 also asserted a claim for breach of contract against Lyles and tortious interference with contract against Lifestyle. In May 2019, Lifestyle

removed N2's suit to this Court under 28 U.S.C. § 1441, based on the parties' diverse citizenship. *See* 28 U.S.C. § 1332.

In January 2020, N2 and Lyles settled. They agreed to a consent judgment, which included a permanent injunction. This Court enjoined Lyles from violating her Franchise Agreement. N2's settlement with Lyles left only its claims against Lifestyle.

In the meantime, N2 tried to obtain discovery from Lifestyle's agent, Publications S.E. In December 2019, N2 sent Publications S.E. a subpoena duces tecum. In March 2020, N2 filed a motion to compel, which the United States District Court for the Northern District of Georgia granted in May 2020, giving Publications S.E. seven days to respond ena.

On May 20, 2020, Publications S.E. provided some responsive documents. But its document production did not respond to the subpoena or comply with the court's order. Publications S.E. ignored several of the subpoena's requests, including a request for all documents referencing N2. Nor did it include any emails between Publications S.E. and Lifestyle's external or in-house counsel.

After demanding the remaining records, N2 filed a motion to show cause. Only then did Publications S.E. produce more than 150 additional documents that it had withheld. (*See* Declaration of James Newman ("Newman Decl."), Exs. 2, 3). This production included emails between Publications S.E. and Lifestyle's counsel about Publications S.E.'s response to the subpoena. (*Id.* at N2_000157-165). It also included emails between Newman and Shore discussing Publications S.E.'s

production and Newman's decision to delete Lyles' Lifestyle email account after this lawsuit was filed. (Newman Decl., Ex. 2, at N2_000156).

N2's motion to show cause has been continued to July 14, 2020, to allow N2 to evaluate the June 22–23, 2020 production. *See* Order, *Neighborhood Networks Pub., Inc. v. Lifestyle Pubs., LLC*, No. 1:20-mi-00040-WMR (N.D.Ga. June 23, 2020) (D.E. 12).

Lifestyle filed its Motion for Summary Judgment on June 4, 2020. (D.E. 42).

On June 5 and 8, 2020, N2 asked the Court to amend the scheduling order to allow for more discovery because, among other reasons, the subpoena production issues with Publications S.E. remained pending. (D.E. 45). On June 22, 2020—the day that Publications S.E. responded to N2's subpoena—Lifestyle opposed additional discovery. In its response, Lifestyle said: "Lifestyle Publications S.E., LLC is an affiliated company of Defendant and the two entities have worked together to prevent the unauthorized disclosure of competitive confidential information. There is [sic] no improper activities occurring or gamesmanship." (D.E. 49).

## Standard of Review

A party is entitled to summary judgment only if it can show "that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might affect the outcome of the suit under the governing law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (alteration and internal quotation marks

omitted). In ruling on a Motion for Summary Judgment, the Court should "view the evidence in the light most favorable to the nonmoving party," which is N2.  *See id.*

<u>**Argument**</u>

This Court should deny Lifestyle's Motion for Summary Judgment.  Lyles was Lifestyle's agent.  Moreover, in her capacity as Lifestyle's agent, Lyles misappropriated N2's trade secrets, committed computer trespass, defrauded N2, and committed unfair and deceptive practices.

## I. Lyles and Newman were Lifestyle's Agents; Lifestyle is thus Liable for Their Bad Acts.

Lifestyle argues that it cannot be liable for Lyles' conduct because she was not its agent.  (*See* D.E. 42, at 15–18).  But the evidence, viewed in the light most favorable to N2, suggests otherwise.

Lyles was Lifestyle's agent.  An agent "is one who, with another's authority, undertakes the transaction of some business or the management of some affairs on behalf of such other, and to render an account of it." *Phelps-Dickson Builders, L.L.C. v. Amerimann Partners*, 172 N.C. App. 427, 435 (2005). To determine whether Lyles and Newman were Lifestyle's agents, the Court should examine: (1) whether Lyles had the "[a]uthority, either express or implied," to act for Lifestyle and (2) whether Lifestyle "control[led]" Lyles. *Phelps-Dickson Builders, L.L.C.*, 172 N.C. App. at 435. Agency is a question of fact. *See Hylton v. Koontz*, 138 N.C. App. 629, 635 (2000).

### A. Lyles acted on behalf of Lifestyle.

On the first element, the facts, viewed in the light most favorable to N2, show that Lyles acted on Lifestyle's behalf.

**First**, Lyles' job application shows that she's working for Lifestyle, not Newman. Lyles' application shows telltale signs of agency. More specifically:

- The application bore a Lifestyle logo; and

- The application referred to Lifestyle as "our company" and invited Lyles to be part of the Lifestyle "team";

(Response ¶ 28). Each of these factors show a single identity between Lyles and Lifestyle.

**Second**, Lyles held herself out as an agent. For instance, Lyles used a "lifestylepubs.com" email address and Lifestyle business cards. (*Id.*). She used Lifestyle's trademarked logo and slogan in her email signatures. (*Id.*). She relied on Lifestyle's tradename, trade dress, and prior magazine art to sell advertisements in a magazine that Lifestyle owned, while using Lifestyle's form contracts that are subject to Lifestyle's approval. (*See id.* ¶ 29). Indeed, though Lyles may solicit advertisers, Lifestyle exercises its discretion over those contracts, including whether to approve them. (*Id.*)

**Third**, before Lyles could start selling advertisements for Lifestyle, she was required to sign a covenant not to compete, which prohibits her from working against Lifestyle. (*Id.* ¶ 41).

