# DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## SOUTHERN DIVISION

### CIVIL ACTION FILE NO.:  7:19-cv-89-BO

| | |
|---|---|
| NEIGHBORHOOD NETWORKS PUBLISHING, LLC and N2 FRANCHISING, LLC,<br>Plaintiffs,<br><br>v.<br><br>JACQUELINE MARIE LYLES and LIFESTYLE PUBLICATIONS, LLC,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **PLAINTIFFS' OPPOSITION TO DEFENDANT LIFESTYLE PUBLICATIONS, LLC's L.R. 56.1 STATEMENT OF FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Local Rule 56.1, Plaintiffs (collectively referred to as "N2") submit the following opposition and response to the statement of material facts by Defendant Lifestyle Publications, LLC ("Defendant Lifestyle") in support of Defendant Lifestyle's Motion for Summary Judgment:

## BACKGROUND

1.     Plaintiff Neighborhood Networks Publishing, Inc. ("N2") owns and publishes "around 900 different community publications, which are published in 47 states." Compl. ¶ 14.

**N2's Response:**

**Admitted except as to 900 being the current number as of the date of this filing**

2.     N2's publications are "hyper-local" magazines that target specific affluent areas of cities and suburbs, and local businesses place advertisements in

them. N2 offers franchises in each of these specific local areas; its franchisees are called "Area Directors." Compl. ¶¶ 1, 16.

**N2's Response:**

**Admitted for purposes of this motion.**

3.      N2 has approximately 800 Area Directors that sell advertising for their respective N2 magazines. Compl. ¶ 15.

**N2's Response:**

**Admitted for purposes of this motion.**

4.      Each of N2's magazines targets a specific local area. Compl. ¶¶ 1, 5, 22.

**N2's Response:**

**Admitted for purposes of this motion.**

5.      Defendant Jacqueline Lyles ("Lyles") was an Area Director for N2 from approximately February 1, 2016 until August 31, 2018. Compl. ¶¶ 28, 33.

**N2's Response:**

**Admitted.**

6.      Lyles' franchise was the Peachtree Battle community in Atlanta, Georgia, and her N2 magazine was titled *Peachtree Battle Living*. Compl. ¶ 28.

**N2's Response:**

**Admitted.**

7.      As an Area Director for *Peachtree Battle Living*, Lyles' duties were to facilitate "publication of, and selling advertising for, *Peachtree Battle Living*." Compl. ¶ 28.

**N2' Response:**

**Admitted.**

8.      The Peachtree Battle community is a few hundred acres in Atlanta—well

under a square mile in area.

https://www.peachtreebattlealliance.org/info.php?pnum=5596e0cc293b4a.

**N2's Response:**

**Admitted for purposes of this motion.**

## THE FRANCHISE AGREEMENT

9.      Lyles entered into a Franchise Agreement with N2. Compl. ¶ 7.

**N2's' Response:**

**Admitted.**

10.     The Franchise Agreement defined Lyles' exclusive "Territory "as "The

Community of Peachtree Battle; in the State of Georgia, county of Fulton and in the

zip code of 30305 as defined on October 18, 2017." Compl. Ex. A, Attachment B.

**N2's Response:**

**Admitted.**

11.     The Franchise Agreement prohibited Lyles from soliciting "any

Community that is not within Franchisee's Territory without Franchisor's prior

written consent." Compl. Ex. A, ¶ 1A.

**N2's Response:**

**Admitted, but immaterial and irrelevant in that the Franchise**

**Agreement defines "Community" as "residential communities, cities, towns,**

3

and villages." (Verified Complaint ("Compl."), D.E. 1-4, Ex. A ("Franchise Agreement"), ¶ 1A). More relevant to the N2's claims is the Franchise Agreement's non-solicitation agreement. (Compl. ¶ 30; Franchise Agreement, ¶ 7(C)).

12.     The non-competition provision contained in the Franchise Agreement provided that "[f]or a period of 24 months immediately following the expiration, termination, or transfer of this Agreement ('Non-Compete Period'), neither Franchisee nor any Principal will compete, directly or indirectly, with Franchisor...or engage in any capacity, by any individual, organization, or company, in any Competitive Business within the Territory; within a 15-mile radius around the perimeter of the Territory; or within a 15-mile radius around the perimeter of the territory of any other N2 Publishing franchisee, directly or indirectly..." Compl. Ex. A, ¶ 7B.

**N2's Response:**

**Admitted for purposes of this motion.**

13.     The non-compete clause in the Franchise Agreement also prohibited Lyles from directly or indirectly "solicit[ing] business from Consumers, Communities, clients (including advertisers) of Franchisor or of any N2 Publishing franchisee (within the geography defined above), nor engage in any business activities that are the same as or similar to those of Franchisor or its franchisees." Compl. Ex. A, ¶ 7B.

**N2's Response:**

**Admitted for purposes of this motion.**

14.     The non-solicitation clause in the Franchise Agreement prohibited Lyles from "soliciting advertising with any N2 Publishing customers that Franchisee has obtained as a result of Franchisor's Confidential Information." Compl. Ex. A, ¶ 7C.

**N2's Response:**

**Admitted for purposes of this motion.**

15.     While Lyles worked for N2, her compensation was based only off of advertising sold in *Peachtree Battle Living*, and Lyles used N2's computer systems to enter information for advertisers in only *Peachtree Battle Living*. Compl. ¶¶ 31-32.