### B. Lifestyle controlled Lyles' actions.

On the second element of agency, the facts, viewed in the light most favorable to N2, show that Lifestyle controlled Lyles.

If Lyles were an independent contractor, she would have been able to exercise control over her day-to-day routine. In North Carolina, an independent contractor is

allowed to use his independent judgment, and he answers to his employer only "as to the result of his work." *McGown v. Hines*, 353 N.C. 683, 687 (2001). To answer this question, the Supreme Court of North Carolina asks several questions, incuding:

(1)     Is the alleged contractor "engaged in an independent business"?

(2)     Does she have special skills or training?

(3)     Does she do work "at a fixed price or for a lump sum or upon a quantitative basis"?

(4)     Does her employer control her "method of doing work"?

(5)     Does she regularly work for her employer?

*Id.* at 688. These factors suggest that Lyles was not a contractor, but an agent or employee. Perhaps most tellingly, Lifestyle controlled Lyles' potential profit.

***First***, Lyles was not involved in an independent business. Lifestyle exercised detailed control over her functions. For instance, she used a "lifestylepubs.com" email address and business card. She used Lifestyle's trademarked logo and slogan in her email signatures. (Response ¶ 30). She relied on Lifestyle's tradename and trade dress to sell advertisements in a magazine that Lifestyle owns, while using Lifestyle's form contracts that were subject to Lifestyle's approval. Indeed, though Lyles may have solicited advertisers, Lifestyle exercised its discretion over those contracts, including in whether to approve them. (*See id.* ¶ 29).

***Second***, Lyles did not have special skills or training. She regularly sought instruction from Lifestyle on basic tasks, like responding to inquiries from prospective advertisers. (*Id.* ¶ 28).

***Third***, for at least three months, Lifestyle provided Lyles with, in effect, a salary. Under Lyles' agreement with Lifestyle, Lifestyle provided her with a "guarantee[d] draw" of $1,000 per month during the first three months of her employment. (*Id.* ¶ 28). Typically, draws—sometimes known as advances—are payments against a monthly commission. *See, e.g.*, 29 C.F.R. § 779.416(a). But when they are *guaranteed*—when they carry no risk that any loss will be carried forward into a subsequent pay period—they are salary. *See id.* Thus for the first three months that Lyles was employed by Lifestyle, she was received a salary, as any employee would.

***Fourth***, Lyles was controlled in how she worked. Lifestyle, through Newman, set a definitive set of weekly goals and appointments to be met each week, and Lyles was expected to report back weekly on her progress. (*See id.* ¶ 45). She was expected to target certain "[c]ategories" of businesses. (*Id.* ¶ 28). She had to share her story and advertising leads with Sue Collins, an editor for Lifestyle. (*Id.* ¶ 48).

***Finally***, Lyles worked only for Lifestyle. She cannot have other sales jobs. To the contrary, she signed a covenant not to compete with Lifestyle. She agreed not to compete with Lifestyle in a similar line of business. (*Id.* ¶ 28).

## C. Because Lyles is Lifestyle's agent, Lifestyle is liable for Lyles' actions.

Because Lyles was Lifestyle's agent, Lifestyle is liable for her conduct. In North Carolina, a principal is liable for its agent's torts if the principal ratifies the agent's act or if the agent commits an act "within the scope of h[er] employment and

in furtherance of the principal's business." *Creel ex rel. Morgan v. N. Carolina Dep't of Health & Human Servs.*, 152 N.C. App. 200, 202 (2002).

*First*, Lifestyle ratified Lyles' conduct. Ratification occurs when a principal binds itself to its agent's act after the fact. *See King Fa, LLC v. Ming Xen Chen*, 248 N.C. App. 221, 226 (2016). Ratification can be express or implied. *Id.* But a principal cannot ratify only part of his agent's acts. That is, he cannot repudiate an agent's wrongdoing, while still accepting its benefits. *See Barbee v. Johnson*, 190 N.C. App. 349, 356 (2008).

Lifestyle ratified Lyles' efforts to obtain the Cunningham advertisement. Once Lyles obtained the Cunningham advertisement, she forwarded her deceptive email conversation with N2's field support staff to Lifestyle's employee, Newman. (Response ¶ 33). Newman, acting on behalf of Lifestyle and with full knowledge that Lyles had obtained the ad from N2, accepted the benefits of Lyles' fraud—the Cunningham ad. *See King Fa, LLC*, 248 N.C. App. at 226.

Lifestyle, the entity publishing the Cunningham advertisement, was aware of Lyles' deception. Newman carried out the sales operations to publish Lifestyle's magazines, and Lifestyle had every opportunity to repudiate the advertisement taken from N2. (Response ¶ 33). Newman also know that Lyles had worked for N2, that Lyles was relying on her old business relationships, and that she was using N2's old ad. (*Id.*).

Further, Lifestyle enjoyed the benefits of Lyles' deceptive conduct. By retaining the benefit of Lyles' conduct, Lifestyle ratified Lyles' actions and must be

held liable for Lyles' misconduct. "It is . . . a settled principle of ratification that the principal must ratify the whole of his agent's unauthorized act or not at all. He cannot accept its benefits and repudiate its burdens." *Carolina Equip. & Parts Co. v. Anders*, 265 N.C. 393, 401 (1965).