**N2's Response:**

**Denied in part.    Under Lyles Franchise Agreement, N2 paid Lyles a monthly commission, which was calculated, in part, based on the amount of revenue actually received by N2 from businesses that had purchased advertising in Peachtree Battle Living. (Compl. ¶31).        In her role as an Area Director, Lyles was responsible for using the N2 Portal to enter billing and payment information for N2 advertisers that had purchased advertising in Peachtree Battle Living.  She also used PubManager to upload content for publication in Peachtree Battle Living.  (Compl. ¶ 32).**

LYLES SELLS HER FRANCHISE

16.     On August 31, 2018, Lyles sold her franchise to Craig O'Neal. Compl. ¶ 33.

**N2's Response:**

**Admitted.**

17.     N2 consented to the sale of Lyles' franchise to O'Neal. Compl. ¶ 34.

**N2's Response:**

**Admitted that N2 consented to the sale of Lyles' franchise to O'Neal as reflected in the Transfer Agreement.  (Compl. ¶ 34; *id.* Ex. B).**

18.     After O'Neal became the Area Director for the Territory, Lyles worked with O'Neal from September through November 2018 to help O'Neal publish *Peachtree Battle Living*. Compl. ¶ 36.

**N2's Response:**

**Admitted.**

19.     When Lyles had become an Area Director, N2 granted her access to its computer systems N2 Portal and PubManager, which are cloud-based software systems that Area Directors "use to manage and process customer advertising contracts and orders" and to "upload and manage files containing articles and customer advertising contracts and orders" and to "upload and management files containing articles and customer advertisements for publication in N2's magazines." Compl. ¶¶ 25-26

**N2's Response:**

**N2 admits the above, but clarifies as follows:**

**In her capacity as an N2 Area Director and franchisee, Jackie Lyles had access to both the N2 Portal and PubManager using unique login names and secure passwords, and used both systems in the ordinary course of business. (Declaration of Mike Beams ("Beams Decl.") ¶ 3.) Lyles was not issued login credentials or otherwise allowed to access N2's Portal or PubManager**

6

without first signing and returning her Franchise Agreement, which includes a confidentiality provision that substantially limited Lyles' authority to use these software systems. (Compl. Ex. A ¶ 7A; Beams Decl. ¶ 13; Affidavit of Jacqueline M. Lyles ("Lyles Aff.") ¶ 5). More specifically, Under § 7 of her Franchise Agreement, Lyles was allowed to use N2's "Confidential Information," including its trade secret information stored on N2 Portal and PubManager, "for the sole purpose" of N2's business. (Compl Ex. A ¶¶ 7A, 11D). She could not use N2's Confidential Information "for [her] own use or for any other purpose," and she could not "use or duplicate" N2's Confidential Information "in any other business[.]" (Compl. Ex. A ¶ 7). Likewise, Lyles' Franchise Agreement forbade her from accessing N2's online systems after her relationship with N2 ended. (Compl. Ex A ¶ 11). In her Franchise Agreement, Lyles agreed that "any disclosure or unauthorized use [of N2's Confidential Information] will cause irreparable loss and harm to" N2. (Compl. Ex A ¶ 7(A)).

The N2 Portal is the cloud-based software system that Area Directors use to, among other purposes, enter, process and manage customer advertising contracts and orders. (Beams Decl. ¶ 4). To access N2 Portal, each Area Director is assigned a unique username and password; Area Directors are not allowed to access the Portal unless they have signed a Franchise Agreement, including a confidentiality agreement. (Beams Decl. ¶ 4).

The customer data gathered and stored by N2 in the Portal ("Customer Data") is proprietary, confidential, and commercially valuable (Beams Decl. ¶ 5; Declaration of Nicole Geraghty ("Geraghty Decl.") ¶¶ 11–30). N2's Customer Data includes, in pertinent part, expiration dates of N2's advertising agreements with customers, contract pricing, agreement terms/duration, and other information relevant to customer contract renewals (collectively "Customer Renewal Information"). (Beams Decl. ¶ 6; Geraghty Decl. ¶¶ 11–24). Expiration dates of customer contracts are particularly valuable. N2's business model is focused on brand advertising. (Geraghty Decl. ¶¶ 11–14). Brand advertising, as compared to other marketing strategies, aims to create a consistent and sustained message about an advertiser's company, as well as its products or services. (*Id.*). Building the brand needed to make a brand advertising campaign successful requires a sustained, long-term commitment from advertisers. (*Id.*). N2 stores the expiration date of its various advertising agreements on N2 Portal so that the information is readily accessible to its franchisees/Area Directors. (*Id.*). Having ready access to expiration dates keeps Area Directors informed. (*Id.*). Keeping contract expirations and renewals top of mind is important because the best time to offer advertising to a business that it is currently on a longer-term agreement is the window of time around that agreement's expiration date. (*Id.*). At that moment, marketing dollars are becoming available, which is the critical time to get

8

in front a client to offer advertising opportunities and to increase the likelihood of a sale.

20. When Lyles sold her franchise to O'Neal, N2 could have terminated her access to N2 Portal and PubManager but chose to not do so.

**N2's Response:**

**N2 admits that it could have, but did not immediately terminate access to N2 Portal upon Lyles transfer of her Franchise to O'Neal. Ordinarily, an N2 contract specialist responsible for managing documents associated with the transfer of an N2 franchise will notify N2's technology team of a transfer and termination of the applicable franchise agreement; N2's technology team will then timely terminate the Area Director's access to N2's electronic systems, including the N2 Portal and PubManager. (Beams Decl. ¶ 18). Lyles agreed to help Craig O'Neal operate *Peachtree Battle Living* during a period of post-transfer transition between September 2018 and November 2018. Accordingly, N2 did not terminate Ms. Lyles's access to N2Portal and PubManager upon the termination of her Franchise Agreement so that she could help operate the publication during the period of transition. (Beams Decl. ¶ 19). After Lyles sold her franchise, she understood that she was still required to keep N2's information confidential. (Lyles Aff. ¶ 6; Compl. Ex. A ¶¶ 7, 11).**

21. N2 did not terminate Lyles' access to N2 Portal and PubManager until March 27, 2019. Compl. ¶¶ 42, 48.

9

**N2's Response:**

Admitted. Admitted further that Lyles's access inadvertently continued despite her no longer working with N2 in any capacity. (Beams Decl. ¶ 15). Because neither Lyles nor Mr. O'Neal notified N2 when she stopped assisting *Peachtree Battle Living* following November 2018, Lyles's login credentials and password to N2 Portal and PubManager remained active unbeknownst to N2 and its technology team. (Beams Decl. 20). Nonetheless, Lyles remained bound by the confidentiality obligations in her Franchise Agreement. (Compl. Ex. A. ¶¶ 7, 11).