Lifestyle did not repudiate the Cunningham advertising agreement. Instead, Lifestyle benefited from it. The Cunningham advertising agreement with Lifestyle was signed a month after Cunningham's agreement with N2 ended. (Response ¶¶ 24, 45). By snooping around in N2's software system, Lyles knew when Cunningham's agreement with N2 ended. (*Id.* ¶¶ 24, 45). Lifestyle was able to solicit Cunningham and facilitate the deal because Lyles knew this end date and took the N2 advertisement from N2 by saying she had "retired" from the business. (*Id.* ¶ 33). This saved Cunningham a design fee, which helped close Lifestyle's deal with Cunningham. Lifestyle benefited from all of this insider information. It was Lifestyle's choice to rely on the N2 advertisement and waive the design fee. Lifestyle failed to repudiate, and therefore accepted, the benefit of Lyles' actions, which means it also is liable for those actions.

***Second***, Lifestyle is liable for Lyles' wrongful conduct under a theory of respondeat superior. In North Carolina, a principal is liable for the acts of its agent committed "within the scope of the agent's authority." *Blanton v. Moses H. Cone Mem'l Hosp., Inc.*, 319 N.C. 372, 375 (1987). If an employee is doing what she is employed to do, even if unlawful, the employer is liable for the resulting injury. *Green v. Freeman*, 233 N.C. App. 109, 113 (2014) (citation and quotations omitted). To be

within the scope of the agent's authority, the agent "must be acting in furtherance of the principal's business and for the purpose of accomplishing the duties of his employment." *Matthews v. Food Lion, LLC,* 205 N.C. App. 279, 282–83 (2010).

As discussed (*supra* § I.A.), Lyles was responsible for soliciting advertising for Lifestyle's publications. (*See e.g.*, Response ¶ 28; *see also* D.E. 43-2 ¶ 8). To aid in her solicitation, Lyles used fraud and deceit not only to obtain the Cunningham ad, but also to obtain sensitive trade secret information, like N2's contract renewal dates. She then used this information to solicit some of N2's customers within days of her access to N2 Portal and PubManager. (Response ¶ 45). Both Lyles' fraud and her misappropriation of trade secrets occurred while she was employed by Lifestyle and for its benefit.

### D. Lifestyle cannot hide behind Publications S.E.

Lifestyle claims that Publications S.E., and only Publications, S.E., is liable for Lyles' conduct. But that is a ruse. Publications S.E. is not an independent business providing independent contracting services. Rather, Publications S.E. is part-and-parcel of Lifestyle, so that the two are indistinguishable.

***First***, Publications S.E. publishes Lifestyle magazines. (Response ¶ 31).

***Second***, Lifestyle identifies Publications S.E.'s "Account Executives," as part of its team. (*Id.* ¶ 28).

***Third***, Publications S.E. uses Lifestyle form agreements with advertisers, binding advertisers in Lifestyle's name. (*Id.*).

***Fourth***, those same agreements identify Publications S.E.'s principal, Newman, as Lifestyle's "Account Manager." (*Id.*).

14

**Fifth**, Lifestyle dictates the prices at which Publications S.E. is allowed to sell advertising. (*Id.* ¶ 29).

**Sixth**, Lifestyle issued Newman a "lifestylepubs.com" email address. (*Id.* ¶ 25).

**Seventh**, Publications S.E. directed a Lifestyle representative to delete an email account from Lifestyle's email system. (*Id.* ¶ 45).

**Eighth**, Lifestyle provided legal advice to Publications S.E., coaching it on how to respond to N2's subpoena. (*Id.* ¶ 29).

**Ninth**, Lifestyle's counsel wrote responses for Publications S.E. to send in response to N2's subpoena. (*Id.*).

**Tenth**, Newman uses Lifestyle's trademark, trade name, and magazine covers in his email signature. (*See id.* ¶¶ 28–29)

**Eleventh**, Lifestyle is requiring Publications S.E. to pay a portion of Lifestyle's legal fees associated with this action. (*Id.* ¶ 29).

**Twelfth**, Lifestyle has proposed splitting the fees associated with its Motion for Summary Judgment. (*Id.*).

**Finally**, Lifestyle has admitted that Account Executives are agents—it has sued another Account Executive for breach of the duty of loyalty, a duty that contractors do not have. *See* Compl., *Lifestyle Pubs., LLC v. Harding*, No. 2:19-CV-2007-DDC-KGG (D. Kan. Jan. 4, 2019) (D.E. 1).

Lifestyle cannot duck liability for its salesperson's misconduct, which occurred while she was selling advertising for *its* magazines on the basis that Publications S.E. is a separate company.

## II.     This Court Should Deny Lifestyle's Motion for Summary Judgment.

### A.     N2 elects to abandon its tortious interference claim.

Lifestyle first contends that the Court should grant its Motion for Summary Judgment as to N2's tortious interference claim. (*See* D.E. 42, at 5–13). This Court need not decide this issue. A plaintiff may "elect[ ] to abandon [some of] [its] claim" and may "leave th[e] Court to decide whether summary judgment is appropriate as to [the plaintiff's] remaining claims[.]" *Jolly v. Univ. of N. Carolina*, 831 F. Supp. 2d 916, 918 (E.D.N.C. 2011); *see also Leibelson v. Cook*, 761 F. App'x 196, 203 (4th Cir. 2019) (district court erred considering the merits of an abandoned claim). N2, having secured a Consent Order enforcing Lyles' covenants not to compete or solicit, abandons that claim.

### B.     This Court should deny Lifestyle's Motion as to N2's trade secrets claim.

Next, Lifestyle contends that the Court should grant summary judgment as to N2's misappropriation of trade secrets claim. (*See* D.E. 42, at 13–16). Not so.