22. While Lyles was helping O'Neal with *Peachtree Battle Living*, and continuing through March 2019, Lyles accessed N2 Portal and PubManager using her same N2-supplied credentials. Compl. ¶ 42 (noting access; Lifestyle disputes the allegation that the access was unauthorized).

**N2's Response:**

N2 admits that Lyles continued to access N2 Portal and PubManager via her login credentials after transferring her N2 franchise for a period that continued through March 2019. N2 denies that such access was authorized. Lyles was an authorized user and permitted to access and use of N2 Portal for the purpose of assisting in transitioning the operation of *Peachtree Battle Living* to Craig O'Neal pursuant to the Transfer and Consent Agreement. (Beams Decl. ¶¶ 17, 19). Based on the terms of her Franchise Agreement and its confidentiality provision, Lyles knew that she

10

**could not make use of N2's systems without permission and for reasons unrelated to operating *Peachtree Battle Living*. (Beams Decl. ¶ 21). Lyles understood that even after selling her franchise she was obligated to keep N2's information confidential. (Lyles Aff. ¶ 6). Lyles has never been authorized to access and use the Confidential Information on N2's systems except to conduct business to benefit her former N2 franchise. (Franchise Agreement ¶ 7; Declaration of Christine Roshto ("Roshto Decl.") ¶ 14). Lyles agreed not to use N2's Confidential Information for any other purpose and specifically agreed not to use it to benefit another business, and her confidentiality obligations continue to this date. (Franchise Agreement¶ 11).**

23.     Lyles viewed "the identity of certain of N2's clients, the nature of the ads those clients were running, the contact information for certain of N2's clients, and the identity of certain N2 clients who had not yet paid N2." Compl. ¶ 43.

**N2's Response:**

**Admitted. Admitted further that in accessing client details in the N2 Portal, Ms. Lyles would have necessarily had access to Customer Data and Customer Renewal Information, including contract expiration dates and customer pricing. (Beams Decl. ¶ 23).**

24.     Lyles viewed the identities and advertisements for 11 N2 advertisers. Compl. ¶ 44.

**N2's Response:**

Denied in part. Between the period of March 22–26, 2019 Lyles made unauthorized use of the N2 Portal to access the client details and advertising lists for 12 N2 customers. (Beams Decl. ¶ 22). Lyles had started selling advertising for Lifestyle more than a month before in February 2019. (Lyles Aff. ¶ 7). Lifestyle competes directly with N2 in the community publication business. (Compl. ¶ 9). Further, during and around the same time that Ms. Lyles accessed such customer information maintained in N2 Portal, she was also soliciting business on behalf of Lifestyle Publications, LLC from N2 advertisers. (Declaration of Katherine Miyahira ("Miyahira Decl.") ¶ 9). More specifically, between March 17, 2019, and April 8, 2019, Lyles solicited business on behalf of Lifestyle from the N2 advertisers listed in the following chart:

| N2 Client | N2 Account # | Contact in Portal | Date Contract Expired | Date Lyles First Contacted on Behalf of Lifestyle Pubs |
|---|---|---|---|---|
| 1. Mercedes Benz - Buckhead | 96745 | Donna Anderson | March 2020 | 3/21/19 |
| 2. Cunningham Associates | 81512 | Jere Smith | February 2019 | 3/21/19 |
| 3. American Leather / Verde Home | 145459 | Rico Berrios | November 2019 | 3/21/19 |
| 4. Hennessy Jaguar/Land Rover | 88620 | Mark Hennessy | June 2019 | Week of 4/1/19 |
| 5. Pharr Road Animal Hospital | 80898 | Brian Hekman | February 2019 | Week of 4/8/19 |
| 6. Leslie Hindman | 128936 | Kimberly Bloomquist | February 2019 | Week of 4/14/19 |
| 7. Ashley Battleson - Engel & Volkers | 55501 | Ashley Battleson | March 2017 | Week of 4/1/19 |
| 8. Southern Stem Cell Institute | 145776 | Richard Ambrozic | November 2019 | Week of 4/1/19 |
| 9. Catalyst Fitness | 80906 | Bill Sonnemaker | February 2019 | Week of 4/8/19 |

(Miyahira Decl. ¶ 9).

25.     Lyles viewed the "content and proofs related to multiple N2 publications circulated in Buckhead and Peachtree Battle areas of Atlanta." Compl. ¶ 46.

**N2's Response:**

**It is admitted that Lyles used PubManager to search for and view content and proofs related to multiple N2 publications circulated in Buckhead and Peachtree Battle areas of Atlanta. (Compl. ¶ 46). It is further admitted that in late March 2019, while soliciting advertising from an N2 advertiser, American Leather / Verde Home, Lyles emailed jnewman@lifestylepubs.com stating "I have attached the ad [American Leather / Verde Home] ran the last month for P'tree Battle Living." (Declaration of James V. Newman ("June 2020 Newman Decl.") Ex. 1, at N2_00023). Attached to that email was a digital copy of the American Leather / Verde Home ad that was published in the February 2019 issue of N2's *Peachtree Battle Living* surreptitiously taken from the N2 Portal. (Miyahira Decl. ¶¶ 13–14; *id* Exs. B, C).**


26.     N2 continued to supply Lyles with active credentials to N2 Portal and PubManager until March 2019. Compl. ¶¶ 48-49.

**N2's Response:**

**Denied. Lyles had active credentials until March 2019 as a matter of inadvertence under circumstance of transition, not because N2 supplied her with them. (Beams Decl. ¶ 15-18). It is expressly denied that Lyles access to**

13

N2 Portal and PubManager was authorized. To the contrary she was expressly forbidden from accessing N2 Portal and PubManager after she transferred her franchise and finished assisting O'Neal with his transition. (Compl. Ex. A, ¶¶ 7A, 11).