#### 1.     Though Lyles *had* authority to access N2's systems, N2 never authorized access on a competitor's behalf.

Lifestyle first claims that Lyles was authorized to access N2 Portal and PubManger. This is untrue.

***First***, Lyles could only access N2's systems for N2's benefit. Under § 7 of her Franchise Agreement, Lyles was allowed to use N2's "Confidential Information,"

16

including its trade secret information stored on N2 Portal and PubManager, "for the **sole purpose**" of N2's business. (*Id.* ¶ 19). She could not use N2's Confidential Information "for [her] own use or for any other purpose," and she could not "use or duplicate" N2's Confidential Information "in any other business[.]" (*Id.*).

**Second**, the Agreement forbade Lyles from accessing N2's online systems after her relationship with N2 ended. (*Id.*) It included a provision that required Lyles to stop accessing N2's systems for **any reason** once her affiliation with N2 ended. Thus Lyles not only was prohibited from accessing N2's online systems for her own purposes during her affiliation with N2, but also was prohibited from using them for any purpose after she left the company.

Because N2 never gave Lyles the right to access N2's online systems for Lifestyle's benefit, this Court should reject this argument.

      2.    **N2 took careful, calculated steps to protect its trade secrets from public disclosure.**

Lifestyle next claims that N2's trade secrets claim should fail because N2 did not take reasonable steps to maintain the secrecy of its Confidential Information. A trade secret must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." N.C. Gen. Stat. § 66-152(3). The facts belie Lifestyle's assertion.

Summary judgment is inappropriate on a "reasonable protection" argument if the plaintiff took calculated steps to protect its trade secrets. *See, e.g., Static Control Components, Inc. v. Darkprint Imaging, Inc.*, 200 F. Supp. 2d 541, 546 (M.D.N.C. 2002). The use of a confidentiality agreement and the use of password-protected

servers are strong evidence that a plaintiff is taking reasonable steps to protect its trade secret information. *See, e.g.*, *id.* (confidentiality agreement); *Safety Test & Equip. Co. v. Am. Safety Util. Corp.*, 2015 WL 1880769, at *12 (N.C. Super. Ct. Apr. 23, 2015) (password-protected database). N2 took steps to protect its Confidential Information.

*First*, N2 requires its Area Directors to sign a Franchise Agreement containing confidentiality provisions. In the Franchise Agreement, each Area Director promises not to disclose N2's Confidential Information and to use it only for the benefit of N2. (Response ¶ 20).

*Second*, N2 forbids its Area Directors from using its Confidential Information after their relationship with N2 ends. (*Id.*). This includes terminating each Area Director's right to use N2's Confidential Information and requiring each Area Director to keep it secret. This provision further insulates N2's Confidential Information from surreptitious use.

*Finally*, N2 protects its Confidential Information through the use of unique usernames and passwords. N2's Confidential Information is available only to Area Directors, who it assigns a unique username and password. (Response ¶ 19). N2 does not give the Area Directors this information until after they have signed the required confidentiality agreement. (*Id.*). Only through a unique username and password can an Area Director access N2's Confidential Information. (*Id.*). These factors show N2 took reasonable steps to protect its Confidential Information, or, at a minimum, create disputed issues of fact.

### 3. Lifestyle's agent, Lyles, misappropriated N2's trade secrets for Lifestyle's benefit.

Next, Lifestlye argues that N2 has no evidence that Lyles ever took or used its Confidential Information "for her own benefit in competing with N2" and that "[a]ccess to trade secrets alone is insufficient to establish that a defendant misappropriated them." (D.E. 42, at 13). Lifestyle ignores the facts and law.

Under the Trade Secrets Protection Act, a plaintiff can establish a prima facie case of misappropriation of trade secrets by demonstrating that the defendant (1) "[k]nows or should have known of the trade secret" and (2) "[h]as had a specific opportunity to acquire it for disclosure or use *or* has acquired, disclosed, or used it without the express or implied consent or authority of the owner." N.C. Gen. Stat. § 66-155. Once a plaintiff establishes a prima facie case, "the burden of proof shifts to the defendant[.]" *Combs & Assocs., Inc. v. Kennedy*, 147 N.C. App. 362, 369 (2001). The defendant may rebut the prima facie case by introducing substantial evidence that it acquired the trade secret through "independent development [or] reverse engineering." *Id.* Alternatively, the defendant may try to show that it obtained the plaintiff's trade secret "from another person with a right to disclose the trade secret." *Id.*

*First*, Lyles unauthorized access to N2's Confidential Information raises an inference that she misappropriated N2's trade secrets. One way that N2 can prove its misappropriation claim is to show that Lyles accessed its trade secrets without authorization. *Med. Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 658 (2009) (trade secret claim may be proved with circumstantial evidence). Doing so raises an

inference of actual acquisition or use of trade secrets sufficient for N2 to survive summary judgment. *Wells Fargo Ins. Servs. USA, Inc. v. Link*, 372 N.C. 260, 281 (2019); *DSM Dyneema, LLC v. Thagard*, No. 13 CVS 1686, 2019 WL 3228346, at *9 (N.C. Super. Ct. June 19, 2019).

Here, the evidence shows that Lyles accessed N2 Portal and PubManager without authorization. Lyles' relationship with N2 ended in November 2018. (Response ¶¶ 5, 16–18). She accessed N2 Portal and PubManger in March 2019, more than three months later. (*Id.* ¶ 22). As discussed, Lyles use of N2 Portal and PubManager during this time was unauthorized. (*See supra* § II.B.1.). Because Lyles accessed N2 Portal and PubManger without authorization, this creates a presumption that Lyles misappropriated N2's Confidential Information.