27. N2 continuously authorized Lyles to access N2 Portal and PubManager from the beginning of her tenure as Area Director in February 2016 until N2 terminated her access on March 27, 2019. Compl. ¶¶ 28, 48–49.

**N2's Response:**

**Denied. Lyles's use of N2 Portal and PubManager between November 2018 and March 2019 was without N2's knowledge or authority. As noted in N2's Response to paragraph 22 above, upon transfer of her Franchise and finalization of O'Neals transition into the Area Director role, Lyles was required to discontinue her use of N2's Confidential Information, including that information stored on N2 Portal and PubManager. (Compl. Ex. A, ¶ 11). Lyles confidentiality agreement forbade her from accessing and using the Confidential Information on N2's systems for any purpose other than to conduct business on behalf of N2. (Compl. Ex. A, ¶ 7; Decl. of Christine Roshto ¶ 14). Lyles agreed not to use N2's Confidential Information for any other purpose and, and her confidentiality obligations continue to this date. (Compl. Ex. A, ¶ 11).**

## LYLES BEGINS WORKING WITH LIFESTYLES PUBLICATIONS, S.E., LLC

28.     In February 2019, Lyles began working as an independent contractor for Lifestyle Publications S.E., LLC ("Publications S.E."). Ex. 2, Declaration of Jim Newman, ¶ 6.

**N2's Response:**

**Denied that Lyles worked for Lifestyle Publications, S.E., LLC ("Newman")[1] as an independent contractor. Indeed, Lifestyle's publications show that Lyles was a Lifestyle "Account Executive." (Affidavit of MaryAnne Celardo, Ex. B, at 3). On February 18, 2019, Newman emailed Lyles from his @lifestylepub.com email address offering Lyles a position selling advertising for Lifestyle. (June 2020 Newman Decl. Exs. 1, at N2_00007–8). The email included a Lifestyle Publication job application conspicuously branded with Lifestyle's logo at the top, and opens with "Thank you for your interest in Lifestyle Publications™[,]" and invites the applicant to join Lifestyle's "winning team" and promises to "provide equal employment opportunities to all…." (June 2020 Newman Decl. Exs. 3, at N2_00195, 00198–99).   Newman instructed Lyles to fill out and return the Lifestyle job application and the other attachments "so I can set you up in our company system and get your email address and cards so fill out and return when you can and of course after you decide to accept." (June 2020 Newman Decl. Ex.**

---

[1] Given that Lifestyle Publications, S.E., LLC and Lifestyle Publications LLC are confusingly similar names, that Newman owns Lifestyle Publications, S.E. LLC, and that Jim New, using an @lifestylepub.com email address, is on most every email of record, Lifestyle Publications, S.E., LLC is referred to as "Newman" for ease of reader.

1, at N2_00008.) On February 26, 2019, Newman emailed Lyles at jackie.lyles@lifestylepubs.com with copies of her new Lifestyle Publishing business cards. (June 2020 Newman Decl. Ex. 2, at N2_000083). The front of the business card read: "Jackie Lyles, Senior Account Manager, Lifestyle Publications" and lists Lyles's email address as jackie.lyles@lifestypubs.com and lists Lifestyle's web address: lifestylepubs.com. (*Id.*). The agreement between Newman and Lyles is identified as independent contractor agreement, but has a "compensation package" consisting of a $1,000 per month base salary for the first three months, is not project base, and is for an indefinite period of time. (2020 Newman Decl. Ex. 1, at N2_00042–43). Attached to Lyles "independent contractor agreement" was a covenant not to compete. (*Id.*). The covenant not to compete is not in Newman's favor but in favor of the undefined term "Magazines". (Declaration of Michelle C. Howard ("Howard Decl."), Ex. 1, at 3). Because Lifestyle's owns the magazines at issue here (Declaration of DeLand Shore ("Shore Decl.") ¶4), the non-compete restricts Lyles from competing with Lifestyles and is to Lifestyle's benefit.

Newman controlled Lyles day-to-day duties and trained her on core tasks of the sales job. For example, Newman training Lyles on her phone script to solicit sale for Lifestyles (June 2020 Newman Decl. Ex. 2, at N2_000096–97), sought his approval for sales proposals (June 2020 Newman Decl. Ex. 2, at N2_000095), and went on sales calls with her (*See e.g.*, *id,* Ex.

16

1, N2__000003). Newman specifically directed that Lyles target certain "categories" of business. (June 2020 Newman Declaration, Ex. 1, at N2_000039). Moreover, he directed Lyles on the solicitation of the Cunningham Associates account, including drafting a response on how to respond to Cunningham Associate's concerns with the length of a 36-month advertising agreement. (June 2020 Newman Decl. Ex. 1, at N2_000020). Newman also instructed her on the categories of businesses that Lyles should focus on. (June 2020 Newman Decl. Ex. 2, at N2_000143).

29. Publications S.E. is an independent contractor for Lifestyle. Ex. 2, Declaration of Jim Newman, ¶ 5.

**Plaintiff denies that Publications S.E. is an independent contractor for Lifestyle. Jim Newman and Publications S.E. are agents of Lifestyle whom act on Lifestyle's behalf and whom Lifestyle controls. For example, Lifestyle has vast discretion and control over how Publications S.E. operates its business and "may reject any Publication and Advertising Contracts" Lifestyle S.E. enters into "for any reason whatsoever[.]" (Lifestyle S.E. Independent Publisher Agreement ¶ 5). Publications S.E. can only solicit business from advertisers at "such prices and terms as are set by Lifestyle[.]" (*Id.* at ¶ 5(i)). In fact, Publications S.E. cannot approve or execute any of the Advertising Contracts Publications S.E. obtains. Instead, Publications S.E. has a duty to have all advertising contracts it obtains**

reviewed, approved, and executed by Lifestyle. (*Id.* at ¶ 5(ii)). Moreover, those Advertising Contracts show that Newman is merely an "Account Manager," not an independent businessman. (June 2020 Newman Declaration, Ex. 1, at N2_00030; Geraghty Declaration, Ex. 2). At any rate, Lifestyle prepares proofs of its publications, which Publications S.E. merely reviews. (June 2020 Newman Declaration, Ex. 1, at N2_00035).