**Second**, other circumstantial evidence shows that Lyles misappropriated N2's Confidential Information. Lyles used N2's trade secrets to drum up business for Lifestyle. For example, Lyles poached one of the customers that she had viewed using N2 Portal and PubManager. Lyles reached out to N2 and misrepresented her employment status—saying that she had "retired." (*Id.* ¶¶ 33, 35). She requested that N2 provide her with a copy of an advertisement that she had done for one of N2's customers, Cunningham. (*Id.* ¶ 35). When this evidence is viewed along with Lyles' admission that she accessed client information on N2 Portal and PubManager and that she was working for the benefit of Lifestyle, it suggests that Lyles misappropriated N2's trade secrets to benefit Lifestyle.

Lyles also attempted to poach other N2 customers. Lyles accessed contract information for a number of N2's customers, including Mercedes Benz-Buckhead, Hennessey Jaguar/Land Rover, Pharr Road Animal Hospital, and Catalyst Fitness. (*Id.* ¶¶ 24, 45). At the time Lyles viewed the information for these customers, each of them was near the end of their contract with N2. (*Id.* ¶ 24). For example, like Cunningham, Pharr Road Animal Hospital's advertising contract was set to expire in February 2019. (*Id.*). So, too, was the advertising contract for Catalyst Fitness. (*Id.*). Unsurprisingly, in March and April 2019, Lyles reached out to these customers to solicit their business. (*Id.* ¶ 33). She also downloaded a high-resolution image of one of their advertisements (American Leather/Verde Home) and emailed it to Lifestyle's publisher. (*Id.* ¶¶ 25, 37). If Lyles had not misappropriated N2's trade secrets, she would not have known which of N2's current customers were ripe for the picking.

Taking all these facts in the light most favorable to N2, Lifestyle's claim that Lyles did not misappropriate N2's Confidential Information falls flat.

### C. Lifestyle, through Lyles, committed a computer trespass; therefore, this Court should deny Lifestyle's Motion for Summary Judgment.

Lifestyle next asks for summary judgment as to N2's computer trespass claim. (D.E. 42, at 16–18). This argument fails. Lifestyle committed computer trespass when Lyles accessed N2 Portal and PubManager without N2's consent.

***First***, Lifestyle contends that Lyles had N2's permission to access N2 Portal and PubManager. Lifestyle's theory is absurd. It claims that N2 should shoulder the blame for Lyles' bad conduct because N2 did not terminate Lyles' access to N2 Portal and PubManager when she left N2 in 2018. Section 14-458(a) prohibits accessing a

computer system "without authority."  N.C. Gen. Stat § 14-458(a).  The statute defines "without authority" as "exceeding the right or permission" granted to her.  *Id.*

It is possible that one may have the ability to access a system, but lack the authority.  *See Spirax Sarco, Inc. v. SSI Eng'ring, Inc.*, 122 F. Supp. 3d 408, 416–18 (E.D.N.C. 2015) (Fox, J.).  Just because Lyles had the ability to access N2 Portal and PubManager, it does not follow that she had the authority to do so.  This result makes sense.  Lifestyle's argument is the equivalent of blaming a homeowner for a robbery because he forgot to lock the door.

**Second**, Lifestyle argues that N2 does not have a claim under § 14-454.  Section 14-458(a) allows a plaintiff to recover in six circumstances, "[e]xcept as otherwise made unlawful by this article."  N.C. Gen. Stat. § 14-458(a).  In other words, the six enumerated circumstances provide *additional* bases for liability, along with the other bases enumerated throughout Article 60.  The statute incorporates those other computer-related crimes and supplements them with its six enumerated circumstances.

With a correct understanding of § 14-458(a), the evidence shows that Lyles violated § 14-454.  That provision prohibits using any computer system (1) to devise or execute "any scheme or artifice to defraud," § 14-454(a)(1), or (2) "to obtain property," § 14-454(a)(2).  As discussed, Lyles used N2 Portal and PubManager to devise a scheme to defraud N2.  She accessed customer information and used that information to solicit N2's current customers.  This conduct violates §§ 14-454 and -458.

Moreover, Lyles used N2 Portal and PubManager to obtain property from N2. In particular, and as discussed above (*supra*, § II.B.), Lyles used her unauthorized access to N2 Portal and PubManager to access and misappropriate N2's trade secrets. This too violates 14-454 and -458.

***Third***, even if § 14-458(a) provides N2's only source of relief, the evidence still shows that Lyles violated that section. Section 14-458(a) prohibits the unauthorized copying of computer data. N.C. Gen. Stat. § 14-458(a)(5). Here, Lyles did just that. She took at least one advertisement from N2 Portal or PubManager. On March 28, 2019, Lyles sent an email to Newman attaching a digital copy of an ad for Verde Home, an N2 customer. (Response ¶ 47). This ad ran in the February 2019 edition Lyles' former publication. (*Id.*). She could not have accessed this ad anywhere but N2 Portal. (*Id.*).

By downloading a copy of the Verde Home ad from N2 Portal, Lyles committed computer trespass. Again, § 14-458(a) prohibits the unauthorized copying of computer data. N.C. Gen. Stat. § 14-458(a)(5). When Lyles took Verde Home's advertisement from N2 Portal, she accessed N2's online systems without authorization. What's more, when Lyles took Verde Home's advertisement from N2 Portal, she copied N2's computer data.