Newman holds himself out as a part of Lifestyle. More specifically, Newman uses Lifestyle's trademark, trade name, and magazine covers in his email signature. (June 2020 Newman Declaration, Ex. 1, at N2_00036, 00039).

Lifestyle's control of Publications S.E. is also shown in the way Lifestyle's CFO Deland Shore and Lifestyle's counsel Carrie Francis directed and instructed Publications S.E. and Jim Newman to respond to N2's subpoena duces tecum in this matter. (June 2020 Newman Decl. Ex. 2, at N2_000152–60). Newman sought and received direction from Deland Shore on the dispute with N2, including having Lifestyle review his proposed emails (June 2020 Newman Decl. Ex. 2, at N2_000152) and receiving instruction on how to avoid responding to N2's subpoena. In fact, Deland Shore instructed Newman "[y]ou can object to [N2's] subpoena because a NC court cannot order compliance…" (June 2020 Newman Decl. Ex. 2, at N2_000157) and to "[j]ust let him know you are not represented…. You have given them what they asked for and haven't felt the need for representation." (June 2020 Newman Decl. Ex. 2, at N2_000162). At a

different time, though, Lifestyle's instruction caused Newman to instead believe or claim that he was in fact represented by Lifestyle's counsel, such as when Newman, copying Lifestyle and its attorney, informed N2's counsel via email that "As I shared previously on the advise [sic] of attorney I have already supplied information requested in subpoena. I will be [sic] continue to follow her advise regarding this matter." (June 2020 Newman Decl. Ex. 2, at N2_000167).

Lifestyle's control over Newman in this litigation is merely operational, but financial. Lifestyle is requiring Publications S.E. to pay a portion of Lifestyle's legal fees associated with this action. (June 2020 Newman Declaration, Ex. 2, at N2_000160). And it has proposed splitting the fees associated with its Motion for Summary Judgment. (June 2020 Newman Declaration, Ex. 2, at N2_000172).

30.     Publication S.E. never consulted with Lifestyle before contracting with Lyles. Ex. 1, Declaration of DeLand Shore, ¶ 11.

**N2's Response:**

**Denied. Lyles submitted a Lifestyle job application so that Newman could get her set up in the "company system", which resulted in Lifestyle creating her Lifestyle-branded business cards and providing her with the a Lifestyle email address: jackie.lyles@lifestypubs.com. (June 2020 Newman Decl. Ex. 1, at N2_00007–08).**

31.     Publications S.E. publishes four magazines, *Alpharetta Lifestyle*, *BuckHaven Lifestyle*, *Johns Creek Lifestyle*, and *Perimeter North Lifestyle*. Ex. 2, Declaration of Jim Newman, ¶ 3.

**N2's Response:**

**Admitted in part. Lifestyle owns and publishes *Alpharetta Lifestyle*, *BuckHaven Lifestyle*, *Johns Creek Lifestyle*, and *Perimeter North Lifestyle*. (Shore Decl. ¶¶ 4–6).**

32.     None of these magazines specifically target the Peachtree Battle area. Ex. 2, Declaration of Jim Newman, ¶ 4.

**N2's Response:**

**N2's Response:   Denied. While selling advertising for publication in *Alpharetta Lifestyle*, *BuckHaven Lifestyle*, *Johns Creek Lifestyle*, and *Perimeter North Lifestyle* Lifestyle, Lyles called on a number of businesses that advertised in N2's *Peachtree Battle Living*. (Miyahira Decl. ¶ 9). Furthermore, on March 21, 2019, Lyles copied Newman on an email with the "Subject: story ideas from a potential client and resident in 30305 (Peachtree Battle)." (June 2020 Newman Decl. Ex. 2, at N2_000102).**

### N2'S CUSTOMER ASKS LYLES FOR A COPY OF ITS AD

33.     On March 28, 2019, Lyles contacted N2 from her personal email address, stating that she used to work for N2 and was "retired," and that a N2 client had contacted her for a copy of an advertisement that it had run in the February 2019 issue of *Peachtree Battle Living*. Compl. Ex. C Ex. A.

**N2's Response:**

Admitted in part. On March 28, 2019 at 11:35 AM, Newman emailed Lyles at jackie.lyles@lifestypubs.com congratulating her on her "first contract" and stating "*I just need you to find and send [Cunningham's] past ad to me and I will show you how we then upload for the ad design team.*" (June 2020 Newman Decl. Ex. 2, at N2_000112) (emphasis added). Less than an hour after receiving Newman's instruction to get the Cunningham Associates ad, Lyles, using her [jackielyles@att.net](mailto:jackielyles@att.net) email address instead of her @lifestypubs.com address (which all the records show was not in the ordinary course of business for her), emailed N2's Support team saying: "I used to work for n2 and 'retired' recently. (June 2020 Newman Decl. Ex. 2, at N2_000110). Her email did not disclose that she worked for Lifestyle. (*Id.*). The email does not state that Cunningham Associates contacted her. (*Id.*). Lyles subsequently emailed the Cunningham Associates advertisement to Newman. Newman thus knew that Lyles was using her old business relationships, and N2's old ad. (June 2020 Newman Decl., Ex. 1, atN2_00027–28).

34. Lyles copied the customer, Cunningham Associates, on the email, and asked N2 to email Jere Smith, the Cunningham contact, a copy of the ad. Compl. Ex. C Ex. A.

**N2's Response:**

**Admitted.**

21

35.    Kate Silberfeld of N2 responded and emailed a copy of the ad only to Lyles, who responded and said she would forward to Cunningham. Compl. Ex. C Ex. A.