## D.    Lifestyle obtained the Cunningham ad by fraud.

Lifestyle next contends that it cannot be liable for fraud because Lyles did not defraud N2. (D.E. 42, at 18). But this is untrue. The evidence, viewed in the light most favorable to N2, shows that, but for Lyles' false representation that she had

"retired," N2 would not have released any advertisement to Lyles and, consequently, Lifestyle.

**_First_**, viewing the facts in the light most favorable to N2, Lyles made an affirmative misrepresentation. She told N2 that she had "retired." (_Id._ ¶ 33). That is, that she no longer worked—_at all_. _See Retired_, Merriam–Webster.com Dictionary ("Withdrawn from one's position or occupation : _having concluded one's working or professional career_." (emphasis added)). As everyone acknowledges, when Lyles wrote that email she was not retired. She was far from it. Instead, she was working for N2's competitor, Lifestyle, selling advertisements and soliciting N2's customers.

Lifestyle makes the incredible claim that Lyles' representation was truthful. It contends that Lyles email meant that she had retired "from N2." (D.E. 42, at 18–19). But the phrase "from N2" is nowhere in Lyles' email. Reading it into that email, as Lifestyle asks the Court to do, contravenes the email's plain text and, moreover, takes a view of the facts that favors Lifestyle.

**_Second_**, and likewise, Lyles concealed a material fact—that she was working for one of N2's competitors. In her email to N2, using her personal email address, Lyles consciously avoided telling N2 about her new role working for Lifestyle. She knew that doing so would keep her from getting her hands on the Cunningham ad that she requested. Indeed, documents produced by Lyles' former supervisor—and Lifestyle co-worker—Jim Newman prove Lyles' duplicity. After emailing N2 and receiving the ad using her personal email address, Lyles forwarded the ad to Newman, showing to Lifestyle how she had obtained the ad through her

misrepresentation about being "retired." (Response ¶ 50). Viewed in the light most favorable to N2, this shows that Lyles knew that N2 would not have provided the Cunningham ad if it had known that she was working for Lifestyle. Further, it shows that Lyles meant to conceal her role with Lifestyle from N2 and that Lifestyle knew about her concealment. Lyles own actions show that she concealed a material fact.

***Finally***, N2 reasonably relied on Lyles' misrepresentation. Under North Carolina law, "a man is not expected to deal with another as if he is a knave, and certainly not unless there is something to excite his suspicion." *White Sewing Machine Co. v. Bullock*, 161 N.C. 1, 8 (1912); *accord Walker v. Town of Stoneville*, 211 N.C. App. 24, 34 (2011). That is to say, when the defendant has superior knowledge, the plaintiff is justified in relying on the defendant's knowledge, unless the defendant says something "so improbable or unreasonable" that would trigger a duty to inquire further. *Id.*

Lyles had superior knowledge of her employment. Lyles sold her N2 franchise in mid-2018, and she left the company for good in late 2018. (Response ¶¶ 5, 16–18). For all N2 knew, Lyles was a committed former Area Director, who had no relationship with Lifestyle. Because Lyles said that she retired—a claim that was neither improbable nor unreasonable—N2 was justified in not questioning Lyles' representation.

Lifestyle incorrectly claims otherwise. Whether a plaintiff's reliance was reasonable is typically a question for the jury. *See Head v. Gould Killian CPA Grp.*, 371 N.C. 2, 9 (2018). To overcome that presumption, Lifestyle must show that "the

facts are so clear that they support only one conclusion." *Id.* To do so, it cites *Solum v. Certainteed Corp.*, 147 F. Supp. 3d 404 (E.D.N.C. 2015), for the proposition that N2 should have taken "reasonable care" by "ask[ing] for the purpose of [Lyles'] request." (D.E. 42, at 19). But that's not true.

*Solum* has nothing to do with fraud by a former franchisee. Rather, the court analyzed cases about representations that were "*directly contrary to the express terms of a written contract*." *Id.* at 411–12 (emphasis added). The Solums claimed they were defrauded, even though they agreed to a contract and hired a contractor, who came recommended through Certainteed's website. The contractor's work was sub-par, so the Solums sued Certainteed for fraud. In rejecting their fraud claim, the district court pointed out that, to access the recommended contractor list, the Solums had to click through an agreement that made clear that Certainteed "ma[d]e[ ] no guarantees or representations regarding the skills or representations of" its Master Craftsmen. *Id.* at 413. Relying on this contract term, the court determined that their reliance was unreasonable.

Unlike in *Solum*, N2 did not click through the fine print. Indeed, there was nothing to warn the company of Lyles' deception. Lyles was a former Area Director who left N2 on good terms. In this circumstance, N2 did not have "an alternative source" from which it could have obtained the truth. *See Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 341 (4th Cir. 1998). Lyles already had defrauded N2 by telling it that she had retired. Even if N2 had asked Cunningham if it "had actually asked for the ad," like Lifestyle suggests (D.E. 42, at 19),

Cunningham's answer would have been, "Yes." The critical question, which N2 had no reason to ask, was whether Lyles or Cunningham meant to place the ad in a competing publication. Even if Lifestyle's assumptions were true, the facts would not be clear as to whether N2 should have asked for more information. N2's fraud claim thus should go to trial.