**N2's Response:**

**Admitted.  Admitted further that Ms. Silberfeld relied on Lyle's statement that she was "retired" and, wanting to help, Ms. Silberfeld provided Lyles with a PubManager link so she could pull only the requested advertisement directly. (Affidavit of Kate Silberfeld ("Silberfeld Aff.") ¶ 8). Ms. Silberfeld did not know Lyles was working for Lifestyle when she provided the ad to her.  (Silberfeld Aff. ¶ 9.)  Had Lyles contacted N2 using an @lifestylepubs.com email address or otherwise disclosed that she was working with Lifestyle Publications, Ms. Silberfeld would not have provided her the Cunningham advertisement. (Silberfeld Aff. ¶ 10).**

## LIFESTYLES AND PUBLICATIONS S.E. DID NOT DIRECT OR CONTROL LYLES' ACTIONS

36.    Until N2 initiated this litigation, Lifestyle never knew of the existence of any contracts between Lyles and N2, including the Franchise Agreement. Ex. 1, Declaration of DeLand Shore, ¶ 12.

**N2's Response:**

**Denied.  Lifestyle's agent Jim Newman hired Lyles and knew that Lyles had worked as an N2 franchisee (Lyles Aff. ¶ 8) and discussed her non-**

compete with N2 in relation to her job selling Lifestyle advertising (June 2020 Newman Decl. Ex. 2, at N2_000154).

37.     No one employed at Lifestyle ever directed Lyles to access N2's computer systems or to solicit customers of N2. Ex. 1, Declaration of DeLand Shore, ¶ 14.

**N2's Response:**

**Denied. In the course of scope of soliciting Cunningham Associates to purchase advertising from Lifestyle in a Lifestyle publication, Newman, as Lyles's supervisor, instructed her to "find and send" a copy of Cunningham's N2 ad, which she then secured from N2 through deceit. (June 2020 Newman Decl. Ex. 1, at N2_000024--26). The record also shows that in the course of scope of soliciting another N2 advertiser, American Leather / Verde Home, to purchase advertising from Lifestyle in a Lifestyle publication and for Lifestyle's direct financial benefit, Lyles pulled a digital copy of the American Leather / Verde Home advertisement from the N2 Portal and then forwarded it to Newman stating "I have attached the ad [American Leather / Verde Home] ran the last month for P'tree Battle Living." (June 2020 Newman Decl. Ex. 1, at N2-000023; *see also* Miyahira Declaration ¶¶ 13–14).**

38.     Publications S.E. never directed Lyles to access N2 Portal. Ex. 2, Declaration of Jim Newman, ¶ 9.

**N2's Response:**

**Denied. See response to Paragraph 37 above.**

23

39.     Publications S.E. never directed Lyles to solicit any of N2's customers. Ex. 2, Declaration of Jim Newman, ¶ 10.

**N2's Response:**

**Denied. Newman worked closely with and managed the process by which Lyles solicited N2 customers, including instructing her how to respond to Cunningham's objections to 36-month advertising agreement and attending sales meeting with Lyles. (See e.g., June 2020 Newman Decl. Ex. 1, at N2_000020, N2_000023, N2_000026).**

40.     In May 2019, one of the publications operated by Lifestyle Publications S.E., LLC, Buckhaven Lifestyles, ran an advertisement for Cunningham Associates. Ex. 2, Declaration of Jim Newman, ¶ 11.

**N2's Response:**

**N2's Response: Admitted that in May 2019 Cunningham Associates advertisement was published in *Buckhaven Lifestyles*, a publication operated by Newman, but owned and published by Lifestyle. (Shore Decl. ¶¶ 4, 6). The advertising agreement under which the Cunningham ad was published is between Lifestyle and Cunningham Associates, with all monies owed under the agreement being payable to Lifestyle. (June 2020 Newman Declaration Ex. 2, at N2_000112–114).**

41.     No one employed by Publications S.E. knew that Ms. Lyles was contractually prohibited from soliciting Cunningham Associates. Ex. 2, Declaration of Jim Newman, ¶ 12.

**N2's Response:**

Denied. Newman knew that Lyles had been an N2 franchisee (Lyles Aff. ¶ 8), had specifically talked to her about her possible obligations under her N2 franchise agreement (June a Decl. Ex. 2, N2_00t 0154), and had previously caused Lyles to sign a non-compete and non-solicit in favor of Lifestyle (Howard Decl., Ex. 1, at 3).

42.     Publications S.E. never directed Lyles to contact N2 to obtain any copy of an ad for Cunningham. Ex. 2, Declaration of Jim Newman, ¶ 12.

**N2's Response:**

Denied. Newman specifically instructed Lyles to "find and send there [sic] past ad to me" (June 2020 Newman Decl. Ex. 2, at N2_000112). Within hours of instructing Lyles to get a copy of the Cunningham ad, Lyles provided a copy of the ad to Newman while also forwarding to Newman a copy of her email to N2 in which she falsely claimed to be "retired" and using her personal email instead of her @lifestylepub.com account. (June 2020 Newman Decl. Ex. 2, at N2_000110–11). Upon receiving the Cunningham ad and Lyle's deceitful email to N2, Newman did nothing other than accept the benefit of the deceit by proceeding under the advertising agreement with Cunningham.  (June 2020 Newman Decl. Ex. 2, at N2_000110–14; Declaration of James V. Newman, D.E. 43-2, ¶ 11).

25

43. Publications S.E. never directed Lyles to solicit any of N2's customers using any of N2's confidential information or trade secrets. Ex. 2, Declaration of Jim Newman, ¶ 12.