### E.    Lifestyle violated the UDPA.

Under North Carolina's Unfair or Deceptive Practices Act, "[*u*]*nfair methods of **competition** in or affecting commerce*, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C.G.S. § 75-1.1 (emphasis added). Conduct is "unfair" if it "offend[s] public policy" or is "immoral, unethical, oppressive, [or] unscrupulous." *Walker v. Fleetwood Homes of N.C., Inc.*, 362 N.C. 63, 72 (2007). Likewise, conduct is "deceptive" if it has "the tendency to deceive." *Gilbane Bldg. Co. v. Fed. Reserve Bank*, 80 F.3d 895, 902 (4th Cir. 1996).

Lifestyle does not dispute many of the elements of N2's unfair practices claim. For instance, it does not dispute that N2 and Lifestyle are competitors. Nor does it dispute that Lyles' misconduct occurred while in competition with N2 and in the course and scope of selling advertising for Lifestyle. Lifestyle does not argue that Lyles' misconduct—her unauthorized use of N2's computer systems and deceptive emails designed to elicit the Cunningham ad—was both unethical and had a tendency to deceive. And it does not challenge that N2 suffered an injury as a result.

When Lyles emailed N2 requesting a copy of the Cunningham advertisement, she did two things that constitute unfair competitive conduct: ***first***, she did not use her @lifestylepubs.com email address, which was a break from her ordinary conduct,

but instead used her personal email address, and ***second***, she actively asserted that she was "retired." (Response ¶ 35). Both actions—not using her business email to conduct business and affirmatively misstating the status of her career—were unfair methods of competition.

Lyles also accessed the N2 system and downloaded an advertisement for Verde Home, which she sent to Lifestyle for use in its publications. (*Id.* ¶¶ 25, 37). Lifestyle makes no mention of this other ad wrongfully downloaded from N2's proprietary software system. Lifestyle repeatedly argues that this case is over one advertisement (D.E. 42, at 1, 18), but Lyles' conduct on behalf of Lifestyle went beyond one ad. (*See* Response ¶ 25, 37 (discussing Verde Home ad)).

Most significantly, Lyles surreptitiously logged on to N2 Portal and PubManager, allowing her to obtain sensitive confidential information. (*Id.* ¶¶ 24, 45–47). More than simply obtaining that information, the evidence viewed in the light most favorable to N2 shows that she used it to solicit N2's existing advertisers, targeting those with expiring contracts.

Lyles' progress report shows that approximately 1/3 of her targets were former N2 advertisers. (Response ¶ 45). More than half of those former N2 advertisers being targeted had N2 advertising contracts that just expired or were near expiration when Lyles was making contact. (*Id.* ¶¶ 24, 45) Lyles' actions were more significant than just one Cunningham ad—it was a calculated scheme to deceptively find out, through N2's proprietary software systems, when N2 advertising contracts would end and to then approach those advertisers to get them to switch away from N2 and to a

competitor, Lifestyle. (Id. ¶¶ 24, 45). It also was designed to use old N2 advertisements to save the advertisers a design fee, which makes the "switch" to advertising with Lifestyle more attractive. (Id. ¶¶ 24, 45). This scheme provided a competitive advantage to Lifestyle, helped Lifestyle to "close the deal" with new advertisers, and existed to benefit Lifestyle, at N2's expense. The number of contacts with former N2 advertisers is telling of the deceptive nature of Lyles' activities snooping through N2's proprietary system on behalf of Lifestyle.

Lifestyle, though, contends that Lyles' fraud, as well as her breach of her Franchise Agreement, do not support N2's unfair practices claim. Not so.

*First*, Lyles' fraud supports N2's UDPA claim. Under North Carolina law, fraud is a per se violation of the UDPA. *See Bhatti v. Buckland*, 328 N.C. 240, 243 (1991); *see also Sparks v. Oxy-Health, LLC*, 134 F. Supp. 3d 961, 997–98 (E.D.N.C. 2015). Because the evidence, viewed in the light most favorable to N2, shows that Lyles, and thus Lifestyle, committed fraud, Lifestyle thus violated the UDPA.

*Second*, Lyles' misappropriation of trade secrets supports N2's UDPA claim. (*See supra*, § II.B.). In North Carolina, "[m]isappropriation of trade secrets constitutes an unfair or deceptive act or practice as a matter of law." *Grout Doctor Global Fran. Corp. v. Groutman, Inc.*, 2015 WL 2353698, at *5 (E.D.N.C. May 15, 2015). Because the evidence, viewed in the light most favorable to N2, shows that Lyles, and thus Lifestyle, misappropriated N2's trade secrets, Lifestyle violated the UDPA.

***Finally***, Lifestyle argues that N2's UDPA claim fails because it is a run-of-the-mill breach of contract claim. This argument fails off the bat because there is no privity of contract between N2 and Lifestyle, and N2's claims against Lifestyle do not sound in contract.

In doing Lifestyle's bidding, Lyles engaged in conduct that is unfair and deceptive as a matter of law and caused N2 injury. (Response ¶ 35).

## F. Constructive trust is an appropriate remedy for Lifestyle's actions.

Lifestyle next asks this Court to grant summary judgment on N2's constructive trust claim. Lifestyle claims a constructive trust is a remedy, not a claim. Lifestyle also claims that a constructive trust is inappropriate because there is no fiduciary relationship between N2 and Lifestyle and N2 has an adequate remedy at law.

### 1. Whether a constructive trust is a remedy or a claim is irrelevant; the relevant question is whether there are facts to support N2's demand.

In North Carolina, courts use constructive trusts to prevent unjust enrichment in cases of fraud, breach of duty, or any "other circumstance" that make it "inequitable for [the defendant] to retain [the property]." *Wilson v. Crab Orchard Dev. Co.*, 276 N.C. 198, 211 (1970). A constructive trust is appropriate to prevent Lifestyle from profiting from its agent's (Lyle's) fraud, deception, and misappropriation of trade secrets.