**N2's Response:**

**Denied in part. Lyles was acting in the course and scope of doing Lifestyle's business, in Lifestyle's name, for Lifestyle's direct financial benefit (June 2020 Newman Decl. Ex. 1, at N2_000018–20, 000024–30) when she accessed N2 Portal and used it without permission to access clients that included contract expiration dates and renewal information. (*See, e.g.*, Beams Decl. ¶¶ 21-25). Lifestyles has also knowingly retained the benefit of the Cunningham ad that was the product, at least in part, of Lyles using expiration information taken from the Portal to target and close the sale. (Geraghty Decl. ¶¶29, 30). Further, Newman controlled Lyles's during the Cunningham sale by instructing her how to respond to the client's objections and concerns (June 2020 Newman Decl. Ex. 1, at N2_000020), attending the sales meetings (*see, e.g.*, June 2020 Newman Decl. Ex. 1, at N2_000026), and instructing her to get Cunningham's N2 ad to facilitate closing the sale. (June 2020 Newman Decl. Ex. 2, at N2_000112).**

44. Publications S.E. has never had in its possession any information obtained through Lyles from N2 Portal or PubManager. Ex. 2, Declaration of Jim Newman, ¶ 14.

**N2's Response:**

**Denied. Newman received and was in actual possession of a digital copy of the American Leather / Verde Home advertisement that Lyles took without permission from PubManager. See N2's response to Paragraph 25 above.**

45.     Publications S.E. has never had any of N2's confidential information or trade secrets in its possession. Ex. 2, Declaration of Jim Newman, ¶ 14.

**N2's Response:**

**Denied. Lyles, at Newman's instruction, maintained and shared with Newman a progress report (the "Progress Report") that tracked her efforts to solicit and sell advertising for Lifestyle. (June 2020 Newman Decl. Ex. 1, at N2_000046). The Progress Report documents the twenty-eight businesses that she solicited during the weeks of 3/17/19, 4/1/19, 4/8/19 and 4/14/19. (June 2020 Newman Decl. Ex. 1, at N2_000046) Of the 28 businesses listed on the Progress Report, nine were N2 advertisers. (Geraghty Decl. ¶ 29).  Of those nine N2 advertisers, four—Cunningham Associates, Pharr Road Animal Hospital, Leslie Hindman, and Catalyst Fitness—had expired only weeks before, in February 2019. A fifth account, Hennessy Jaguar/Land Rover, was set to expire just 2 months later, in June 2019. (Geraghty Decl. ¶ 29) The timing of these solicitations on behalf of Lifestyle Publications indicate that Lyles knew when those N2 accounts had expired or were set to expire, and then targeted those accounts using that knowledge. (Geraghty Decl. ¶ 29).**

**Except for use of her personal email address to deceive N2 into providing the Cunningham ad, Lyles regularly used her @lifestylepub.com email address to solicit advertisers on behalf of Lifestyle (see generally June 2020 Newman Decl. Exs. 1–3). Because Lyles used her @lifestylepub.com email account to solicit, on Lifestyle's behalf, N2's advertisers that she was specifically targeting based on contract expiration dates maintained in N2 Portal (*See, e.g.*, June 2020 Newman Decl. Ex. 1, at N2_00019–20, 00023), N2's confidential information and trade secrets would have likely existed on the servers hosting Lifestyle's email accounts. N2 is entitled to an inference that its confidential information and trade secretes were included in Lyles's @lifestylepub.com email account, which Lifestyle controlled, given that Lifestyle, at Newman's instruction, deleted Lyles's @lifestylepub.com during the pendency of this action. (June 2020 Newman Decl. Ex. 2, at N2_000156).**

46.     Lyles never shared with Publications S.E. any confidential information or trade secrets that she had obtained from N2. Ex. 2, Declaration of Jim Newman, ¶ 15.

**N2's Response:**

**Denied. In the course and scope of selling advertising for Lifestyle, Lyles actually used confidential information and trade secrets, such as contract expiration dates (Geraghty Decl. ¶¶ 26-31). Lyles use of such information, which resulted in at least Cunningham's advertising agreement with Lifestyle (June 2020 Newman Decl. Ex. 1, at N2_000030). The**

total contract value of Lifestyle's Cunningham ad agreement is $27,000. (Geraghty Decl. ¶ 32).

47.    Until this litigation, Publications S.E. never knew that Lyles had accessed N2's computer systems while under contract with Publications S.E. Ex. 2, Declaration of Jim Newman, ¶ 9.

**N2's Response:**

**Denied. On March 28, 2019, Lyles emailed a digital copy of the American Leather / Verde Home ad that was published in the February 2019 issue of N2's *Peachtree Battle Living* (June 2020 Newman Decl. Ex. 1, at N2_000023), and which she surreptitiously took from the N2 PubManager. (Miyahira Decl. ¶¶ 13, 14.) Lyles specifically informed Newman: "I have attached the ad they ran last month in P'tree Battle Living. Please see below." (June 2020 Newman Decl. Ex. 1, at N2_000023).**

48.    Lifestyle has never directed Lyles to solicit N2's customers. Ex. 1, Declaration of DeLand Shore, ¶ 14.

**N2's Response:**

**Denied.  The acts or knowledge of Lifestle's agent Newman are imputed to Lifestyle.  Based on the progress reports that Lyles was submitting to Newman (see e.g., June 2020 Newman Decl. Exs. 1–2, at N2_000046, N2_000108),  Newman and Lifestyle knew or should have known that Lyles was soliciting her former N2 customers. Further, Lyles shared both story and advertising leads with Sue Collins, an editor for Lifestyle.**

(June 2020 Newman Declaration, Ex. 1, N2_00018).  Lifestyle has knowingly retained and ratified the financial benefit of Lyle's solicitation of Cunningham Associates. (Shore Decl. ¶ 19; June 202 Newman Decl. Ex. 1, at N2_000030).

49.    Lifestyle has never directed Lyles to obtain any of N2's confidential information or trade secrets. Ex. 1, Declaration of DeLand Shore, ¶ 18.