Lifestyle's argument that a constructive trust is a remedy, not a claim, raises a meaningless distinction. North Carolina courts treat the distinction as one without a difference. *Bell v. Disner*, 2014 WL 6978690, at *7 (W.D.N.C. Dec. 9, 2014); *Global*

*Textile Alliance v. TDI Worldwide, LLC*, 2018 WL 6272929, at *12–13 (N.C. Super. Ct. Nov. 29, 2018).

> ## 2. Viewing the facts in the light most favorable to N2, there are sufficient facts to justify N2's request for constructive trust.

Lifestyle next argues that the record facts do not support a constructive trust because Lifestyle is not N2's fiduciary and because N2 has an adequate remedy at law. Neither contention has merit. A constructive trust does not require a fiduciary relationship. Instead, a constructive trust is appropriate because it would be inequitable for Lifestyle to retain N2's trade secrets or money obtained from Lyle's misappropriation of N2's trade secrets. *See Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 530–31 (2012). For the same reason, N2 is entitled to a constructive trust to redress Lifestyle's retention of funds from Cunningham and its misappropriation of trade secrets.

## G. Punitive damages are appropriate for N2's trade secrets, computer trespass, and fraud claims.

Lifestyle finally asks this Court to dismiss N2's punitive damages claim. Punitive damages are appropriate when there are "aggravating circumstances [that] . . . justify the award of punitive damages." *Wiley v. L3 Commc'ns. Vertex Aero., LLC*, 795 S.E.2d 580, 590 (N.C. Ct. App. 2016). Thus, N2 must show (1) Lifestyle is liable for compensatory damages and (2) either (a) fraud; (b) malice; or (c) willful or wanton conduct "was present and was related to the injury for which compensatory damages were awarded." N.C. Gen. Stat. § 1D-15.

Lifestyle's argument that "punitive damages" is not an independent cause of action is a red herring. Though punitive damages "cannot exist as an independent cause of action," when "a right of action exists . . . exemplary damages may be recovered[.]" *Hawkins v. Hawkins*, 101 N.C. App. 529, 532 (1991). Here, they can be.

Viewing the facts in the light most favorable to N2, N2's request for punitive damages is sound. Lyles, acting on behalf of Lifestyle, engaged in fraudulent, malicious, and willful and wanton conduct, so punitive damages are appropriate. For one thing, punitive damages "necessarily follow" a willful and malicious misappropriation of trade secrets. *Akzo Nobel Coatings, Inc. v. Rogers*, 2011 WL 5316772, at *25 (N.C. Super. Ct. Nov. 3, 2011). Lyles' misappropriation of N2's trade secrets was willful. After all, when Lyles signed her Franchise Agreement, she acknowledged that "any disclosure or unauthorized use [of N2's Confidential Information] *will cause irreparable loss and harm* to" N2. (Response ¶ 19). Lyles' computer trespass was malicious and willful for the same reason. In the Franchise Agreement, Lyles acknowledged that unauthorized disclosure would harm N2. Finally, genuine issues of material fact permit N2's fraud claim against Lifestyle to continue to trial, and support a punitive damages award.

The Court thus should deny Lifestyle's motion as to N2's punitive damages claim.

## III. The Court Should Deny Lifestyle's Motion under Rule 56(d)(1), Because Lifestyles Intentionally Destroyed Evidence.

In all events, this Court should deny Lifestyle's Motion under Federal Rule of Civil Procedure 56(d)(1). That Rule allows the Court to deny summary judgment

when the nonmovant "cannot show facts to justify its opposition." Fed. R. Civ. P. 56(d)(1).

If this Court determines that N2's response is insufficient, it is because Lifestyle spoiled the evidence. *See, e.g.*, *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2nd Cir. 1999) ("It has long been the rule that spoliators should not benefit from their wrongdoing"). More specifically, it intentionally deleted emails sent and received by Lyles from its system. (June 2020 Newman Declaration, Ex. 2, Doc. N2_00156; Declaration of Dale, Ex. 1). These emails would show Lyles' interactions with advertisers. Moreover, they would show Lyles' communications with Lifestyle's representatives. N2 was unaware of this spoliation of evidence, which Lifestyle hid as it intentionally interfered with N2's efforts to obtain documents responsive to a subpoena issued to Publications S.E.

## <u>CONCLUSION</u>

For all those reasons, this Court should deny Lifestyle's Motion for Summary Judgment on all of N2's claims, except for N2's claim for tortious interference which it elects to abandon.

Respectfully submitted, this the 25th day of June, 2020.

/s/ Chris S. Edwards
Alex C. Dale
N.C. State Bar I.D. No.: 028191
email: acd@wardandsmith.com
Christopher S. Edwards
N.C. State Bar I.D. No.: 48385
email: csedwards@wardandsmith.com
For the firm of
Ward and Smith, P.A.
Post Office Box 7068
Wilmington, NC 28406-7068
Telephone: 910.794.4800
Facsimile: 910.794.4877
Attorneys for Plaintiffs

## <u>CERTIFICATE OF WORD COUNT</u>

I certify that this Response in Opposition to Defendant's Motion for Summary Judgment complies with Local Civil Rule 7.2(f)(3). Based on the word count generated by Microsoft Word, this Response in Opposition to Defendant's Motion for Summary Judgment contains 8,388 words.

ND: 4837-5046-5728, v. 5