**N2's Response:**

**Denied in part.  Lifestyle, through Newman, hired Lyles to sell advertising in its publications.  Lyles was acting in the course and scope of her authority to solicit advertising business on Lifestyle's behalf, in Lifestyle's name, for Lifestyle's direct financial benefit (see e.g., June 2020 Newman Decl. Ex. 1, at N2_000018–20, 000024–30) when she accessed N2 Portal and used it without permission to access clients that included contract expiration dates and renewal information. (See e.g., Beams Decl. ¶¶ 21-25).  Lifestyles has also knowingly retained the benefit of the Cunningham ad that was the product, at least in part, of Lyles using expiration information taken from the Portal to target and close the sale. (Geraghty Decl. ¶¶29, 30).**

50.    Lifestyle never directed Lyles to contact or mislead N2 regarding obtaining a copy of the Cunningham ad. Ex. 1, Declaration of DeLand Shore, ¶ 20.

**N2's Response:**

Denied. In the course and scope of doing Lifestyle's business, in Lifestyle's name, for Lifestyle's direct financial benefit, Lifestyle's affiliated company (Shore Decl. ¶ 5) and agent, Jim Newman, instructed Lyles to "find and send" a copy of Cunningham's N2 ad, which she then secured from N2 through deceit. (June 2020 Newman Decl. Ex. 1, at N2_000024–26). She then forwarded to Newman her deceptive email to N2 and the Cunningham ad thus giving him actual notice and knowledge of the means she used to get the ad from N2. (June 2020 Newman Decl. Ex. 1, at N2_000024–26). Lyles's Progress Report for Lifestyle notes Lyles believed "the art cost [was] now bothering [Cunningham]" (June 2020 Newman Decl. Ex. 1, at N2_000046). Cunningham's advertising agreement shows that Lifestyle agreed to waive the ad design fee (i.e., the art cost Cunningham was worried about) to help close the sale. (June 2020 Newman Decl., Ex. 1, at N2_000030, including handwritten note "One Time Free Design"). Being able to help a prospective advertiser avoid an ad design fee, provides a competitive advantage and helps close sales. (Geraghty Decl. ¶ 43). Further, Lifestyle was able to avoid incurring ad design expenses by using the Cunningham ad that N2 designed and holds rights to, and help close the sale by waiving the design fee. (Geraghty Decl. ¶ 43). The value of the N2-designed Cunningham ad, as measured by the ad design fee that N2 typically charges new advertisers, is $499.00. (Geraghty Decl. ¶ 48). N2 has suffered economic injury as a result of Lifestyle Publications using artwork created by N2—the Cunningham

ad—to offer free ad design services to Cunningham ((Geraghty Decl. ¶ 47.) Although it is difficult to provide a precise value of N2's injury resulting from Lifestyle having unfairly used N2's Cunningham ad to solicit and negotiate an ad agreement with Cunningham, $499.00 is an appropriate value of the ad itself. (Geraghty Decl. ¶¶ 48-50). In addition to $499.00 design value of the Cunningham ad, Lifestyle Publication benefited financially from its unfair and anti-competitive use of the ad to overcome Cunningham's reluctance to pay an ad design fee and which directly contributed to consummation of the Cunningham ad agreement, which has and will yield profit to Lifestyle ranging between, at a minimum, $3,240 (12% of $27,000) and $4,050 (15% of $27,000). (Geraghty Decl. ¶ 50).

51.    Lifestyle has never had in its possession any of N2's confidential information or trade secrets. Ex. 1, Declaration of DeLand Shore, ¶ 22.

**N2's Response:**

 Denied. See N2's response to Paragraph 50 above. Further, Lifestyle's use of and benefit from N2's confidential expiration dates helped Lifestyle target and close the Cunningham sale. N2 was harmed by Lifestyle Publication's use of N2's contract expiration dates and term and pricing information to target and solicit N2's current and former advertisers, including Cunningham. (Geraghty Decl. ¶41). N2 has suffered economic injury as a result of Lyles and Lifestyle Publications using the expiration dates of specific N2 customer accounts, including Cunningham, to target

those accounts. **(Geraghty Decl. ¶46). It is difficult to provide a total and precise valuation of N2's damages that resulted from Lifestyle Publications' unfair and anti-competitive conduct. (Geraghty Decl. ¶ 49). In addition to $499.00 design value of the Cunningham ad, Lifestyle Publication benefited financially from its unfair and anti-competitive conduct in that it resulted in consummation of the Cunningham Associates ad agreement attached here as Exhibit B, which has and will yield profit ranging between, at a minimum, $3,240 (12% of $27,000) and $4,050 (15% of $27,000). (Geraghty Decl. ¶ 49).**

52.     No one employed by Lifestyle knew that Ms. Lyles was contractually prohibited from soliciting Cunningham Associates. Ex. 1, Declaration of DeLand Shore, ¶ 20.

**N2's Response:**

**Denied. Lifestyles, through Newman, knew that Lyles had worked as an N2 franchisee (Lyles Aff. ¶ 8), had discussed her non-compete with N2 in relation to her job selling Lifestyle advertising (June 2020 Newman Decl. Ex. 2, at N2_000154) and knew or reasonably should have known that Lyle's N2 franchise agreement included a non-solicit.**

53.     No one employed at Lifestyle knew prior to this litigation that Ms. Lyles had accessed N2's computer systems while contracted with Publications S.E. Ex. 1, Declaration of DeLand Shore, ¶ 14.

**N2's Response:**

**Denied. Lyles used her @lifestylepub.com email addresses to forward a digital copy of the American Leather / Verde Home ad that was published in the February 2019 issue of N2's *Peachtree Battle Living* (June 2020 Newman Decl. Ex. 1, at N2_000023), and which she surreptitiously took from the N2 PubManager. (Miyahira Decl. ¶¶ 13–14).**

This 25th day of June, 2020.

> */s/ Chris S. Edwards*
> Alex C. Dale
> N.C. State Bar I.D. No.: 028191
> email: acd@wardandsmith.com
> Christopher S. Edwards
> N.C. State Bar I.D. No.: 48385
> email: csedwards@wardandsmith.com
> For the firm of
> Ward and Smith, P.A.
> Post Office Box 7068
> Wilmington, NC 28406-7068
> Telephone: 910.794.4800
> Facsimile: 910.794.4877
> Attorneys for Plaintiffs